D. Angus Lee, OSB No. 213139
ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99 Suite 200
Vancouver, WA  98665
P. 360-635-6464
Angus@AngusLeeLaw.com

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| RENE GONZALEZ, an individual, and FRIENDS OF RENE GONZALEZ, a political committee,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PORTLAND, a municipal corporation; SIMONE REDE, in her official capacity as City Auditor; and REED BRODERSON, in his official capacity as Deputy City Auditor,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:** 3:26-CV-00670<br><br>**1) Damages Under 42 U.S.C. § 1983**<br>**2) Attorney Fees and Costs Under 42 U.S.C. § 1988** |

For his complaint, plaintiff, RENE GONZALEZ, by and through undersigned counsel, allege as follows:

## I.    INTRODUCTION

1.1    This is a civil rights action under 42 U.S.C. § 1983 to remedy the use of City of Portland Charter § 3-305 enforcement process, an unconstitutional enforcement process, which imposed serious financial penalties without the procedural safeguards required by the United States Constitution.

Page 1:  COMPLAINT

1.2    An Oregon state trial court has already ruled, in a final and unappealed decision, that City of Portland's enforcement process Defendants used against Plaintiff violated Plaintiff's Fourteenth Amendment right to procedural due process. That decision is attached as Exhibit A. Although the state court could address the violation in that case, it did not have authority in that action to award Plaintiff damages for the constitutional harm Defendants inflicted.

1.3    Defendants have had sufficient opportunity to appeal the state court's ruling that the process was unconstitutional. They did not.

1.4    Plaintiff seeks damages for the unconstitutional enforcement action imposed on him and his campaign.

## II.    PARTIES

2.1    Plaintiff RENE GONZALEZ is an individual residing in Multnomah County, Oregon.

2.2    Friends of Rene Gonzalez, formerly known as Rene for Portland, is the official campaign committee for Rene Gonzalez and was such at all relevant times.

2.3    Defendant CITY OF PORTLAND is a municipal corporation and political subdivision of the State of Oregon.

2.4    Defendant AUDITOR SIMONE REDE is, and at all relevant times was, the elected City Auditor for the City of Portland. The Auditor and the Auditor's Office are responsible for the administration and enforcement of campaign finance regulations in City of Portland elections. At all relevant times, the Auditor was the final policymaker for the Auditor's Office with respect to the challenged enforcement process. Auditor Rede is sued in her official capacity.

2.5     Defendant Deputy Auditor Reed Broderson is, and at all relevant times was, a Deputy City Auditor for the City of Portland. Deputy Auditor Broderson is sued in his official capacity.

2.6     At all relevant times, the conduct of Defendants alleged herein was taken under color of state law, in the purported performance of official duties.

### III.     JURISDICTION AND VENUE

3.1     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

3.2     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants reside in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.

### IV.     FACTUAL ALLEGATIONS

4.1     Plaintiff Rene Gonzalez, and his campaign Friends of Rene Gonzalez, participated in the City of Portland's Small Donor Elections ("SDE") program during the 2024 election cycle. Plaintiff's authorized campaign committee participated in the SDE program and complied with the SDE program's audit, verification, and reporting requirements.

4.2     The City's governing law is unequivocal that SDE-participating candidates may receive any amount the SDE system allows. Portland City Charter § 3-304 provides that "a candidate participating in a government system of public funding of campaigns … may receive any amount that such system allows a participating candidate to receive." (emphasis added).

Page 3:   COMPLAINT

4.3    The City Auditor's own administrative rules likewise confirm that SDE participants are eligible to receive amounts authorized by the SDE program. Portland City Auditor Administrative Rules, ARA-13.03(B)(1), Complaints Involving Small Donor Election Program Participants, states: "Candidates participating in the City's public funding of campaigns program, known as the Small Donor Elections program, are eligible to receive any amount of money based on that program's rules."

4.4    The SDE Administrative Rules further provide that the SDE program is the City's ultimate arbiter of whether an SDE-participating candidate violated SDE requirements. The SDE Administrative Rules state: "The Small Donor Elections program will be the ultimate arbiter at the City of Portland of whether a participating candidate violated the requirements or rules of the Small Donor Elections program." SDE Administrative Rules, Ch. 2.16(15)(C) (emphasis added).

**A. Online fundraising, serial contributions, and the SDE program's guidance**

4.5    Plaintiff's campaign received the majority of its contributions through online, credit card based donation tools used by modern campaigns. Those tools do not reliably automatically prevent a donor from making multiple contributions over time that, in the aggregate, exceed the applicable cap, because the donation system cannot always determine whether the donor previously contributed through a different transaction, date, or channel in a manner that would cause a subsequent donation to exceed a cap.

4.6    Like other campaigns, Plaintiff's campaign encountered instances in which donors made multiple transactions, resulting in an aggregate amount that, at least temporarily, exceeded the applicable cap, even though the campaign did not solicit

Page 4:   COMPLAINT

unlawful contributions and did not intend to retain any amount above what the program permitted.

4.7    Plaintiff's campaign did what responsible campaigns do when such issues arise, it proactively engaged with the City's SDE program to ensure compliance and to cure any overages promptly.

4.8    In 2024, Plaintiff's campaign manager, Amy Wood, communicated with Susan Mottet of the SDE program regarding excess or over-the-limit donations and how the SDE program treated them when identified and refunded. In that communication, Ms. Mottet confirmed, in substance, that the SDE program had discretion, that the SDE program primarily wanted to see refunds, and that the SDE program treated excess donations as permissible loans up to $5,000 until repaid, specifically:

- "Small Donor Program has discretion; we just like to see refunds."
- In response to whether SDE viewed excess donations as loans: "That's correct. We decided to treat it as a loan up to $5k."

4.9    Consistent with that guidance, the campaign did not attempt to retain over-limit amounts. Instead, it treated excess amounts as needing to be returned, and it began refunding excess amounts when identified. The campaign did not need loans, and it worked to refund excess amounts as soon as practicable.

4.10    Beginning in or about May 2024, while seeking SDE verification, Plaintiff's campaign disclosed to the SDE program the existence of serial contributions and the campaign's efforts to refund them when discovered. The campaign continued disclosing these issues through the verification process until it received SDE verification and matching funds on or about July 22, 2024.

4.11    The SDE program's guidance to the campaign remained consistent and clear: serial contributions returned to donors when identified would be treated as

Page 5:   COMPLAINT

permissible loans under the SDE program so long as the aggregate amount did not exceed $5,000.

4.12    To obtain and retain SDE eligibility, Plaintiff's campaign, like every SDE campaign, was subject to SDE scrutiny, including audit and verification processes that necessarily revealed the serial contributions and the timing of refunds. The City's SDE program was therefore aware of the serial contributions and the campaign's refund efforts well before the City Auditor imposed the challenged enforcement action.

4.13    On information and belief, the SDE program has never treated belatedly refunded serial contributions, returned when identified, as a violation of SDE program rules. On information and belief, the City Auditor has enforced its contrary interpretation only against Plaintiff.

### B. The Auditor ignored mandatory SDE consultation and issued a determination without SDE input

4.14    The City Auditor's own rules govern how the Auditor is to proceed when a complaint involves alleged violations of both the SDE program and the City's campaign finance regulations.

4.15    ARA 13.03(B)(2) directs that, if a complaint is submitted involving alleged violations of both the SDE program and City campaign finance regulations, the Auditor's Office may do one or both of the following:

a. Refer the complaint to the SDE program for its own investigation, or

b. Submit a consultation question to the SDE program for an advisory determination as to whether relevant circumstances would violate SDE rules, and the Auditor "may rely" on that advisory determination in assessing whether a campaign finance violation occurred.

4.16    Because SDE-participating candidates may receive any amount the SDE program allows, and because the SDE program is the City's "ultimate arbiter" of SDE

Page 6:   COMPLAINT

compliance, the Auditor could not lawfully decide SDE compliance questions in a vacuum. At minimum, constitutionally adequate and legally correct decision making required that the Auditor refer the matter to the SDE program or obtain an advisory determination addressing whether the challenged contributions and refunds violated SDE rules.

4.17    In the serial contributions matter, the City Auditor did not meaningfully refer the matter to the SDE program and did not obtain the SDE program's advisory determination addressing whether the serial contributions and refunds were permissible under SDE rules.

4.18    On November 13, 2024, the City Auditor, acting through Chief Deputy Auditor Reed Brodersen, issued Determination 2024-09-RG against Rene Gonzalez and Rene for Portland, wrongly determining that they had violated applicable campaign-finance rules and imposing a monetary penalty without the required SDE program input.

4.19    In Determination 2024-09-RG, Deputy Auditor Reed Brodersen fined Rene Gonzalez and Rene for Portland $9,180 without providing a hearing.

4.20    Had the Auditor asked the SDE program to determine whether the serial contributions at issue in Determination 2024-09-RG violated SDE program rules, the SDE program would have advised the Auditor of its position regarding belatedly refunded serial contributions, an issue that multiple campaigns had already raised with the SDE program.

4.21    On information and belief, the Auditor avoided seeking the SDE program's advice or avoided creating a record of those communications because the Auditor knew

Page 7:   COMPLAINT

the SDE program was aware of Plaintiff's serial contributions and did not perceive belatedly refunded serial contributions as a violation of SDE program rules.

### C. The Auditor's Redetermination Process Functioned as a Punitive Adjudication Without Basic Due Process Protections

4.22   Earlier, on October 21, 2024, the City Auditor, acting through Chief Deputy Auditor Reed Brodersen, had issued Redetermination 2024-01-RG against Rene Gonzalez.

4.23   In Redetermination 2024-01-RG, Deputy Auditor Reed Brodersen fined Rene Gonzalez $2,400 without providing a hearing.

4.24   In Redetermination 2024-01-RG, the Auditor issued an initial no-violation determination, then withdrew that determination and reissued a new adverse determination.

4.25   The Auditor further acknowledged it possessed subpoena authority but elected not to use it.

4.26   The process thus allowed Defendants to investigate, accuse, decide, publicly issue a determination, reopen the matter, and reverse course, all without providing Plaintiff any evidentiary hearing, sworn testimony, or cross-examination.

4.27   In Redetermination 2024-01-RG, Defendants did not merely find a violation. They also wrongly publicly accused Plaintiff and his staff of attempting to interfere with the investigation and of misleading investigators, and expressly relied on those allegations as aggravating factors to increase the penalty beyond the mandatory minimum.

Page 8:   COMPLAINT

4.28    The process therefore operated not as a neutral administrative screening mechanism, but as a punitive, reputation-damaging adjudication issued without the ordinary safeguards that accompany serious factual accusations.

4.29    These determinations also illustrate the standardless discretion built into the challenged enforcement process. In one matter, Defendants stated that Plaintiff cooperated with the investigation. In another, Defendants accused Plaintiff and his staff of interference and misleading conduct and used those accusations to justify a higher multiplier penalty. The same office thus acted as investigator, evaluator of credibility, determiner of aggravation, adjudicator of liability, and assessor of punishment, all without a neutral evidentiary hearing.

**D. The punitive enforcement mechanism and the absence of constitutionally required procedure**

4.30    The City's enforcement mechanism, City of Portland's Charter § 3-305 enforcement process, authorizes punitive monetary penalties calculated as a multiplier of an alleged overage, including multipliers as high as twenty times the asserted unlawful amount. Under this multiplier regime, a campaign can face severe penalties that are untethered to culpability, intent, or practical ability to prevent third-party transactions, and can be imposed without any evidentiary hearing.

4.31    In practical terms, the multiplier regime creates extreme and foreseeable risk of catastrophic penalties. For example, if a donor makes online donations that exceed the cap by $5,000 in the aggregate, a twenty-times multiplier could yield a penalty of $100,000, even where the campaign did not solicit unlawful funds, did not know of the overage when a transaction occurred, and was attempting to refund the overage.

4.32   The City's Charter § 3-305 enforcement process provides no constitutionally adequate safeguard before these severe penalties are imposed. The City does not provide a meaningful pre-deprivation hearing, does not provide a meaningful post-deprivation hearing, and does not provide fundamental adversarial protections such as sworn testimony and cross-examination, even though the City's own legislative framework shows hearings are feasible and available in comparable contexts.

4.33   The enforcement process also imposes compressed, campaign-disruptive response deadlines. Under the City Charter § 3-305 enforcement process, the response timeline is shortened during the final 30 days before an election, including reducing the response period to five business days. This is substantially less time than is typically provided to respond to the initiation of litigation or other high-stakes legal process, and it creates a heightened risk of error precisely when a candidate has the greatest need to focus on campaigning.

4.34   In Plaintiff's case, the compressed timeline forced the campaign to divert scarce time and resources away from the campaign's final push and into defending against an aggressive and high-stakes enforcement action under a process that did not provide due process.

4.35   In at least one of the key matters involving Plaintiff, the response deadline fell on or immediately adjacent to Election Day, meaning the City's enforcement process effectively compelled Plaintiff to defend against severe penalties on an emergency footing at the most consequential moment of the election.

4.36   The City's Charter § 3-305 enforcement process therefore operated as a punitive weapon. It imposed a credible threat of massive financial penalties, required an

emergency response during the final phase of the campaign, and did so without the procedural safeguards the Fourteenth Amendment requires.

**E. Selective enforcement**

4.37   After the election, Plaintiff's campaign reviewed publicly available campaign finance data for Plaintiff's principal mayoral opponents, including Keith Wilson and Carmen Rubio, and identified multiple transactions reflecting contributions that exceeded the applicable cap and were either refunded late or not refunded.

4.38   Plaintiff's review of ORESTAR data reflected, among other things, dozens of contributions to these campaigns exceeding the cap, many of which were refunded after substantial delay, including refunds after the election.

4.39   Wilson's campaign utilized the same treasurer as Plaintiff's campaign, C&E Systems, underscoring that the phenomenon of serial or excessive contributions in an online fundraising environment was not unique to Plaintiff and was readily identifiable in the same public reporting systems available to the City Auditor.

4.40   On information and belief, numerous other 2024 City of Portland campaigns that received SDE verification and matching funds also reflected belatedly refunded serial contributions.

4.41   The Auditor was put on notice of the above referenced serial over contributions.

4.42   On information and belief, despite the public availability of this information and despite Plaintiff's notice to the City Auditor, the Auditor did not initiate enforcement actions against Plaintiff's opponents or other similarly situated campaigns for belatedly refunded serial contributions.

Page 11: COMPLAINT

4.43    Even after being provided with evidence of similarly situated campaigns with the same or worse refund timing issues, the Auditor did not pursue equal enforcement. Instead, the Auditor maintained the singular, punitive enforcement posture against Plaintiff.

4.44    The selective enforcement was not accidental. It reflected a deliberate choice to deploy the enforcement process against Plaintiff while declining to use the same interpretation or enforcement tools against Plaintiff's similarly situated opponents and other campaigns.

4.45    The City Auditor's two unconstitutional enforcement actions imposed a civil penalty of $11,580.00 against Plaintiff. The Auditor imposed those fines through an administrative process that did not provide Plaintiff any meaningful opportunity to be heard before the penalty was assessed. There was no evidentiary hearing, no opportunity to present witnesses under oath, and no ability to test the City's allegations through cross-examination.

4.46    The Auditor instead acted as investigator, accuser, and adjudicator, and assessed a monetary penalty based on a paper process that lacked the procedural safeguards required by the Fourteenth Amendment.

4.47    The absence of any hearing is not a technical defect; it is the core constitutional problem. The City's enforcement scheme authorizes severe monetary penalties, including near unlimited multiplier-based fines, while withholding the basic procedural protections that are ordinarily required before the government may deprive a person of property.

//

Page 12: COMPLAINT

**F. The Oregon state trial court ruling**

4.48    Plaintiff challenged the City's enforcement determinations through a writ of review in Oregon circuit court, including Determination 2024-09-RG and Redetermination 2024-01-RG.

4.49    Plaintiff was represented in the challenge by attorney Peter Gabriel.

4.50    On July 31, 2025, the Oregon circuit court issued a final decision holding that the City's Charter § 3-305 enforcement process violated procedural due process under the Fourteenth Amendment. The court reversed the Auditor's enforcement action in Determination 2024-09-RG and Redetermination 2024-01-RG on those constitutional grounds. The decision is attached as **Exhibit A**.

4.51    Defendants did not appeal that ruling.

4.52    Since the Oregon circuit court's ruling, Defendants have recently amended the challenged campaign-finance provisions and, in a public hearing concerning those amendments, largely acknowledged that the prior enforcement process was unconstitutional and abusive.

4.53    Those amendments and public acknowledgments constitute further confirmation that the process used against Plaintiff was constitutionally defective and operated in an abusive manner, causing the harms alleged herein.

**G. Damages and continuing harm**

4.54    Defendants' unconstitutional enforcement action and unconstitutional process caused Plaintiff concrete harm, including but not limited to:

a. The forced diversion of campaign time, attention, and resources during the final critical weeks of the election to defend against an unconstitutional emergency enforcement proceeding.

b. Reputational harm from being publicly accused of campaign finance violations and subjected to punitive enforcement.

c. Financial harm associated with responding to the City's enforcement demands, including pro se legal work undertaken on an emergency basis during the campaign.

d. Attorneys' fees incurred to obtain judicial relief from Defendants' unconstitutional process through the writ of review proceeding.

4.55    Plaintiff incurred thousands of dollars in attorneys' fees in the writ of review litigation required to overturn Defendants' unconstitutional enforcement action and to vindicate Plaintiff's Fourteenth Amendment rights.

4.56    Attached hereto as **Exhibit B** is a true and correct copy of Portland City Charter Chapter 3, Article 3 – Campaign Finance in Candidate Elections, §§3-301 – 3-308.

4.57    Attached hereto as **Exhibit C** is a true and correct copy of Portland City Code, §2.16.040 – Contribution and Expenditure Requirements for Participating and Certified Candidates.

4.58    Attached hereto as **Exhibit D** is a true and correct copy of the Small Donor Elections Administrative Rules, Chapter 2.16.

4.59    Attached hereto as **Exhibit E** is a true and correct copy of City of Portland, Portland City Auditor Administrative Rule ARA 13.03.

4.60    Attached hereto as **Exhibit F** is a true and correct copy of City of Portland, Portland City Auditor Administrative Rule ARA 13.05.

4.61    Attached hereto as **Exhibit G** is a true and correct copy of the Portland City Auditor's Notice of Determination Complaint Nos. 2024-09-RG.

4.62    Attached hereto as **Exhibit H** is a true and correct copy of the Portland City Auditor's Notice of Determination Complaint Nos. 2024-01-RG.

Page 14: COMPLAINT

4.63    Notice of Tort claim was served on Defendants on or about April 17, 2025.

## V.    FIRST CAUSE OF ACTION
### Deprivation of Procedural Due Process
### (42 U.S.C. § 1983, Fourteenth Amendment)

5.1    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

5.2    Defendants, acting under color of state law, deprived Plaintiff of property without due process of law by imposing and attempting to collect civil penalties, including a civil penalty of $11,580.00, through an enforcement process that did not provide constitutionally adequate notice and a meaningful opportunity to be heard.

5.3    The challenged process did not provide Plaintiff a hearing before the deprivation, did not provide an evidentiary hearing in any meaningful form, and did not provide basic adversarial safeguards such as the opportunity to present witnesses under oath and test the City's allegations through cross-examination. The process therefore created an impermissibly high risk of erroneous deprivation and, as applied to Plaintiff, caused actual injury.

5.4    The City Auditor was the final policymaker for the Auditor's Office with respect to the challenged enforcement process, and enforced and maintained that process as alleged herein. The City of Portland is responsible for the constitutional injuries caused by its enforcement scheme and by the actions of its final policymakers.

5.5    As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages, including the monetary penalty imposed, litigation expenses required to overturn the unconstitutional enforcement, and other harms alleged above, including attorneys' fees incurred in the writ of review proceeding.

5.6    Plaintiff is entitled to compensatory damages against the individual Defendants, and against the governmental entity to the extent the entity is responsible for the challenged policy and practice.

## VI.    SECOND CAUSE OF ACTION
### Official Policy, Practice, and Policymaker Responsibility
### (42 U.S.C. § 1983)

6.1    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

6.2    The constitutional violations alleged in this Complaint were caused by Defendants' official code, policy, practice, and custom, including the maintenance and use of an enforcement process that authorizes severe civil penalties without a meaningful hearing or constitutionally adequate procedural safeguards.

6.3    The constitutional violations were also caused by acts and decisions of a final policymaker. At all relevant times, the City Auditor was the final policymaker for the Auditor's Office with respect to the challenged campaign finance enforcement process, and maintained, implemented, and enforced that process as alleged herein.

6.4    The City of Portland is liable under 42 U.S.C. § 1983 because Plaintiff's constitutional injuries were caused by the City's policy, practice, and final policymaker action.

## VII.    DAMAGES AND PRAYER FOR RELIEF

7.1    WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor and award the following relief:

C. Compensatory damages in an amount to be proven at trial.

D. Reasonable attorney fees and costs under 42 U.S.C. § 1988 and other applicable law.

E. Such other and further relief as the Court deems just and proper.

Dated: April 2, 2026.

Respectfully submitted,

*/s/ D. Angus Lee*
D. Angus Lee, OSB No. 213139
ANGUS LEE LAW FIRM, PLLC

*Attorney for Plaintiff*

# EXHIBIT A

Page 18: COMPLAINT

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

FRIENDS OF RENE GONZALEZ F/K/A
RENE FOR PORTLAND AND RENE
GONZALEZ,

                          Petitioner,

vs.

OFFICE OF THE AUDITOR, CITY OF
PORTLAND

                          Respondent,

Case No. 24CV59662

DECISION AND ORDER ON PETITION
FOR WRIT OF REVIEW

Friends of Rene Gonzalez F/K/A Rene for Portland and Rene Gonzalez ("Petitioner") filed a Request for Writ of Review seeking review of the Office of the Auditor, City of Portland's ("Respondent") determination that Petitioners violated campaign finance laws and the imposition of civil penalties in Redetermination No. 2024-01-RG ("Wikipedia Matter") and Determination 2024-09-RG ("Serial Contributions"). The parties have agreed to consolidate the matters.

Petitioner alleges in Petitioners' Opening Brief ("Opening Brief") (1) legal error in the Serial Contributions matter; (2) that the decision in the Wikipedia Matter was not supported by substantial evidence; and (3) that Portland City Charter Section 3-305 violates the due process clause of the 14th Amendment to the United States Constitution. Respondent filed Respondent's Answering Brief on Writs of Review ("Answering Brief"), and Petitioner filed Petitioner's Reply Brief ("Reply Brief").

For the reasons that follow, the Court finds City of Portland Charter Section 3-305 denied Petitioner due process required under the 14th Amendment of the United States Constitution and is therefore unconstitutional. Accordingly, Redetermination No. 2024-01-RG and Determination 2024-09-RG are **REVERSED**.

**Motion to Strike and Judicial Notice**

Petitioner has asked the Court to take judicial notice of the applicable city laws and regulations attached to the Declaration of Peter M. Gabriel. Respondent raised no objection to the Court taking judicial notice of those laws and regulations. The Court will therefore take judicial notice of the applicable city laws and regulations.

Respondent has moved to strike from the record the Declaration of Rene Gonzalez, Amy Wood, and Peter M. Gabriel, citing among other cases *Alt v. City of Salem*, 306 Or 80 (1988) and

Page **1** of **8**

arguing that the Court is limited to the record in the underlying proceeding and cannot take new evidence.  *See* Respondent's Motion to Strike Declaration of Rene Gonzalez, Amy Wood, and Peter M. Gabriel at 1.  Petitioner filed a response noting exceptions to the general rule recognized in *Alt* and other cases.  Petitioners' Opposition to Respondent's Motion to Strike.

The Court considers the effort to supplement the record as a motion to remand for a factual determination.  *See Alt. City of Salem*, *supra* at footnote 7.[1]  Given the Courts ruling on the constitutional issue, the motion is **MOOT**.

**Standard of Review**

ORS 34.040 allows for writs of review of city administrative decisions in certain situations.  The statute provides in relevant part:

> (1) The writ shall be allowed in all cases in which a substantial interest of a plaintiff has been injured and an inferior court including an officer or tribunal other than an agency as defined in ORS 183.310 (1) in the exercise of judicial or quasi-judicial functions appears to have:
>
> * * *
> (c) Made a finding or order *not supported by substantial evidence* in the whole record;
> (d) Improperly construed the applicable law; or
> (e) Rendered a decision that is unconstitutional. * * *

ORS 34.040(1) (emphasis added).

Petitioner has alleged each of these as a basis for their appeal.  The Court having determined the decision rendered is unconstitutional, the issues of legal error and lack of substantial evidence will not be addressed.

**Denial of Due Process**

Petitioner argues Portland City Charter Section 3-305 violates the Due Process Clause of the 14th Amendment to the United States Constitution.  Opening Brief at 32.  They argue this is the case for two reasons.  First, it fails to provide procedural protections because a violation subjects the accused to substantial fines and fees. *Id*.  Second, "the mandatory broadcast of any adverse determination in the midst of a political campaign." *Id*.  They argue the base requirement of the Due Process Clause is that a person deprived of property be given an opportunity to be heard at a meaningful time and in a meaningful manner. *Id*. at 33. They argue, moreover, two aspects of the Auditor's process raise due process concerns: "(a) it calls for extremely narrow timelines for respondents to respond and low barriers for complaints; and (b) it lacks either pre- or post- deprivation hearings," which, they argue "creates substantial risk of

---

[1] "A plaintiff may attempt to supplement the record by affidavit attached to the petition. The defendant or opposing party may seek to supplement the record by attachments to the return. If any supplement is controverted, the reviewing court cannot decide the facts, but can only remand for a factual determination." *See Alt. City of Salem*, *supra* at footnote 7.

Gonzalez Complaint, Ex. A-2

'erroneous deprivation.'" *Id.* at 35.

Section 3-305 outlines the process for processing complaints in connection with campaign finance. It provides the following:

(a) The provisions of this Article shall be implemented by ordinance to be operative not later than September 1, 2019.

(b) *Each violation of any provision in this Article shall be punishable by imposition of a civil fine which is not less than two nor more than twenty times the amount of the unlawful Contribution* or Expenditure or Independent Expenditure at issue.

(c) Any person may file a written complaint of a violation of any of the Provisions with the City Auditor.

(d) The City Auditor, otherwise having reason to believe that a violation of any provision has occurred, shall issue a complaint regarding such violation.

(e) Upon receipt or issuance of a complaint, the City Auditor:

(1) Shall examine the complaint to determine whether a violation has occurred and shall make any investigation necessary.

(2) Within two business days of receiving or issuing a complaint, shall issue a notification, including a copy of the complaint, to every person who is the object of the complaint.

(3) *Shall accept written materials supporting or opposing the complaint for a period of 10 business days following any such notification.*

(4) *Shall render a decision on the complaint within 10 business days of the close of the material submission period.*

(f) If the complaint is received or issued within 30 days of the date of the election involving the object of the complaint, then all time periods stated in subsections (e)(3) and (e)(4) above shall be reduced by one-half.

(g) The City Auditor may issue subpoenas to compel the production of records, documents, books, papers, memoranda or other information necessary to determine compliance with the provisions of this Article.

(h) Upon finding a violation of the requirement for timely disclosure set forth in Section 3-303 above, the City Auditor shall determine the true original sources of the Contributions and/or Independent Expenditures used to fund the Communication at issue and shall immediately issue a statement to all interested

Gonzalez Complaint, Ex. A-3

parties and news organizations containing all of the information about the involved donor(s) required by Section 3-303 above.

(i)  The complainant or any person who is the object of the complaint may, within 30 days of the issuance of the decision, appeal that order to the appropriate Circuit Court as an agency order in other than a contested case.

(j)  The *decision in the matter shall be deemed final, following completion of any judicial review*. Such decision shall be enforced by the City of Portland. If the decision is not enforced within thirty (30) days of the decision becoming final, the complainant may bring a civil action in a representative capacity for the collection of the applicable civil penalty, payable to the City of Portland, and for any appropriate equitable relief.

City of Portland Charter Section 3-305 (emphasis added).

The process outlined in Section 3-305 does not purport to provide a "hearing", pre- or post-imposition of civil penalties. Respondent does not argue that it does. [2]  Instead, Section 3-305 provides for an *investigation* whose result can be the imposition of civil penalties.  *See* Section 3-305(e).  The subject of a complaint is entitled to (1) a notice within 2 days of the complaint; and (2) the option of submitting materials opposing the complaint within a period of 10 days following receipt of the notice. *See* Section 3-305(e) 2 and 3. There is no allegation the Auditor did not follow the prescribed process.

Whether a process complies with the Due Process Clause of the 14th Amendment to the United States Constitution is based on the application of a three-part balancing test to the particular case, as outlined in *Mathews v. Eldridge*, 424 US 319 (1979).  The 9th Circuit Court of Appeals in *Yagman v. Garcetti*, 852 F3d 859 (9th Cir 2017) explained the application of the balancing test.  They write:

> * * * there are no 'hard and fast' rules for determining the requisite timing and adequacy of pre- and post-deprivation procedures. *See Brewster*, 149 F.3d at 984. Rather, once this court has concluded a protected interest is at stake, it must apply the three-part balancing test established in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1979), to determine 'whether a pre-deprivation hearing is required and what specific procedures must be employed at that hearing given the particularities of the deprivation.' *Shinault*, 782 F.3d at 1057. The *Mathews* factors are: '(1) the private interest affected; (2) the risk of erroneous deprivation through the procedures used, and the value of additional procedural safeguards; and (3) the government's interest, including the burdens of additional procedural requirements.' *Id.* 'By weighing these concerns, courts can determine whether a State has met the fundamental requirement of due process—the opportunity to be heard at a meaningful time and in a meaningful manner.'

*Yagman v. Garcetti*, supra at 864.

---

[2] Respondent does point to Petitioner's right to seek a writ of review, which the Court will address in due course.

Gonzalez Complaint, Ex. A-4

Respondent argues Petitioner was not denied due process.  *See* Answering Brief at 23. Acknowledging the *Matthews* balancing test, Respondent first argues that Petitioner had notice and an opportunity to be heard.  Answering Brief at 23. Further, they argue Petitioner's private interests were minimally affected by the decision.  *Id*. at 24 ("The imposition of relatively small fines minimally affects private interests and accordingly requires less process.").   To be clear, the interest at issue is the imposition of *potential* civil penalties of "*not less than 2 nor more than 20 times the amount* of the unlawful Contribution." Depending on the amount at issue in any given case, that amount could indeed be substantial.  Here that amount turns out to be $11,580.00 in civil penalties.  Indeed, Petitioner argues they could have potentially been as high as $60,000 for the Serial Contributions matter alone.  *See* Opening Brief at 33.  The Court finds the private interest at stake is substantial as Petitioner argues.  It may not amount to a person's livelihood. Nevertheless, it is, at least potentially, a significant sum of money.[3]

Addressing the second factor ("the risk of erroneous deprivation through the procedures used, and the value of additional procedural safeguards"), Respondent argues the Auditor's Office's procedures are more than adequate to provide due process.  *See* Answering Brief at 26. As noted by Respondent, that process allows an opportunity to submit written materials after a notice of complaint.  *Id*. They also note Petitioner was also afforded the opportunity to submit written materials.  *Id*. at 28.  In addition, they note Petitioner failed to take advantage of an opportunity to seek reconsideration pursuant to Respondent's administrative rules, ARA-13.03(D)(5).  *Id*. Indeed, reconsideration is allowed under the Auditor's Administrative Rules.[4] Respondent, however, does not address the fact that the process simply fails to provide for an actual hearing.  Instead, they point to the writ of review process—a process they elsewhere note does not afford an opportunity for consideration of new evidence[5].

In response to Petitioner's suggestion that a pre- or post-deprivation hearing is required, with the presentation of evidence and witnesses subject to cross examination, Respondent argues such requirements are not universal.  *Id*. at 27.  Respondent relies on the hearing via the writ of review process to suggest that it, in combination with the investigation, provides due process.  *Id*. at 28.  They argue that "confrontation and cross-examination are not rights universally applicable to all hearings."  *Id* at 29. Indeed, they point to two cases where access to the writ of review was deemed sufficient to meet the hearing requirement of due process.  *See Ester v. City of Monmouth*, 322 Or 1 (1995)(finding that a statutory right to writ of review to challenge a tax

---

[3] Respondent cites a number of appellate cases involving parking tickets and traffic citations, each of those cases, it should be noted, included a process that afforded the complainant an actual hearing.  *See Knutson v. Village of Lakemoor*, 932 F3d 572, 575 (7th Cir 2019) (issue was defenses that could be raised in red light camera hearing before a hearings officer); *see also Rector v. City & Cnty. of Denver*, 348 F3d 935, 938 (10th Cir 2003) ("Recipients who appear at the parking referee's office are advised of the procedures relevant to the hearing and are then given an opportunity to seek a fine reduction.)

[4] "The Auditor's Office may, on its own discretion or on request of an interested party, withdraw a decision for reconsideration within the earlier of 30 days from issuance of the decision or until the decision is appealed." ARA-13.03(D)(5).

[5] *See* Respondent's Motion to Strike Declarations of Rene Gonzalez, Amy Wood, and Peter M. Gabriel at 1 ("In a writ of review proceeding, the record is limited to that which was before the lower tribunal whose decision is being reviewed; the Court cannot take new evidence.")

Gonzalez Complaint, Ex. A-5

assessment provided due process where a "10-taxpayer" statutory requirement prevented tax court jurisdiction); *see also Citizen's Ass'n of Portland v. International Raceways, Inc.*, 833 F2d 760, 762 (1987) (finding that the hearing requirement of due process was met where a party was represented at a variance hearing, but failed to exercise their right to file a writ of review).

Petitioner argues the process is inadequate to avoid error. *See* Opening Brief at 35. They argue the narrow timelines and lack of a pre- or post-deprivation hearing create a substantial risk of "erroneous deprivation." *Id.* With respect to the writ of review, they argue it does not provide them an opportunity to present new evidence and does not address the gaps in Respondent's process. *Id.* at 37. Among other things, they highlight that in the Wikipedia Matter, the initial notice of investigation makes no mention of what language was problematic. *Id.* at 37. They also point to the October 2, 2024, withdrawal of the prior determination in the Wikipedia Matter that found no violation being reconsidered based on "new information that bears on the determination." *Id.* Petitioner notes the withdrawal failed to explain what constituted new information. *Id.* Moreover, they note Petitioner was not afforded an opportunity to respond to the new evidence. *Id.* at 38. The Court agrees such defects in process allows for errors, particularly in situations where there was nothing provided to Respondent as to what new information bore on Respondent's prior determination.

As to the third factor, the government's interest (including burdens the government would face in providing additional procedural protections, such as an actual hearing where witnesses testify under oath and subject to cross-examination), Respondent failed to address it.[6] There is no indication what the burden is of providing a hearing within the Respondent's process, or to allowing for witness testimony with an opportunity for cross examination. They do not argue any time constraints requiring the quick imposition of civil penalties. The Court cannot imagine there would be any. Nor do they argue a workload burden. Instead, they simply argue nothing more is required, and Petitioner had an opportunity to be heard. They write:

> Petitioner was provided with notice of the campaign finance complaints and an opportunity to present 'written materials* * *opposing the complaint[s]' And Petitioner took full advantage of that opportunity, presenting his side of the story in extensive written responses to both complaints.* * * Moreover, in the Wikipedia Matter, Petitioner sat for a lengthy interview in which he was given a further opportunity to present evidence in support of his position, and further made his case in email communication with the Auditor's Office.

Respondent's Answering Brief at 28.

Petitioner, on the other hand, indicates that the government's interest is in the "proper use of public dollars and transparency in election finance." Opening Brief at 38. They point to the procedure currently available in the Small Donor Program under PCC 2.16.170, which provides access to a hearings officer. *Id.* at 39. That code provision incorporates the procedure for hearings before the Code Hearings Officer. *See* PCC 2.16.170 G.6. ("The hearings will be conducted in accordance with the provisions of Chapter 22.10, except as otherwise provided in

---

[6] On that point, they simply say, "Of course, conducting a contested case hearing involving live expert and lay witnesses *is no small burden*." Respondent Op. Brief at 30 (emphasis added).

Gonzalez Complaint, Ex. A-6

this Section.").

PCC 2.16.170's stated purpose is explained as follows:

The purpose of this Section is *to provide persons or political committees adversely affected by administrative determinations* made under this Chapter with a *timely, effective, and impartial appeal and review of the determination* by a Hearings Officer or entity, to be recommended by the Commission and appointed by the Director."

PCC 2.16.170A (emphasis added).

It provides for several hearing types: (1) certification hearings; (2) matching fund hearings; and (3) *penalty hearings*. PCC 2.16.170D (emphasis added). PCC 2.16.170D.3 provides:

A candidate, person or political committee who has received a notice of proposed penalty from the Director *may challenge the proposed penalty* by filing a written request for reconsideration as outlined in Subsection 2.16.170 F. and, if still dissatisfied, *a written request for a hearing* as outlined in Subsection 2.16.170 E.

PCC 2.16.170D.3 (emphasis added).

PCC Chapter 22.10 provides for a hearing. *See* PCC 22.10.050. Appeals are reviewed de novo by the Code Hearings Officer. *Id.* Parties are allowed to be represented by counsel and are allowed to present evidence and argument on all issues. *See* PCC 22.03.050. Witnesses testify under an oath administered by the Code Hearings Officer. *Id.* There are rules of evidence. *See* PCC 22.03.080A ("Objections to evidence may be received in written form or orally at the hearing on the record."). And, to Petitioner's point, witnesses are subject to cross-examination. PCC 22.03.08C ("Every party will have the right of cross examination of witnesses who testify and will have the right to submit rebuttal evidence.").

Considering the process afforded *some* other participants in the Small Donor Program, it is difficult to accept Respondent's argument that the process under Section 3-305 is adequate to avoid error. There is no indication that the particulars in this case are different from civil penalties assessed in cases processed under PCC 2.16.170 and PCC Chapter 22.10. In fact, the penalties under the Small Donor Program are potentially less. *See* PCC 2.16.160A.3. ("A civil penalty imposed under this Section *will not exceed $10,000* for any violation except as otherwise provided in this Section or as permitted by the Commission and published in administrative rules.")

Respondent fails to provide any reason the process afforded *other* participants in the Small Donor Program[7] would create such a substantial burden that it could not be part of the

---

[7] "For candidates participating in the Small Donor Elections program (*which Gonzalez is*), * * *" Notice of Determination, Complaint NO. 2024-09-RG, page RG09-1 (emphasis added).

Gonzalez Complaint, Ex. A-7

process due Petitioner under Section 3-305 of the City Charter.  In fact, the opposite is true: the City of Portland has determined for itself that in some situations indistinguishable from the present one—where civil penalties are being assessed for violation of City campaign finance laws—a process substantially similar to a court trial is the process due.

What PCC Chapter 22.10 shows is that a pre-deprivation hearing is indeed feasible. The 9th Circuit Court of Appeals explain in *Yagaman, supra*,

> The Supreme Court has held, however, that usually 'the Constitution requires *some kind of ... hearing* before the State deprives a person of liberty or property. * * * Thus, in 'situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation ...remedy to compensate for the taking.'

*Yagaman v. Garcetti*, supra at 864.

Respondent has a process that provides a pre-deprivation hearing that is not overly burdensome and minimizes the risk of error that has been denied to Petitioner in this case.   As such, the Court finds Petitioner was denied due process in violation of the Due Process Clause of the 14th Amendment to the United States Constitution. Accordingly, Redetermination No. 2024-01-RG and Determination 2024-09-RG are **REVERSED**.

IT IS SO ORDERED.

**7/31/2025 8:30:28 AM**

Circuit Court Judge Melvin Oden-Orr

Gonzalez Complaint, Ex. A-8

# EXHIBIT B

Page 19: COMPLAINT



# Article 3 Campaign Finance in Candidate Elections

( City Charter Article )

[Article added November 6, 2018, effective December 5, 2018.]

## Section 3-301 Contributions in City of Portland Candidate Elections

**(a)**  An Individual or Entity may make Contributions only as specifically allowed to be received in this Article.

**(b)**  A Candidate or Candidate Committee may receive only the following Contributions during any Election Cycle:

**(1)**  Not more than five hundred dollars ($500) from an Individual or a Political Committee other than a Small Donor Committee;

**(2)**  Any amount from a qualified Small Donor Committee;

**(3)**  A loan balance of not more than five thousand dollars ($5,000) from the candidate;

**(4)**  No amount from any other Entity, except as provided in Section 3-304 below.

**(c)**  Individuals shall have the right to make Contributions by payroll deduction by any private or public employer upon the employer's agreement or if such deduction is available to the employees for any other purpose.

## Section 3-302 Expenditures in City of Portland Candidate Elections.

**(a)**  No Individual or Entity shall expend funds to support or oppose a Candidate, except those collected from the sources and under the Contribution limits set forth in this Article.

**(b)**  An Entity shall register as a Political Committee under Oregon law

---

**Search Code, Charter, Policy**

**Keywords**

[                    ]    Search

Gonzalez Complaint, Ex. B-1

within three (3) business days of making aggregate Independent Expenditures exceeding $750 in any Election Cycle to support or oppose one or more Candidates in any City of Portland Candidate Election.

**(c)** Only the following Independent Expenditures are allowed per Election Cycle to support or oppose one or more Candidates in any particular City of Portland Candidate Election:

> **(1)** An Individual may make aggregate Independent Expenditures of not more than five thousand dollars ($5,000).

> **(2)** A Small Donor Committee may make Independent Expenditures in any amounts from funds contributed in compliance with Section 3-301 above.

> **(3)** A Political Committee may make aggregate Independent Expenditures of not more than ten thousand dollars ($10,000), provided that the Independent Expenditures are funded by means of Contributions to the Political Committee by Individuals in amounts not exceeding five hundred dollars ($500) per Individual per year.

## Section 3-303 Timely Disclosure of Large Contributions and Expenditures.

**(a)** Each Communication to voters related to a City of Portland Candidate Election shall Prominently Disclose the true original sources of the Contributions and/or Independent Expenditures used to fund the Communication, including:

> **(1)** The names of any Political Committees and other Entities that have paid to provide or present it; and

> **(2)** For each of the five Dominant Contributors providing the largest amounts of funding to each such Political Committee or Entity in the current Election Cycle:

>> **a)** The name of the Individual or Entity providing the Contribution.

>> **b)** The types of businesses from which the maker of the Contribution has obtained a majority of income over the previous 5 years, with each business identified by the name associated with its 6-digit code of the North American Industry Classification System (NAICS).

> **(3)** For each of the largest five Dominant Independent Spenders

Gonzalez Complaint, Ex. B-2

paying to provide or present it:

> **a)** The name of the Individual or Entity providing the Independent Expenditure.

> **b)** The types of businesses from which the maker of the Independent Expenditure has obtained a majority of income over the previous 5 years, with each business identified by the name associated with its 6-digit code of the North American Industry Classification System (NAICS).

**(b)** If any of the five largest Dominant Contributors or Dominant Independent Spenders is a Political Committee (other than a Small Donor Committee) or nonprofit organization, the prominent disclosure shall include its top three funders during the current Election Cycle.

**(c)** The disclosure shall be current to within ten (10) days of the printing of printed material or within five (5) days of the transmitting of a video or audio communication.

## Section 3-304 Coordination with Public Funding of Campaigns.

A candidate participating in a government system of public funding of campaigns (including the Public Election Fund established under Portland City Code Chapter 2.16) may receive any amount that such system allows a participating candidate to receive.

## Section 3-305 Implementation and Enforcement.

**(a)** The provisions of this Article shall be implemented by ordinance to be operative not later than September 1, 2019.

**(b)** Each violation of any provision in this Article shall be punishable by imposition of a civil fine which is not less than two nor more than twenty times the amount of the unlawful Contribution or Expenditure or Independent Expenditure at issue.

**(c)** Any person may file a written complaint of a violation of any of the Provisions with the City Auditor.

**(d)** The City Auditor, otherwise having reason to believe that a violation of any provision has occurred, shall issue a complaint regarding such violation.

**(e)** Upon receipt or issuance of a complaint, the City Auditor:

Gonzalez Complaint, Ex. B-3

**(1)** Shall examine the complaint to determine whether a violation has occurred and shall make any investigation necessary.

**(2)** Within two business days of receiving or issuing a complaint, shall issue a notification, including a copy of the complaint, to every person who is the object of the complaint.

**(3)** Shall accept written materials supporting or opposing the complaint for a period of 10 business days following any such notification.

**(4)** Shall render a decision on the complaint within 10 business days of the close of the material submission period.

**(f)** If the complaint is received or issued within 30 days of the date of the election involving the object of the complaint, then all time periods stated in subsections (e)(3) and (e)(4) above shall be reduced by one-half.

**(g)** The City Auditor may issue subpoenas to compel the production of records, documents, books, papers, memoranda or other information necessary to determine compliance with the provisions of this Article.

**(h)** Upon finding a violation of the requirement for timely disclosure set forth in Section 3-303 above, the City Auditor shall determine  the true original sources of the Contributions and/or Independent Expenditures used to fund the Communication at issue and shall immediately issue a statement to all interested parties and news organizations containing all of the information about the involved donor(s) required by Section 3-303 above.

**(i)** The complainant or any person who is the object of the complaint may, within 30 days of the issuance of the decision, appeal that order to the appropriate Circuit Court as an agency order in other than a contested case.

**(j)** The decision in the matter shall be deemed final, following completion of any judicial review. Such decision shall be enforced by the City of Portland. If the decision is not enforced within thirty (30) days of the decision becoming final, the complainant may bring a civil action in a representative capacity for the collection of the applicable civil penalty, payable to the City of Portland, and for any appropriate equitable relief.

Gonzalez Complaint, Ex. B-4

## Section 3-306 Adjustments.

All dollar amounts shall be adjusted on January 1 of each odd-numbered year to reflect an appropriate measure of price inflation, rounded to the nearest dollar.

## Section 3-307 Severability.

For the purpose of determining constitutionality, every section, subsection, and subdivision thereof of this Section, at any level of subdivision, shall be evaluated separately. If any section, subsection or subdivision at any level is held invalid, the remaining sections, subsections and subdivisions shall not be affected and shall remain in full force and effect. The courts shall sever those sections, subsections, and subdivisions necessary to render this Section consistent with the United States Constitution and with the Oregon Constitution. Each section, subsection, and subdivision thereof, at any level of subdivision, shall be considered severable, individually or in any combination.

## Section 3-308 Definitions.

Unless otherwise indicated by the text or context of this Article, all terms shall have the definitions at Chapter 260 of Oregon Revised Statutes, as of January 1, 2018. Terms found therein or defined below are capitalized in this Article.

**(a)** "Candidate" has the meaning set forth at ORS 260.005(1).

**(b)** "Candidate Committee" has the meaning set forth at ORS 260.039 - 260.041, as of November 8, 2016, for the term "principal campaign committee."

**(c)** "City of Portland Candidate Election" means an election, including a primary election, to select persons to serve (or cease serving) in public offices of City of Portland.

**(d)** "Communication" means any written, printed, digital, electronic or broadcast communications but does not include communication by means of small items worn or carried by Individuals, bumper stickers, Small Signs, or a distribution of five hundred (500) or fewer substantially similar pieces of literature within any 10-day period.

**(e)** "Contribution" has the meaning set forth at ORS 260.005(3) and 260.007, as of November 8, 2016, except it does not include

    **(1)** funds provided by government systems of public funding of

Gonzalez Complaint, Ex. B-5

campaigns or

    **(2)** providing rooms, phones, and internet access for use by a candidate committee free or at a reduced charge.

**(f)** "Dominant Contributor" means any Individual or Entity which contributes more than one thousand dollars ($1,000) during an Election Cycle to a Candidate Committee or Political Committee.

**(g)** "Dominant Independent Spender" means any Individual or Entity which expends more than one thousand dollars ($1,000) during an Election Cycle to support or oppose a particular Candidate.

**(h)** "Election cycle" means:

    **(1)** Generally, the period between an election at which a candidate is elected and the next election for that same office, disregarding any intervening primary or nominating election, any recall election, or any special election called to fill a vacancy.

    **(2)** For any recall election: the period beginning the day that the recall election is called or declared and ending at midnight of the day of the recall election.

    **(3)** For any special election called to fill a vacancy: the period beginning the day that the special election is called or declared and ending at midnight of the day of the election.

**(i)** "Entity" means any corporation, partnership, limited liability company, proprietorship, Candidate Committee, Political Committee, or other form of organization which creates an entity which is legally separate from an Individual.

**(j)** "Expenditure" has the meaning set forth at ORS 260.005(8) and ORS 260.007, as of January 1, 2018, except that:

    **(1)** It does not include a Communication to its members, and not to the public, by a Membership Organization not organized primarily for the purpose of influencing an election.

    **(2)** The exception in ORS 260.007(7) does not apply.

**(k)** "General Election Period" means the period beginning the day after the biennial primary election and ending the day of the biennial general election.

**(l)** "Individual" means a citizen or resident alien of the United States entitled to vote in federal elections; however, when this Article expresses

Gonzalez Complaint, Ex. B-6

a limitation or prohibition, "Individual" means any human being.

**(m)** "Membership Organization" means a nonprofit organization, not formed or operated for the purpose of conducting or promoting commercial enterprise, which has Individual members who have taken action to join the organization and have made a payment of money or volunteer time to maintain membership in the organization.

**(1)** It cannot have commercial enterprises as members.

**(2)** It can transfer to one and only one small donor committee not more than forty percent (40%) of the amount paid to the organization by each Individual member, with a limit of one hundred dollars ($100) transferred per Individual member per calendar year.

**(3)** It shall within thirty (30) days of any such transfer notify each paying member of the amount transferred, expressed in dollars or as a percentage of the member's amount paid to the organization. Such notice may be provided by regular mail or electronic mail to each affected member or by posting the information on the organization's main website. If the amount transferred is the same for each member or category of members (in dollars or in percentage of amount paid), the posting may state that amount or percentage without identifying Individual members.

**(n)** "Primary Election Period" means the period beginning on the 21st day after the preceding biennial general election and ending the day of the biennial primary election.

**(o)** "Prominently Disclose" means that the disclosure shall be readily comprehensible to a person with average reading, vision, and hearing faculties, with:

**(1)** any printed disclosure appearing in a type of contrasting color and in the same or larger font size as used for the majority of text in the printed material;

**(2)** any video disclosure remaining readable on the regular screen (not closed captioning) for a not less than 4 seconds;

**(3)** any auditory disclosure spoken at a maximum rate of five words per second;

**(4)** any website or email message in type of a contrasting color in the same or larger font size as used for the majority of text in the message;

Gonzalez Complaint, Ex. B-7

Case 3:26-cv-00670-AN    Document 1    Filed 04/06/26    Page 35 of 128

**(5)** any billboard or sign other than a Small Sign: in type of a contrasting color and not smaller than 10 percent of the height of the billboard or sign.

**(p)** "Small Donor Committee" means a Political Committee which has never accepted any Contributions except from Individuals in amounts limited to one hundred dollars ($100) per Individual contributor per calendar year.

**(q)** "Small Sign" means a sign smaller than six (6) square feet.

Gonzalez Complaint, Ex. B-8

# EXHIBIT C

Page 20: COMPLAINT

Case 3:26-cv-00670-AN     Document 1     Filed 04/06/26     Page 37 of 128        2/8/26, 10:39 PM



# 2.16.040 Contribution and Expenditure Requirements for Participating and Certified Candidates.

( City Code Section )

(Amended by Ordinances [189677](#), [190243](#), [190598](#), [191335](#), and 192098, effective October 24, 2025.)

**A.** Before accepting any allowable, matchable, seed money or in-kind contributions governed by this Chapter, a participating candidate must establish a candidate's campaign account for the candidate for the purpose of receiving contributions and making expenditures in accordance with this Chapter.

**B.** Before accepting any allowable contribution or matchable contribution governed by this Chapter on which a participating candidate intends to rely for certification under Section 2.16.050 and seek City matching funds, a participating candidate must:

    **1.** File a notice of intent using the form prescribed by the program with the Director before the deadline, which can be no earlier than June 1 the calendar year before the election; and

    **2.** Attend mandatory training provided by the City.  The candidate's treasurer must also attend the training.

**C.** A participating candidate may accept up to $5,000 total in seed money contributions. Certified candidates may not accept seed money contributions. The Commission will establish a deadline for accepting seed money contributions and the deadline will be published in administrative rules.

**D.** Participating and certified candidates may accept in-kind contributions in an amount determined by the Commission and published in administrative rules.

**E.** During an election cycle, participating and certified candidates may only accept allowable contributions, matchable contributions, City matching funds, and seed money contributions, and in-kind contributions allowed by this Chapter, and other types of Contributions as determined by the Commission.

## Search Code, Charter, Policy

**Keywords**   **Sort by**

[          ]   Relevance &#x2195;   Sear

## City Code Titles

[Title 1 General Provisions](#)

[Title 2 Legislation & Elections](#)

[Title 3 Administration](#)

[Title 4 Original Art Murals](#)

[Title 5 Revenue and Finance](#)

[Title 6 Special Taxes](#)

[Title 7 Business Licenses](#)

[Title 9 Protected Sick Time](#)

[Title 10 Erosion and Sediment Control Regulations](#)

[Title 11 Trees](#)

[Title 12 Utility Operators](#)

[Title 13 Bees and Livestock](#)

[Title 14 Public Order and Police](#)

[Title 15 Emergency Code](#)

[Title 16 Vehicles and Traffic](#)

[Title 17 Public Improvements](#)

Gonzalez Complaint, Ex. C-1

2/8/26, 10:39 PM

**F.** Participating and certified candidates may not accept allowable contributions or matchable contributions from any one individual totaling more than $350 in the election cycle, except as seed money contributions.

**G.** From the date the election cycle begins until filing a notice of intent, a participating candidate may not collect any contributions other than allowable, seed money and in-kind contributions allowed by this Chapter and may only make expenditures from such contributions. After filing a notice of intent, participating and certified candidates may not make expenditures from funds other than City matching funds and allowable, matchable contributions, seed money or in-kind contributions, as allowed by this Chapter.

**H.** Participating and certified candidates must deposit all allowable contributions, matchable contributions, City matching funds, and seed money contributions received into the candidate's campaign account. Participating and certified candidates must deliver to the Director documentation, as specified by administrative rule, for each allowable contribution, matchable contribution, seed money contribution, and in-kind contribution.

**I.** A participating or certified candidate may retain a preexisting campaign committee or political activities committee as long as the campaign committee or political activities committee does not accept contributions or make expenditures during the election cycle for which the candidate is seeking a covered office, other than a transfer of seed money contributions to the candidate, consistent with Subsection 2.16.040 C. The Commission will determine whether preexisting committees may make certain transactions not related to promoting the candidate in the current election cycle, and its determination will be published in administrative rules.

**J.** The Commission will determine how loans are repaid and its determination will be published in administrative rules.

**K.** The Commission will set total contributions limits, if any, and these limits will be published in administrative rules.

**L.** The Commission may set the amount of loans or debt a campaign may accept.

[Title 18 Noise Control](#)

[Title 19 Harbors](#)

[Title 20 Parks and Recreation](#)

[Title 21 Water](#)

[Title 22 Hearings Officer](#)

[Title 23 Civil Rights](#)

[Title 24 Building Regulations](#)

[Title 25 Plumbing Regulations](#)

[Title 26 Electrical Regulations](#)

[Title 27 Heating and Ventilating Regulations](#)

[Title 28 Floating Structures](#)

[Title 29 Property Maintenance Regulations](#)

[Title 30 Affordable Housing](#)

[Title 31 Fire Regulations](#)

[Title 32 Signs and Related Regulations](#)

[Title 33 Planning and Zoning](#)

[Title 34 Digital Justice](#)

Gonzalez Complaint, Ex. C-2

# EXHIBIT D

Page 21: COMPLAINT

**Small Donor Elections Administrative Rules, Chapter 2.16**

Table of Contents
1.  Authority
2.  Purpose
3.  Definitions
4.  Small Donor Elections Fund
5.  Qualification and Certification
6.  Contributions
7.  City Matching Funds
8.  Use of Contributions
9.  Contested Elections
10. Special Elections and Vacancies
11. Inadequate Funds
12. Recounts
13. Changing Office Sought
14. Reporting Requirements
15. Complaints
16. Return of City Matching Funds
17. Documentation, Audits, and Investigations
18. Violations and Penalties
19. Appeals
20. Mitigating Circumstances and Personal Emergencies
21. Withdrawal
22. Interpretation
23. Emergency Rulemaking

**1. Authority.** The Small Donor Elections program (program) Director is authorized by Portland City Code (PCC) 2.16.030 to adopt rules necessary to implement the program.

**2. Purpose.** The program's purpose is to prevent corruption or the appearance of corruption caused by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office and the related goals listed in the legislative findings when the Small Donor Elections Code was passed. These Administrative Rules provide further detail to implement of the program and will be broadly interpreted to effectuate the program's purpose.

**3. Definitions.**

A.     "**Allowable contribution**" means a contribution of no more than $350 in support of a participating or certified candidate that is:

1.     Made by an individual or a small donor organization; and
2.     Made during the election cycle in which the candidate is seeking office;
3.     Not eligible to be matched with city matching funds; and
4.     Includes the fair market value of proceeds from selling campaign merchandise.

B.     "**Approximate date of sale**" means a similar time period that is relevant to determining a probable price. The following factors support the relevance of a selected approximate date of sale:

Gonzalez Complaint, Ex. D-01

**Small Donor Elections Administrative Rules, Chapter 2.16**

1.   The amount of time from the approximate date of sale and the actual date of sale;

2.   If the approximate date of sale reflects any applicable predictable, time-bound differences in pricing, such as seasonal pricing; and

3.   If the approximate date of sale reflects economic conditions that are not drastically different from the actual date of sale, such as differences in pricing before and after an economic crash.

C.   A "**consumer**" is a member of the general public who is not a member of a class that could confer certain privileges or advantages to its members, such as a reason for sellers to seek influence with or provide favors for members of such a class or because the consumer has a personal relationship with the seller. Persons who are not members of the general public for these purposes include elected officials, candidates, government officials, government offices, nonprofit organizations, as well as relatives, friends, , business associates or others for whom a seller may wish to seek influence or perform a favor.

D.   "**Contributions**" do not include services an individual provides without compensation while volunteering their time to the candidate or campaign committee.

E.   "**Democracy building activities**" are the following activities as carried out by a political committee or a 501(c)(4), 501(c)(5), 501(c)(6) nonprofit organization:

1.   Paid staff time and related goods or use of real or personal property for canvassing, phone banking, and text banking, provided that the majority of the canvassers and phone bankers and text bankers are volunteers;

2.   Providing participating candidates with a list of individuals from the contributors contact list for campaigns to contact directly; and

3.   Paid staff time providing the following services to participating candidates:

    A.   Creating and sharing messaging on issues that are part of the contributor organization's mission;

    B.   Identifying voter models for campaign communications;

    C.   Increasing voter engagement;

    D.   Security planning; and

    E.   Campaign planning.

F.   "**Egregious**" means conspicuously, glaringly, or flagrantly bad, which includes conduct that would conceal an instance of committing fraud against the program, accepting a large contribution significantly over contribution limits, or conduct that would conceal an instance of violating a requirement or prohibition of the program.

G.   "**Fair market value**" means the most probable price in cash or its equivalent, as of the actual or approximate date of a sale, transaction, or transfer, for which property, goods, or services would sell or be provided after reasonable exposure in the market under conditions requisite to fair pricing, with the consumer – who is a member of the general public – and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under duress. In appropriate circumstances, fair market value can be assessed as a range of prices and need not be a single price.

H.   For the purpose of Administrative Rule 20, "**family**" includes a spouse, child, parent or step-parent, domestic partners, parents-in-law, grandparents or grandchildren, and household members.

I.   "**In-kind contribution**" means real or personal property, good, or service that has monetary value, other than money, that is provided directly by a contributor to a participating or certified candidate without equivalent compensation or consideration. In-kind contributions that increase language inclusivity or accessibility for people with disabilities may be provided directly or indirectly to a participating or certified candidate. "In-kind contribution" does not include refreshments served at no charge, if they are incidental to the event at which they are provided.

Gonzalez Complaint, Ex. D-02

**Small Donor Elections Administrative Rules, Chapter 2.16**

J.　　"**Loan**" and "**debt**" do not mean:
　　　　1.　The campaign's use of a credit card;
　　　　2.　A campaign that pays for property, goods, or services within 90 calendar days of being provided the property, goods or services; or
　　　　3.　The candidate, campaign staff, or campaign volunteers being reimbursed by the campaign for campaign expenses provided that the expenses being reimbursed are either:
　　　　　　a.　Under $500; or
　　　　　　b.　Reimbursed within 10 business days of the expenditure being paid.

K.　　"**Matchable amount**" means the amount, in aggregate, of a matchable contribution, that is matched per donor per election period.

L.　　"**Matchable contribution**" means contributions of up to $350 in aggregate per donor per election period.

M.　　"**Match rate**" means the rate at which the matchable amount is matched.

N.　　"**Publicly neutral**" means someone who has not, in relation to a race covered by this program:
　　　　1. Made a contribution;
　　　　2. Endorsed a candidate;
　　　　3. Carried out work for a campaign directly or for an employer or for an entity that endorses, contributes to, or makes independent expenditures for or against a candidate; or
　　　　4. Engaged in any other conduct that would cast reasonable doubt, if known to the public, that they can make unbiased decisions.

O.　　"**Seed money contribution**" means a contribution of no more than $500 that is not an allowable contribution, an In-kind contribution, or a matchable contribution, which is received by a participating candidate before filing an application for certification.

P.　　"**Small donor organization**" is any political committee or a 501(c)(4), 501(c)(5), or 501(c)(6) nonprofit organization that has accepted at least ninety percent (90%) of its current funds from contributions of $250 or less per donor per year. Small donor organizations are not required to apply for a small donor organization designation but may apply for the designation using the form provided on the program website and by submitting all documents required on the application form. If an organization that fits the definition of a small donor organization transfers funds to a political committee, the political committee qualifies as a small donor organization if 90% of the funds it collects directly and from organizations that qualify as small donor organizations collectively meet the financial threshold for small donor organizations, provided that the small donor organizations that made the transfers to the political committee provide sufficient documentation of their contributions that the Director can determine that they qualify as small donor organizations.

Q.　　"**Violation**" means each instance of failing to comply with the PCC 2.16 or these Administrative Rules.

**4. Small Donor Elections Fund**

A.　　The following will be deposited in the Small Donor Elections Fund (Fund):
　　　　1.　All amounts appropriated to the Fund by the City Council;
　　　　2.　Any unspent City matching funds remaining in a candidate's campaign account after the candidate is no longer a candidate for a covered office that is returned to the Fund as provided in PCC 2.16.100;
　　　　3.　All civil penalties issued for violating a provision of the program;
　　　　4.　All interest earned on money in the Fund; and

Gonzalez Complaint, Ex. D-03

**Small Donor Elections Administrative Rules, Chapter 2.16**

    5.       Voluntary contributions to the Fund:
- a.    Voluntary contributions may be in any amount.
- b.    Payment may be made in the form of cash, check, money order, credit card, or electronic check.
- c.    Contributors may make voluntary contributions directly to the City, either in person, via United States Mail, or on the program website.
- d.    The Director will publish on the program website an address to which voluntary contributions may be sent to via United States Mail.
- e.    Contributors may request a receipt from the Director.
- f.    Contributors and contribution amounts will be disclosed publicly.

B.    The Fund may allocate up to $10,000 total per election cycle to assist in ensuring that public candidate debates and forums are accessible to all Portlanders.

C.    Hosts of a public candidate debate or public candidate forum, or a candidate invited to one, may apply for financial assistance from the Fund to completely or partially cover the cost of ensuring that the debate or forum is accessible to those with disabilities. Applicants must use the application form provided on the program website.

### 5. Certification and Qualification

A.  A Candidate who has fulfilled the following conditions may apply for Certification:
1. Has filed a Notice of Intent to participate in the program by the deadline published by the Director;
2. Has completed a mandatory training;
3. Whose Treasurer has completed a mandatory training;
4. Has submitted a complete certification application; and
5. Has filed all required reports of contributions and expenditures and any documentation required or requested by the Director.

B.  Grounds for denial of certification or decertification:
1. Failing to meet certification requirements;
2. Submitting falsified documentation;
3. Intentionally, knowingly, recklessly, or negligently reporting contributions that were not made by the reported contributor; or
4. A single egregious violation of a program requirement or rule, if it undermines the purpose of the program, or repeated violations of requirements or rules of the program if collectively the violations undermine the purpose of the program.

### 6. Contributions

A.  Participating candidates must collect at least the following documentation for all contributions made with cash or a money order: an attestation signed by the donor as published by the Director on the program website;

B.  Seed money contributions may be collected from the first day of the election cycle until the day a candidate files an application for certification.

C.  Participating and certified candidates may accept in-kind contributions valued at no more than $10,000 per election per donor from a small donor organization or in the form of democracy building activities.

D.  Candidates may take loans of up to a maximum of $5,000 total at any point during the election cycle.

E.  Candidates may make allowable or matchable contributions to their own campaign.

F.  Differentiating Discounts from In-Kind Contributions: If property, goods, or services are sold or provided for an amount less than their fair market value, then regardless of the form of the sale, transaction, or transfer, the difference between the amount paid and the fair market value shall be considered an in-kind contribution. If a discount from the fair market value is negotiated or otherwise provided, regardless of whether any price or discount was advertised, the discount shall be disregarded in calculating the amount of

Gonzalez Complaint, Ex. D-04

**Small Donor Elections Administrative Rules, Chapter 2.16**

the in-kind contribution unless the same discount is or would be available to all similarly situated purchasers who are members of the general public.

G.  Establishing Fair Market Value and Penalty Amounts for Violations:

    1.  Establishing Fair Market Value. Any of the following, to the extent that it is relevant to the definition of fair market value for that property, good, or service, may be accepted as evidence fair market value:

        a.  A contract, invoice, or rate sheet with clear pricing or a publicly- listed price that shows the vendor or a similar vendor provides the same or similar property, good, or service to members of the general public.

        b.  If there is an advertised price and the candidate did not provide evidence or sufficient evidence of the same or similar discounts being given to members of the general public by the same vendor or a similar vendor, the Director may set the fair market value at the advertised price.

        c.  If there is no advertised price and the candidate did not provide evidence or sufficient evidence of the same price being given to members of the general public by the same vendor or a similar vendor, the Director may determine the fair market value using a contract, invoice, or rate sheet with clear pricing or a publicly-listed price from the vendor or a similar vendor on the same property, good, or service, if available, or for a similar property, good, or service.

        d.  Where the price is the cost to the seller plus a markup, clear evidence of the actual cost to the vendor and the vendor's – or in lieu of evidence from the vendor, a similar vendor's - standard markup is evidence of fair market value.

        e.  If the vendor does not provide this service to members of the general public, a contract, invoice, or rate sheet with clear pricing used with the majority of clients is evidence of fair market value.

    2.  Responding to a complaint relating to in-kind contributions:

      a.  If the Director receives a complaint alleging or is in possession of evidence that suggests an impermissible receipt or use of an in-kind contribution, the Director will inform the candidate of the complaint or information.

      b.  The candidate will have 7 calendar days to provide the Director with evidence establishing the fair market value that supports the candidate's estimate of the fair market value of the property, good, or service at issue.

      c.  The Director will review the evidence provided by the candidate and may conduct an investigation to determine whether the evidence provided by the candidate supports the candidate's fair market value estimate.

      d.  Within 10 business days of receiving the evidence from the candidate, the Director will send a written determination to the candidate with the Director's findings, including the Director's estimate of the fair market value of the property, good, or service  at issue and the basis for that estimate.

      e.  If the Director penalized the candidate in relation to accepting of an in-kind contribution and the candidate disagrees with the Director's written determination, the candidate may request a reconsideration of the determination within 7 calendar days after the date of the determination by the Director.  The candidate may provide the Director with additional supporting evidence of the candidate's basis for the candidate's estimated fair market value for the Director to consider.

Published November 30, 2023    5

Gonzalez Complaint, Ex. D-05

**Small Donor Elections Administrative Rules, Chapter 2.16**

    f.  If the candidate does not request a reconsideration, the Director's determination of the fair market value becomes final, and the Director may assess penalties based on the difference between the maximum allowable amount of an in-kind contribution and the fair market value of the in-kind contribution at issue. If the candidate does request a reconsideration, any penalty the Director issued will be final.

    g.  A candidate may appeal the Director's decision regarding the determination of the fair market by filing a written request for a hearing no later than 7 calendar days after the mailing of the reconsideration decision.  A candidate may appeal the Director's determination of a penalty as set forth in PCC 2.16.170.E., following the procedures for requesting a hearing on penalties.

3.  Range of prices: If the fair market value is established as a range of prices instead of a single price or rate, the violation amount the City determines is valid if it is within the range of prices.

4.  The Director shall determine an appropriate penalty based in part on the difference between the fair market value and the amount paid by the campaign.

## 7. City Matching Funds

A.  Matchable donors may only have their contributions matched up to the matchable amount per candidate in each contested election.

B.  Until 42 days before the election, the City will distribute City matching funds to campaigns at least every month provided the amount owed is at least $1,000. Beginning 42 days before the election, the City will distribute City matching funds at least every 7 calendar days.

C.  The City will distribute City matching funds only once a contribution reported is validated as matchable by the City.

D.  A participating candidate may not offer items of value in exchange for a contribution that is submitted for City matching funds, other than items of de minimis value. Participating candidates may sell items of value at or over fair market value, but may only submit as a matchable contribution the amount paid for the items of value that is over the fair market value.

E.  Match rate: Certified candidates will receive a match rate of 9 dollars for every 1 dollar in matchable contributions received in aggregate, per donor, per candidate, per election, up to the matchable amount.

F.  Matchable amount: The matchable amount is the first $20 received in aggregate per donor per candidate per election cycle.

## 8. Use of Contributions

A.  City Matching Funds may not be used to pay:
    1.  Any loans, debts, fines or penalties exceeding $5,000 total per election;
    2.  For travel outside of the counties adjacent to the tri-county area, defined as Multnomah, Washington, and Clackamas Counties;
    3.  For certain vehicle-related expenses, such as vehicle purchases, leases, rental, insurance, repairs, or fuel.

B.  Campaign funds may not be used to pay:
    1.  The candidate in consideration for the rendering of professional services by the candidate.

C.  A business that the candidate is a whole or part owner of or receive a financial benefit directly related to the campaign's purchase of the use of property, goods, or services, unless they ask the Director for and are granted an exception for special circumstances, such as there being no other business that offers this type of property, good, or service.

D.  City matching funds may be used to pay:

Gonzalez Complaint, Ex. D-06

**Small Donor Elections Administrative Rules, Chapter 2.16**

1. Attorney, accountant and other professional service fees, except as prohibited by state law;
2. Parking expenses related to the campaign;
3. Vehicle mileage reimbursement for campaign purposes, using the standard rate used by the City for mileage reimbursement;
4. Reimbursement for taxis or car-sharing companies for campaign purposes;
5. Reasonably-priced tickets to events attended for campaign purposes;
6. Penalties as outlined in section 18 of these rules; and
7. Election night and post-election parties.

E. Campaign funds may be used to reimburse a business as described in Rule 8(B)(2) for the actual cost to that business for legitimate campaign expenses.

## 9. Contested Elections

A. For Mayor and Auditor, if all of a participating candidate's opponents withdraw from running for office, the seat will become uncontested. For Councilor, if all but two of a participating candidate's opponents withdraw from running for office, the seat will become uncontested.

B. The program will stop distributing City matching funds for matchable contributions submitted after the Director notifies the candidate that the candidate has become uncontested and will not distribute City matching funds to the candidate as long as the candidate remains uncontested.

C. Matchable contributions collected before a candidate is contested will be matched once the candidate is contested.

## 10. Special Elections and Vacancies

A. The Director will publish on the program website a calendar of the following dates within 3 business days of special election dates being announced:
1. First and last day of the election cycle;
2. First day the Notice of Intent can be filed;
3. Deadline to file for certification; and
4. Deadlines to return unspent City matching funds.

## 11. Inadequate Funds

A. If there is a significant risk that the amount in the Small Donor Elections Fund is insufficient to provide the full amount of City matching funds to participating candidates:
1. The Director may reduce the total City matching funds cap in regularly scheduled election, special elections, or both.
2. The Director may reduce the match rate or total city matching funds cap in different amounts for different covered offices in order to minimize the impact of the reduction on participating candidates who are facing non-participating candidates.

B. If the Director reduces the match rate or total city matching funds cap due to a potential budget shortfall, the Director may increase the amount each donor may give each candidate in a race affected by the reduction from $350 to up to $500, in proportion to the reduction in the match rate or total city matching funds cap.

## 12. Recounts

A. Certified candidates may raise allowable and in-kind contributions to pay for recounts and related expenses.

## 13. Changing Office Sought

A. A participating candidate may change which office they are seeking as follows:
1. The candidate must withdraw from the office sought with the City Elections Office

Gonzalez Complaint, Ex. D-07

**Small Donor Elections Administrative Rules, Chapter 2.16**

and file successfully with the City Elections Office for the new office sought; and

2. The candidate must submit an amendment to the Notice of Intent with the program with all required documentation.

3. If the participating candidate was not certified prior to changing the office sought, the candidate must fulfill all requirements for certification by the certification application deadline for the newly sought office, including collecting the number of matchable contributions required to be certified in the newly sought office. The candidate may use matchable contributions collected prior to changing the office sought toward the number of matchable contributions they are required to collect for certification for the new office they are seeking only if the contributor provides their written permission to switch the contribution to the newly sought office.

4. If the participating candidate was certified prior to changing the office sought, the candidate's certification status will be temporarily suspended and distribution of City matching funds will cease until the candidate successfully completes all requirements for certification by the certification application deadline for the newly sought office, including collecting the number of matchable contributions required to be certified in the newly sought office. The candidate may use matchable contributions collected prior to changing the office sought toward the number of matchable contributions they are required to collect for certification for the new office they are seeking only if the contributor provides their written permission to switch the contribution to the newly sought office. If the candidate does not get certified for the program by the deadline, the candidate must return all unspent City matching funds to the program.

B. Matchable contributions collected prior to changing the office sought will be matched with City matching funds only if the contributor provides their written permission to switch the contribution to the newly sought office.

C. Written permission may not be collected when the contribution is originally collected from the contributor, such as inclusion in language on the remit documentation for contributions.

## 14. Reporting Requirements
A. For Participating candidates:
1. Reporting schedule:
   a. Participating candidates will report all contributions and expenditures to the program on the same schedule as required by the state. In the first report since turning in a Notice of Intent, the contributions and expenditures reported must include all contributions and expenditures since the first day of the election cycle. Participating candidates will continue to report all contributions and expenditures until the candidate has returned all funds to the program.
2. Reporting mechanism:
   a. Participating campaigns must report all contributions and expenditures and other related required documentation of contributions and expenditures to the online Small Donor Elections application, as published on the program website or provided to campaigns by the Director.
   b. When directed by the Director, participating campaigns must report all contributions and expenditures and other related required documentation of contributions and expenditures using a form, as published on the program website or provided to campaigns by the Director.
3. Reporting combined expenditures: When an expenditure of over $100 to one vendor covers more than one type of expense (such as polling, advertising, mail, consulting), the campaign must itemize what portion of the expenditure was paid

Gonzalez Complaint, Ex. D-08

for each type of expense.
B. Reporting requirements for non-participating candidates:
1. Within 14 days after the election, all non-participating candidates must provide to the Small Donor Elections program on the spreadsheet form provided by the program, or another spreadsheet if approved by the Director, the following information for all contributions collected during the election cycle:
   a. Date of contribution
   b. Amount of contribution
   c. Name of contributor
   d. Aggregate from that contributor
   e. Address of contributor
2. The names and addresses of the reported contributors who contributed less than $100 in aggregate during the election cycle must be kept confidential by the program per state law and is not subject to public records requests.

15. **Complaints**
A. Complaints:
1. Must be filed using the form provided on the program website;
2. May be filed only by a candidate for City office;
3. May not be filed anonymously;
B. Anyone can provide a tip to the program of a possible violation by calling or emailing the program at the phone number and email address published on the program website. Tips may be provided to the program anonymously.
C. The Small Donor Elections program will be the ultimate arbiter at the City of Portland of whether a participating candidate violated the requirements or rules of the Small Donor Elections program.
D. Upon receipt of a complaint, the program will determine whether the complaint requires an investigation. Complaints about conduct that has already been investigated and frivolous complaints are not required to be investigated.
E. If a complaint requires an investigation, the program must complete the investigation and make a determination withing the following time line:
1. If it is more than 42 days prior to an election, within 10 business days of receiving all requested information and documentation requested from the subject of the complaint, unless the Director requests an additional 5 business days to carry out additional investigatory activities; or
2. If it is 42 or fewer days prior to an election, within 3 business days of receiving all requested information and documentation requested from the subject of the complaint, unless the Director requests an additional 3 business days to carry out additional investigatory activities.

16. **Return of City Matching Funds**
A. By the date a campaign is due to return unspent City matching funds, the campaign must send the Director:
1. A report showing the total amount in funds collected other than City matching funds, the total amount of City matching funds collected, a calculation of the

Gonzalez Complaint, Ex. D-09

**Small Donor Elections Administrative Rules, Chapter 2.16**

         percent of contributions that were public, the total amount spent on the campaign, and the total amount remaining in the account; and
2. A payment equal to the percent of City matching funds collected multiplied by the amount remaining in the account by the deadline to be deposited in the Small Donor Elections Fund.

B. The Director will determine whether the amount each campaign returned is accurate. If the Director determines the amount returned by a campaign is not accurate, the Director will notify the campaign of the correct amount due. The campaign must send any additional owed funds within 7 business days.

C. Upon expulsion from the program:
1. A participating candidate against whom a civil penalty has been imposed for violation of the program must return to the Director an amount of money equal to all revenues distributed to the candidate from the Fund after the date the candidate was certified.
    a. The Director will seek immediate recovery of City matching funds for any violation of this rule.
2. Expelled candidates must also pay the Fund for interest on the total amount of revenues received at a rate of 10 percent per annum, in addition to the penalty and interest on the penalty.

### 17. Documentation, Audits, and Investigations
A. Record retention: Candidates must keep all documents submitted to the Director, financial records, and supporting documentation - including without limitation the original signed attestations received by the campaign - related to campaign expenditures and contributions for inspection by the Director from the first day of the election cycle until 6 months after the election.

B. Records requests: Candidates must provide any records or documentation the Director requests relating to ensuring compliance with the program and cooperate with any investigatory measures deemed relevant to the potential violation by the Director or any body to which Director refers the matter. The Director or the Director's designee may conduct unannounced site visits to campaigns to inspect documents.

C. The Director may engage a vendor or governmental body to administer or enforce any provision of the program, including without limitation conducting inspection of documentation, conducting investigations or taking enforcement actions.

### 18. Violations and Penalties
A. General. The Director has authority to assess civil penalties for violation of the program or these rules. The purpose of this section is to discourage and deter the intentional or negligent violation of program requirements or prohibitions, ensure the proper stewardship of public funds, and encourage accurate reporting of contributions and expenditures for the purpose of public transparency in campaign finance. It is not the intent of this section to discourage participating in the program through excessive penalties for mistakes that do not harm the purpose of this section or the purpose of the program.

B. Maximum penalty.
1. No penalty imposed under the program or these rules will exceed $10,000 (ten thousand dollars) for any violation except where the amount of the violation exceeds $10,000 or as otherwise provided in PCC 2.16.150 and these rules.
2. Limits on penalties do not include interest or repayment of City matching funds. Penalties are subject to interest at a rate of 10 percent of the total amount per annum.

Gonzalez Complaint, Ex. D-10

**Small Donor Elections Administrative Rules, Chapter 2.16**

C. Violations may be cured without penalty by the reporting deadline for the contribution or expenditure that was in violation if the conduct that was a violation has a related reporting period. Other violations may be cured without penalty if corrected prior to the program sending the party a penalty notice, or as otherwise provided in these Administrative Rules.

D. Late filings.
   1. A late filing is one that is remedied before the subsequent reporting deadline.
   2. The penalty for the late filing or unreported amounts of contributions and expenditures on a participating candidate filing and non-participating candidate filing is half a percent of the transaction amount(s) per calendar day.

E. Insufficient filings.
   1. An insufficient filing is when an entry on a report is missing one or more fields of required information or an item of information provided is not accurate or adequate.
      a. Missing or inadequate information:
         i. If there are entries listed that do not include all of the required information, a notification will be sent to the person the campaign or political committee designates to receive notifications about program determinations.
         ii. If all the requested information is provided by the amendment deadline provided in the notice, the report is considered sufficient and there is no penalty.
         iii. If the campaign or political committee is unable to secure the missing information by the amendment deadline, they may submit a filing showing that the contribution or expenditure has been returned.
            a. This must be done within the amendment deadline.
            b. If the Director determines the return filing to be sufficient, penalties will be waived.
      b. Inaccurate information: If required information reported is inaccurate, it is subject to a penalty.
   2. The penalty for an insufficient filing is half a percent of the transaction amount(s) per calendar day, subject to a cap of twenty-five (25 percent) of the transaction amount.

F. Fully omitted contributions and expenditures.
   1. A fully omitted filing of a contribution or expenditure is one that is not remedied before the subsequent reporting deadline.
   2. The penalty for a fully omitted filing of a contribution or expenditure, is one percent of the transaction amount(s) per calendar day, subject to a cap of 50 percent of the transaction amount.

G. Prohibited contributions.
   1. If a campaign accepts a prohibited contribution, it may cure the violation by returning the prohibited amount prior to the transaction's reporting deadline and reporting the contribution as refunded at the next reporting deadline. If a campaign cures a prohibited contribution on time, no penalty will be assessed. If a campaign cannot repay a contribution to the contributor, paying the same amount to the Fund within the cure period is an effective cure.
   2. The penalty for prohibited contributions as set out in 02.06.040 is two times the amount of the prohibited contribution. The penalty will be waived if the campaign pays back the prohibited contribution within the cure period.

Gonzalez Complaint, Ex. D-11

3. Candidates who collect contributions from a prohibited source or in a prohibited amount for a covered office prior to filing a Notice of Intent to participate in the program and return or cure any prohibited contributions within 30 days of filing the Notice of Intent are subject to a penalty of 25 percent of the total amount of prohibited expenditures. The penalty will be waived if the campaign pays back the prohibited contribution prior to receiving notice of the penalty from the Program. A candidate may not be certified until all prohibited contributions are returned and cured, and any owed penalty is paid. A candidate may cure the violation by:
   a. Transferring the violation amount to a frozen account associated with the candidate's campaign account;
   b. Donating the violation amount to the Small Donor Elections Fund, if permitted by state law; or
   c. Donating the violation amount to any organization described in section 170(c) of Title 26 of the Internal Revenue Code or to any charitable organization defined in ORS 128.620, if permitted by state law.

4. Candidates who collect contributions from a prohibited source or in a prohibited amount for an office other than a covered office prior to filing a Notice of Intent to participate in the program and return or cure any prohibited contributions within 30 days of filing the Notice of Intent are subject to a penalty of 25 percent of the total amount of prohibited expenditures. The penalty will be waived if the campaign pays back the prohibited contribution prior to receiving notice of the penalty from the program. A candidate may not be certified until all prohibited contributions are returned and cured, and any owed penalty is paid. If, on the day the candidate updates their Statement of Organization with the Secretary of State's office to a covered office, the amount in the candidate's campaign account is less than the total violation amount, the total violation will be considered cured, if the total
amount in the candidate's campaign account on the day the Statement of Organization is updated, is:
   a. Transferred to a frozen account associated with the candidate's campaign account;
   b. Donated to the Small Donor Elections Fund, if permitted by state law; or
   c. Donated to any organization described in section 170(c) of Title 26 of the Internal Revenue Code or to any charitable organization defined in ORS 128.620, if permitted by state law.

5. Candidates who collect contributions from a prohibited source or in a prohibited amount prior to filing a Notice of Intent to participate in the program and do not return any prohibited contributions within 30 days of filing the Notice of Intent will not be certified to use the program until remedied.

H. Prohibited Expenditures.
   1. A prohibited expenditure includes expenditures in violation of PCC 2.16.080.
   2. The penalty for a prohibited expenditure by a candidate who is not certified is to make a personal contribution to the Fund in the same amount as the prohibited expenditure and to pay a penalty of 10 percent of the prohibited expenditure amount to the Fund.

I. For violations that do not have a related reporting deadline and do not relate to fraud or document falsification, the Director will notify a campaign of a potential violation and give the campaign 7 calendar days to explain why the expenditure was not prohibited or to cure it. If the Director determines the expenditure was not prohibited or was effectively cured, the campaign will not be penalized. If the campaign does not explain or cure the

Gonzalez Complaint, Ex. D-12

expenditure within 7 days or if the Director determines the expenditure was prohibited, the campaign will be subject to the penalty.

J. In-kind contribution violations.
   1. The first $1,000, calculated to accrue cumulatively, of prohibited in-kind contributions can be cured by paying an amount equal to the prohibited amount to the Fund within the reporting period.
   2. In-kind contributions which exceed the total limit per donor by more than $1,000 (one thousand dollars), calculated to accrue cumulatively, are subject to a penalty of twice the amount of the violation.

K. Campaign Account Violations.
   1. A candidate with a campaign account that is not designated as the candidate's campaign account may transfer the funds in the account to a savings account associated with the candidate's campaign account. The savings account must be inactive for the duration of the relevant election cycle once created, other than making a seed money contribution within the rules and limits of the program, curing violations described in Administrative Rule 18(G)(3), or for de minimis transactions as stated in PCC 2.16.040. It will be treated as separate from the designated campaign account and subject to the provisions in this section.
   2. Campaign account violations include without limitation:
      a. Depositing campaign contributions or matching funds into or making expenditures from an account other than the designated campaign account reported to the Director, other than expenditures permitted by these rules;
      b. Having more than one active campaign account, including an associated savings account as described in subsection a of this section;
      c. Having a campaign account other than the candidate's campaign account that has not been reported to the Director; and
      d. Failure to return City matching funds erroneously distributed to a campaign account within by the deadline in the notification sent by the Director.
   3. Violations of campaign account requirements set out in PCC 2.16.040 A will be assigned a penalty as follows:
      a. Minor violations will be required to cure the violation by paying the Fund an amount no more than equal to the amount of the violation.
      b. Serious violations will be subject to a penalty of no less than equal to the amount of the violation and no more than triple the violation.
      c. Whether a violation is minor or serious is at the discretion of the Director. The Director will weigh the following factors to determine whether a violation is minor or serious:
         i. Whether the violation occurred prior to the candidate filing a Notice of Intent with the Director;
         ii. Whether the violation requires a recent proactive action to occur;
         iii. The amount of the transaction that was in violation; and
         iv. Whether the candidate reasonably would have known of the violation prior to it occurring and been able to prevent the violation.

L. Soliciting or directing contributions to other campaign finance entities to support one's own election, in violation of PCC 2.16.120 H, will result in a penalty of up to $10,000 (ten thousand dollars) at the Director's discretion.

M. Misrepresentation of Program Status: Any candidates, campaign staff, or campaign surrogates found to have misrepresented that a candidate is participating in this

Gonzalez Complaint, Ex. D-13

**Small Donor Elections Administrative Rules, Chapter 2.16**

Program and that contributions being solicited at the moment of the misrepresentation will be matchable when they have not filed a Notice of Intent, have been notified of rejection from certification, have passed the certification deadline and not been certified, or have been decertified will be subject to a penalty of $1,000 (one thousand dollars) for each incident with a maximum of $5,000 (five thousand dollars).

N. Falsifying documents: A campaign that submits to the Director a document that has been falsified by the candidate or campaign staff, or by a third party and the candidate or campaign staff knows or should have known that the document was falsified, is subject to decertification and repayment of all City matching funds with 10 percent interest per annum.

O. Any other violations: Any other violation of the program or these rules may result in a penalty, denial of certification, decertification per PCC 2.16.160 B, and repayment of public funds, including interest.

P. An egregious violation, or multiple violations which together are egregious, by a participating candidate may subject the candidate to tripling of the penalty imposed, denial of certification, or decertification per PCC 2.16.160(b), or a combination of these. Egregious violations include without limitation failures to timely and accurately report expenditures or contributions that violate program requirements, failure to remedy a violation within a reasonable time period, and failure to pay penalties totaling a large percentage of their privately raised funds within a reasonable time period.

Q. Withholding City matching funds:
   1. The Director may withhold City matching funds from a campaign:
      a. In the case of high outstanding penalty amounts or egregious violations, until penalties are paid and any other required remedies are carried out; or
      b. In the case that a campaign does not answer program questions or provide requested documentation during a program investigation, until questions are answered and documentation is provided.
   2. A candidate from whom City matching funds have been withheld may appeal the decision according to process outlined in PCC 2.16.170(D)(2).

R. Exceptions:
   1. If any violation is made as a result of an error by the Director, the violation is waived and no penalty is assessed.
   2. Multiple like instances in one reporting period of de minimis impact may be combined when calculating the penalty at the discretion of the Director.

S. Payment of penalties.
   1. No penalty may be paid using City matching funds, except as permitted or required in these Administrative Rules or the published Penalty Matrix.
   2. If a civil penalty has been imposed against a candidate or the campaign committee of a candidate, the candidate will be personally liable for the amount to be paid.
   3. If a civil penalty has been imposed against a political committee other than a campaign committee of a candidate, the directors of the political committee will be jointly and severally liable for the amount to be paid.
   4. The following penalties must be paid from the candidate's campaign account:
      a. Reporting penalties in Subsections C, D, and E;
      b. Prohibited contributions in Subsection F;
      c. Prohibited expenditures in Subsection G;
      d. In-kind contributions in Subsection H; and

Gonzalez Complaint, Ex. D-14

**Small Donor Elections Administrative Rules, Chapter 2.16**

      e.    Other violations as described in Subsection M only if the penalty notice specifies that the penalty may be paid from the candidate's campaign account.

5. The following penalties must be paid by the candidate from personal funds:
      a.    Campaign account violations in Subsection I;
      b.    Soliciting or directing contributions as described in Subsection J;
      c.    Misrepresentation of program status in Subsection K;
      d.    Other violations as described in Subsection M, if the penalty notice specifies that the penalty may not be paid from the candidate's campaign account.

6. Civil penalties may be paid at any time after receiving the notice of proposed penalty, but are due within 7 (seven) business days of the penalty becoming final.

7. Penalties imposed under this Section are subject to interest at a rate of 10 percent of the total amount per annum.

8. All moneys received for violations of any provision of the program must be paid and credited to the Fund.

T. Failure to pay penalties.

1. At the request of the Director, the City Attorney may seek civil penalties and enforcement of any provision of the program, in addition to any other remedies provided by law, in Circuit Court or other appropriate venue.

## 19. Appeals

A.    Purpose: The Request for Reconsideration and appeals processes have multiple purposes which are in the interest of the appellant and provides voters with information regarding a candidate that may impact how they vote. These purposes and the interests of these parties must be taken into consideration when implementing the Request for Reconsideration and appeals processes.

1. The purposes of the Request for Reconsideration process are:
      a.    For the appellant: to receive a timely resolution to a program determination they believe is in error;
      b.    For the program: to be alerted to a potential error in a program determination in a timely manner without the expense of legal representation and conducting a full appeal process.

2. The purposes of the appeal hearings process are to:
      a.    For the appellant: to receive a determination from a third party whether the program determination was in error for the reasons they assert it was in error;
      b.    For the program: to have a process in place for a third party to review a party's rationale and evidence that a program decision was in error as well as the program's rationale and evidence that it was accurate, as an additional protection to ensure that program determinations are being made in a manner that is legally sound and politically neutral.

Gonzalez Complaint, Ex. D-15

B.      Appeals are limited to issues raised and facts asserted in the Request for Reconsideration: An appellant may not raise an issue or assert a fact in the appeal process that they did not raise or assert in their Request for Reconsideration.

C.      Appeals by a candidate follow the procedures set forth in PCC 2.16.170 and these rules.

D.      Appeal by the program of the Hearing Officer's decision: If a program determination or penalty is overturned in whole or in part by a hearings officer, whether the program appeals the hearings officer's decision will be determined using the following process:

1.      The Portland Elections Commission will form a subcommittee to recommend whether to appeal the hearings officer's decision. Only Portland Elections Commissioners who are publicly neutral on the outcome of the appellant's race may serve on the subcommittee.

2.      Attorney advice:

a.      If the City Attorney's office represented the program before the hearings officer, the Director will solicit the advice of the City Attorney's office whether to appeal the hearing officer's decision and if doing so would serve program objectives.

b.      If external counsel represented the program before the hearings officer, the Director will solicit the advice of the same external counsel about whether to appeal the hearing officer's decision and if doing so would serve program objectives.

3.      The Director will share as much of the advice from the attorney with the subcommittee of the Portland Elections Commission as can be shared without jeopardizing confidentiality or attorney-client privilege, if those are implicated.

4.      The subcommittee will share with the Director their recommendation whether to appeal the hearings officer's decision and rationale.

5.      The Director will make the final decision whether to appeal the hearings officer's decision.

**20. Mitigating Circumstances and Personal Emergencies**

A.      The Director may reconsider a proposed penalty imposed or repayment determination made under the provisions of PCC 2.16.160 or these rules if the person, candidate or committee provides evidence of a valid mitigating circumstance or personal emergency that caused the initial violation or insufficient filing.

B.      The only mitigating circumstances that the Director may consider in a late or insufficient filing case are:

1.      The lateness or insufficiency of a report is the direct result of clearly-established fraud, embezzlement, or other criminal activity against the committee, committee treasurer or candidate, as determined in a criminal or civil action in a court of law or independently corroborated by a report of a law enforcement agency or insurer or the sworn testimony or affidavit of an accountant or bookkeeper or the person who actually engaged in the criminal activity. This mitigating circumstance is not available to the candidate or treasurer who was the perpetrator of the wrongdoing described above;

2.      The lateness or insufficiency of a report is the direct result of fire, flood or other calamitous event, resulting in physical destruction of, or inaccessibility to, committee records" ("Calamitous event" means a phenomenon of an exceptional character, the effects of which could not have been reasonably prevented or avoided by the exercise of due care or foresight); or

3.      The lateness or insufficiency of a report is the direct result of an error by the

Gonzalez Complaint, Ex. D-16

Director.

C. Personal Emergency.
    1. A valid personal emergency is an emergency, such as a serious personal illness or injury or death in the family of the candidate or treasurer which:
        a. Caused a report to be late; or
        b. Caused a candidate to withdraw as a candidate for office.
    2. Personal emergency does not include illness such as a common cold or flu. In the case of a late report, personal emergency also does not include a long-term illness where other arrangements could have been made.
D. Request for reconsideration. A person, candidate or committee may request a reconsideration of a proposed penalty or a repayment determination due to mitigating circumstances or a personal emergency. The request must be in writing and must detail the mitigating circumstances or personal emergency. The request must be filed with the Director no later than the date the penalty or repayment is due to be paid.

## 21. Withdrawal
A. A certified candidate may withdraw from the program by:
    1. Submitting to the Director a Notice of Intent form with withdrawal indicated; and
    2. Repaying to the Fund any remaining funds in their account up to the full amount of the City matching funds received.

## 22. Interpretation
A. If a question arises on which Portland City Code Chapter 2.16 and these Administrative Rules are silent, guidance in resolving the question may be found in the laws of the State of Oregon, provided that: (1) the determination under state law is not in conflict with any provision of Portland City Code Chapter 2.16 or these Administrative Rules; and (2) the state law is not otherwise inapplicable.

## 23. Rulemaking
A. The Portland Elections Commission may, at any time, amend these rules.
B. Amendments do not take effect until the Director has issued public notice and provided direct notice to all candidates subject to the rule. This notice must include the rule change and, when possible, the rationale for the amendment.

\* The changes to Administrative Rule 7 were made to December 23, 2022, beginning of election cycle.

Gonzalez Complaint, Ex. D-17

# EXHIBIT E

Page 22: COMPLAINT

**CITY OF PORTLAND**
**PORTLAND CITY AUDITOR**
**ADMINISTRATIVE RULE**



---

**ARA 13.03**

**CAMPAIGN FINANCE: COMPLAINT PROCESS**

**Background:** These rules are based on a voter-approved Charter amendment, related City Code, and subsequent court rulings.

**A.  Filing a Complaint**

1.  Complaints alleging violations of the City's campaign finance regulations must be filed in writing with the City Elections Office within the Auditor's Office. Complainants are encouraged to use the City Auditor's complaint form, which indicates the information needed to ensure a comprehensive investigation. Complaints may be filed:

    a.  By email to: elections@portlandoregon.gov.

    b.  By mail to: City Elections Office, 1221 SW 4th Ave, Room 130, Portland, OR 97204.

    A complainant who needs assistance making a complaint should email the City Elections Office.

2.  Complaints should include the following information:

    a.  Name(s) and contact information of complainant(s). The City Elections Office does not accept allegations submitted anonymously.

    b.  If a complainant requests that their name, contact information, and identifying details be kept confidential, the Elections Office will treat the information as confidential and exempt from public disclosure under ORS 192.355(4) unless ordered to disclose it under the law.

        i.  A complainant may request confidentiality of their identity at any time but, whenever possible, complainants should request

Gonzalez Complaint, Ex. E-1



**CITY OF PORTLAND**
**PORTLAND CITY AUDITOR**
**ADMINISTRATIVE RULE**

confidentiality from the Elections Office at or before the first communication with the Office about the complaint.

    ii. The Elections Office reserves the right to determine which details about a complainant are ones that tend to identify their identity.

c. The name of the candidate, campaign, political committee, individual, or other entity alleged to have violated the City's campaign finance regulations.

d. A description of the alleged violation(s).

    i. For example, a contribution alleged to have been received or made in violation of the City's campaign finance laws, a communication that lacked the required disclosures, or a private or public employer that failed to permit a contribution to be made by payroll deduction.

e. A complainant may raise more than one allegation per complaint.

f. The date(s) of the violation(s).

g. Any applicable dollar amount(s) associated with the violation(s), if known.

3. The Auditor's Office may decline to investigate any submissions that do not include the information in Subsection (A)(2).

4. Complainants are encouraged to include with the complaint all relevant documentation or evidence they may have pertaining to the violation(s).

5. Duplicative allegations or allegations that are substantially similar to those in an ongoing investigation or a previously rendered decision will not be reinvestigated.

Gonzalez Complaint, Ex. E-2



**CITY OF PORTLAND**
**PORTLAND CITY AUDITOR**
**ADMINISTRATIVE RULE**



6. Complaints alleging only violations of Charter and Code provisions in ARA 13.01(E) (Constitutional Limits on Enforcement) that the Auditor's Office does not enforce will not be investigated.

**B. Complaints Involving Small Donor Elections Program Participants**

1. Candidates participating in the City's public funding of campaigns program, known as the Small Donor Elections program, are eligible to receive any amount of money based on that program's rules.

2. If a complaint is submitted to the Auditor's Office involving alleged violations of both the Small Donor Elections program and the City's campaign finance regulations, the Auditor's Office may do one or both of the following:

   a. Refer the complaint to the Small Donor Elections program for its own investigation, or

   b. Submit a consultation question to the Small Donor Elections program for the program to issue an advisory determination as to whether certain circumstances relevant to a complaint would be deemed to violate the rules of the Small Donor Elections program.

      i. The Auditor's Office may rely on the Small Donor Election program's advisory determination in making its own determination of whether a violation of the campaign finance regulations has occurred.

      ii. If the Small Donor Election program conducts an investigation after providing an advisory determination to the Auditor's Office and draws a different conclusion than that reached in the advisory determination, the Auditor's Office may amend its own determination in accordance with Subsection (D)(5) below.

**C. Complaint Investigations**

1. For allegations against a contributor alleged to have contributed more than the amounts allowed in Code Section 2.10.010:

Gonzalez Complaint, Ex. E-3



a. When contact information for a contributor alleged to be in violation is not included as part of a complaint, the Auditor's Office will make a good faith effort to expeditiously obtain the contributor's contact information (including an email address, physical address, or phone number) in order to provide the contributor notice and opportunity for response as required by City Code 2.10.050 E.2.

b. For this subsection, a good faith effort may include requesting contributor contact information from a campaign alleged to have received an unlawful contribution from the contributor.

c. At the Auditor's Office's discretion, the timeline for an investigation may be tolled (meaning, the timelines set forth in City Code 2.10.050 will be paused) during the period it takes to determine the contributor's contact information.

2. For investigations, generally:

   a. Upon receiving or initiating a complaint, the Auditor's Office will follow the notice and investigation procedures prescribed in Code Subsections 2.10.050 E. – H.

   b. Written materials and other evidence relevant to the allegations in the complaint:

      i. May be submitted by email to: elections@portlandoregon.gov or by mail to: City Elections Office, 1221 SW 4th Ave, Room 130, Portland, OR 97204.

      ii. May include supporting evidence, such as documents or photographs, attached as exhibits and/or links to relevant electronic media.

      iii. May be requested by the Auditor's Office, during or after the material submission period.

Gonzalez Complaint, Ex. E-4



**CITY OF PORTLAND**
**PORTLAND CITY AUDITOR**
**ADMINISTRATIVE RULE**

---

    c.   The Auditor's Office may issue and seek enforcement of subpoenas requiring the production of any relevant information necessary to determine compliance with the provisions of Code Chapter 2.10.

        i.   Subpoenas will require a response no earlier than seven calendar days after issuance, unless a shorter period is required to comply with applicable deadlines.

        ii.   Should a person or entity fail to comply with a subpoena, the Auditor's Office may:

            A.   Draw adverse inferences in its determination against any individual or entity that fails to comply with a subpoena; and/or

            B.   Apply to the Multnomah County Circuit Court for an order to the subpoenaed party mandating compliance with the Auditor's Office subpoena or an appearance set by the court to show cause why they had not complied.

**D.  Auditor's Office Decision and Enforcement**

    1.   The Auditor's Office's decision on the complaint must:

        a.   Be in writing and provided to all interested parties.

        b.   Identify whether a violation of the City's campaign finance regulations occurred and the basis for the decision.

        c.   Include a statement that the complainant or the subject of the complaint may seek review of the decision in Multnomah County Circuit Court.

    2.   If the Auditor's Office finds that an entity or individual violated one or more of the City's campaign finance regulations, the Auditor's Office will issue a written decision in the form of a warning and letter of education or a notice of violation, which includes the following information:

Gonzalez Complaint, Ex. E-5



   a. The name of the individual or entity found to be in violation of the City's campaign finance regulations.

   b. For violations of timely disclosure requirements, all available and previously undisclosed information found through the investigation about the involved communication donor(s).

   c. A brief description of the complaint and the Auditor's Office's findings.

   d. A statement of the amount due as a civil penalty, if any, and instructions for paying the civil penalty.

3. Warning and Letters of Education

   a. Upon finding a violation, if the Auditor's Office finds reason to believe the subject of the complaint put forth a good faith effort to comply with Code Chapter 2.10, the Auditor's Office may, for a first-time violation, issue a warning and letter of education if there is no mandatory minimum penalty prescribed in the Code. For purposes of this subsection, "good faith effort" means what a reasonable person would determine is a diligent attempt to comply with the City campaign finance regulations under the circumstances.

   b. Once an election date has passed, the values of deterrence and provision of timely information to the electorate are diminished. Therefore, if the Auditor's Office receives a complaint or issues a determination after the relevant election date, the Auditor's Office may issue a warning and letter of education if there is no mandatory minimum penalty prescribed in the Code.

4. Civil Penalties

   a. The civil penalty for each contribution or expenditure violation is not less than two nor more than 20 times the amount of the unlawful contribution or expenditure.

**CITY OF PORTLAND**
**PORTLAND CITY AUDITOR**
**ADMINISTRATIVE RULE**



b. If the civil penalty cannot be determined based on an unlawful contribution or expenditure, the Auditor's Office will determine an appropriate civil penalty up to $3,000 per violation.

c. In determining the amount of a civil penalty, the Auditor's Office may consider mitigating or aggravating factors, including:

  i. The overall budget and resources available to the campaign or entity.

  ii. The number of previous violations by the penalized party within the same election cycle.

  iii. Whether the violation was repeated and continuous or isolated and infrequent. The Auditor's Office may choose to treat repeated similar actions occurring during the same election cycle as aggravating circumstances under a single violation.

  iv. Whether the violation appears to have been made knowingly based on relevant circumstances and available records.

  v. The campaign or entity's level of cooperation during the investigation, including providing timely and relevant information as requested.

  vi. The amount of penalties, if any, previously imposed on the same party or other parties under similar circumstances.

  vii. *For communications disclosure violations*: The size of the intended audience and the cost of the communication.

  viii. *For contribution and expenditure violations*: The size of the contribution or expenditure.

  ix. Whether complaints have been filed in apparent abuse of the complaint process. This can occur, for example, when

Gonzalez Complaint, Ex. E-7

**CITY OF PORTLAND**
**PORTLAND CITY AUDITOR**
**ADMINISTRATIVE RULE**



complaints against a potential competitor are filed repeatedly with similar allegations occurring in a short period, instead of filing all allegations as one complaint.

    x. Any other applicable factors the Auditor's Office deems relevant.

d. Limits on civil penalties imposed under this rule do not include interest. Civil penalties not paid within 60 days from the payment due date may be subject to 10 percent simple interest per annum.

5. Withdrawal and Reconsideration

    a. The Auditor's Office may, on its own discretion or on request of an interested party, withdraw a decision for reconsideration within the earlier of 30 days from issuance of the decision or until the decision is appealed.

    b. The Auditor's Office may consider additional information in deciding whether to withdraw the decision.

    c. Upon withdrawal of a decision, the Auditor's Office may accept additional relevant evidence for consideration.

    d. In the event the Auditor's Office withdraws a decision, the Auditor's Office will issue a new written determination within 30 days. The reissued determination will be provided to all interested parties.

6. Appeal

    a. Decisions of the Auditor's Office will be subject to judicial review in the Multnomah County Circuit Court.

    b. Decisions of the Auditor's Office can be appealed to the Circuit Court:

        i. For decisions that are not withdrawn for reconsideration, within 60 days from the issuance of a decision; and

Gonzalez Complaint, Ex. E-8



**CITY OF PORTLAND**
**PORTLAND CITY AUDITOR**
**ADMINISTRATIVE RULE**

ii. For decisions that are withdrawn for reconsideration, within 60 days from the issuance of the reissued decision.

7. A decision is considered final for purposes of Code Section 2.10.050 J.:

  a. For decisions that are appealed, following the completion of any judicial review or the final disposition of any appeal;

  b. For decisions that are not appealed, after the time for appeal has expired in accordance with ARA 13.03(D)(6).

## Auditor's Office Administrative Rule Information

Questions about these administrative rules may be directed to the City Elections Office.

## Auditor's Office Administrative Rule History

Adopted by the City Auditor on April 6, 2020, as interim rules, for a period of no greater than 180 days.

Amended by the City Auditor on April 29, 2020, as interim rules, for a period of no greater than 180 days.

Amended by the City Auditor on October 3, 2020, after a minimum 30-day public comment period.

Amended by the City Auditor on June 1, 2021, after a minimum 30-day public comment period.

Amended by the City Auditor on December 5, 2023, after a minimum 30-day public comment period.

Gonzalez Complaint, Ex. E-9

# EXHIBIT F

Page 23: COMPLAINT

**CITY OF PORTLAND**
**PORTLAND CITY AUDITOR**
**ADMINISTRATIVE RULE**



---

**ARA 13.05**

**CAMPAIGN FINANCE: CONTRIBUTION LIMITS**

**Background:** These rules are based on a voter-approved Charter amendment, related City Code, and subsequent court rulings.

A. The following are the only contributions permitted to be made to and received by candidates or candidate committees during an election cycle:

1. For any individual or political committee, up to the corresponding amount listed in Appendix A.

2. For a qualified small donor committee as defined in Code Section 2.10.080 P., contributions in any amount.

3. For contributions to participants in the Small Donor Elections program, as specified in Subsection (C).

B. A contribution refunded or declined within seven calendar days of receipt by the candidate or candidate committee (the "Return Period") will not be considered in determining whether a contributor, candidate, or candidate committee has exceeded the acceptable contribution limits set forth in Code Section 2.10.010 B. Notwithstanding the foregoing, the Auditor's Office will accept and investigate complaints about contributions even if the Return Period has not yet elapsed.

C. Candidates participating in the Small Donor Election program:

1. May accept contributions under the limits prescribed by that program.

2. A candidate who departs from the program voluntarily or involuntarily is subject to the campaign finance contribution limits defined in Code Chapter 2.10, as adjusted for inflation in **Appendix A**.

Gonzalez Complaint, Ex. F-1

**CITY OF PORTLAND**
**PORTLAND CITY AUDITOR**
**ADMINISTRATIVE RULE**



---

**Auditor's Office Administrative Rule Information**

Questions about these administrative rules may be directed to the City Elections Office.

---

**Auditor's Office Administrative Rule Information and History**

Adopted by the City Auditor on June 1, 2021, after a minimum 30-day public comment period.

Amended by the City Auditor on January 11, 2024, after a minimum 30-day public comment period.

Gonzalez Complaint, Ex. F-2

# EXHIBIT G

Page 24: COMPLAINT





November 13, 2024

Rene Gonzalez
P.O. Box 42307
Portland, OR 97242
*By certified mail*

**Delivered Electronically**
candidate@reneforportland.com
amy@reneforportland.com

## Notice of Determination
Complaint No. 2024-09-RG

Dear Rene Gonzalez and Rene for Portland:

### I.   Introduction and Overview

On October 17, 2024, the Elections Division, within the Auditor's Office, received a complaint alleging that Rene Gonzalez and Rene for Portland (collectively, Gonzalez) violated Portland's campaign finance law. (Ex. 1.) The complaint, which included a detailed spreadsheet of transactions, with information downloaded from the Oregon Elections System for Tracking and Reporting database ("ORESTAR"), can be construed as raising two discrete sets of issues.

The first issue relates to contributions that Rene for Portland received after November 8, 2022, and before December 23, 2022, that the complaint contends, when combined with contributions from the same contributors that occurred on or after December 23, 2022, exceeds the amount permitted by the City's campaign finance law.

1221 SW Fourth Ave, Room 310
Portland, OR 97204
reed.brodersen@portlandoregon.gov
portland.gov/auditor
503-823-2767

*Gonzalez Complaint, Ex. G-01*

The second issue relates to transactions on or after December 7, 2023,[1] that, individually or in the aggregate with other transactions from the same contributor during the election cycle, allegedly exceed the amount permitted under the City's campaign finance law and were partially refunded.[2] Refunds occurred on March 9, July 16, October 18, and November 4, 2024, and occurred anywhere from 31 to 223 days after their respective contributions.

After receiving the complaint, the Auditor's Office conducted an investigation, as detailed below. The Auditor's Office determines Gonzalez **did not violate** the City's campaign finance law with respect to the first issue. But the Auditor's Office determines Gonzalez **did violate** the City's campaign finance law with respect to the second issue and issues **a civil penalty of $9,180**.

## II.  The Auditor's Office conducted a complete investigation of this matter and Gonzalez cooperated with the investigation.

Under City Charter, the Auditor is required to take written complaints of campaign finance violations from any person. (Charter Section 3-305(c).) Upon receipt of a complaint, the Auditor is required, by law, to do the following: examine the complaint, make any investigation necessary, issue a notification of the complaint to every person who is an object of the complaint, accept written materials supporting or opposing the complaint, and render a decision on the complaint. (Charter Section 3-305(e).)

The Auditor's Office provided the complaint in this matter to Gonzalez on October 28, 2024. Gonzalez responded to the complaint on November 5, 2024. (Ex. 3.) On the issue of belated refunds, Gonzalez stated that refunding contributions was a manual process and that donation overages were refunded as soon as identified. (Ex. 3 at 2.) Gonzalez also followed up with additional information. (Ex. 4.) The Auditor's Office further received additional responses to the complaint as follows, and which are addressed in Exhibit 2:

---

[1] December 7, 2023, signifies the date Gonzalez publicly announced his candidacy for City of Portland mayor for the November 5, 2024, General Election, and the date on which Gonzalez filed his initial Notice of Intent with the Small Donor Elections program.

[2] One contributor, Kurt Ruttum, is excluded from this group and only discussed here and in Exhibit 2. Ruttum's first contribution, given on April 20, 2023, precedes the December 7, 2023, date and was given during the period Gonzalez was raising seed money. The Auditor's Office cannot rule out that this was a seed money contribution. If it was, this would mean Ruttum was allowed to give an additional $350 to Gonzalez as a separate allowable or matchable contribution. Ruttum did give a second contribution of $350 on January 25, 2024. (Ex. 2 at 6.) The Auditor's Office lacks evidence to find Ruttum's second contribution violated the City's campaign finance law, and thus excludes Ruttum's contributions from the analysis.

- Wendy Gerlach responded on October 31, 2024. (Ex. 6.)
- David Angeli responded on November 3, 2024. (Ex. 7.)
- David Pollock responded on November 5, 2024. (Ex. 8.)
- William Cornog responded on November 6, 2024. (Ex. 9.)
- Kurt Ruttum responded on November 6, 2024. (Ex. 10.)
- Al Jubitz responded on behalf of Nancy Jubitz on November 8, 2024. (Ex. 11.)

After reviewing submitted responses and ORESTAR transactions, the Auditor's Office made findings as to the contributors and transactions related to Issue No. 1 and Issue No. 2 (as defined below). These are addressed below and in Exhibit 2.

## III. Determination

### A. City Charter limits the amounts and sources of candidate contributions.

City Charter provides that a contributor can make and a candidate may receive only the following contributions:

- $500 — adjusted by inflation to be $579 for the current election cycle — from any individual or political committee other than a "Small Donor Committee";
- Any amount from a qualified "Small Donor Committee"; and
- For candidates participating in the Small Donor Elections program (which Gonzalez is), any amount permitted by the Small Donor Elections program.[3]

In addition, the Auditor's Office does not consider a contribution that is refunded or declined within seven calendar days of receipt by a candidate or candidate committee in determining whether the contributor, candidate, or candidate committee has exceeded the limits set forth above.[4]

The complaint, and the spreadsheet of Rene for Portland's campaign finance transactions (populated with ORESTAR data) that the complainant submitted to the Auditor's Office identified two overarching sets of issues, discussed separately below.

### B. All the Issue No. 1 transactions were lawful contributions.

#### 1.    Factual background to Issue No. 1.

The complaint identified a series of 32 separate sets of transactions that allegedly met the following criteria: 1) a contributor made at least one contribution after November 8,

---

[3] City Charter Section 3-304.

[4] ARA 13.05(B).

3

2022, and before December 23, 2022 (Time Window 1); 2) the same contributor made at least one additional contribution between December 7, 2023, and October 25, 2024 (Time Window 2); 3) together, the contributions on a per-contributor basis in Time Window 1 plus Time Window 2 exceed $579.

With the exception of transactions related to two contributors (whom the Auditor's Office analyzes with other "Issue No. 2" contributors), these transactions are excerpted at Exhibit 12 to this document. This Determination refers to these transactions as the "Issue No. 1" transactions. The Auditor's Office has confirmed the relevant data supplied by complainant related to the Issue No. 1 transactions accurately reflects what Gonzalez reported in ORESTAR. Moreover, Gonzalez's response to the complaint does not dispute the accuracy of the ORESTAR transactions. (Ex. 3.)

### 2. Determinations for Issue No. 1.

The Auditor's Office concludes that all of the Issue No. 1 transactions were permissible under the City Charter's campaign finance limits.

### a. All of the transactions in Issue No. 1 were permissible contributions, as each contribution that put the contributor over the Charter limits was allowed by the Small Donor Elections program.

For all the Issue No. 1 transactions, the following is true: 1) a contributor contributed less than $579 to Gonzalez in Time Window 1; 2) the same contributor also contributed no more than $350 to Gonzalez in Time Window 2; and 3) the total of the transactions in Time Window 1 and Time Window 2 exceeds $579. (Exhibit 12[5].) $579 is the stated amount that a contributor may contribute, and a candidate may receive, per election

---

[5] One contributor, Nancy Jubitz, merits further discussion. In ORESTAR, Jubitz appeared to have made two $500 contributions to Gonzalez on December 20, 2022, with an apparent result of $1,000 contributed to Gonzalez in Time Window 1. (Exhibit 12.) However, Al Jubitz, the husband of Nancy Jubitz, responded to the complaint and clarified that one of the December 20, 2022, contributions of $500 was in fact his contribution to Gonzalez (i.e., the Jubitzes contend that Gonzalez inaccurately recorded their contributions). The result of this correction is that Nancy Jubitz becomes similarly situated to the other Issue No. 1 contributors, as Nancy Jubitz's contributions in Time Window 1 did not exceed $579 and the contributions in Time Window 2 did not exceed $350. Gonzalez has since amended the transaction in ORESTAR to reflect only one contribution of $500 on December 20, 2022, designated for Nancy Jubitz. (Ex. 13.)

Gonzalez Complaint, Ex. G-04

cycle under the City Charter's contribution limits.[6] The relevant election cycle for purposes of determining contribution limits under Charter is November 9, 2022, through November 5, 2024.[7]

Thus, a hypothetical contributor who gave Gonzalez $500 on December 20, 2022, and another $350 on January 1, 2024 — a total of $850 in the election cycle — would, at first glance, appear to be in excess of the Charter limits in the 2022-2024 election cycle by $271 ($850 minus $579). However, the analysis is not that simple, because the City Charter's campaign finance provisions also provide that contributors can make, and candidates can receive, "any amount" that the system allows a candidate participating in the Small Donor Elections program to receive.[8]

Gonzalez is a participating candidate in the Small Donor Elections program. He filed his (initial) Notice of Intent to Participate in Portland's Small Donor Elections Program ("Notice of Intent") on December 7, 2023, and his 2024 Certification Application on July 22, 2024. The Small Donor Elections program code and rules expressly allow participating candidates to raise funds — in the form of "allowable" contributions, seed money, and in-kind contributions — during the period from when the Small Donor Elections program's election cycle began (December 23, 2022, for the 2022-2024 cycle) through the filing of a notice of intent.[9] When combined together, these contributions can exceed the amount a single contributor is permitted to give a candidate under City Charter.[10] It is therefore necessary to assess whether a candidate became a participating candidate under the Small Donor Elections program in determining if contributions received early in the cycle ultimately violate the City's Charter.[11]

The contributors listed in Exhibit 12 did not give more than $579 in Time Window 1, which is not governed by the Small Donor Elections program's rules. Under the Small Donor Elections program rules, contributors were allowed to contribute up to $350 each

---

[6] See Charter Section 3-301(a)-(b)(1), as adjusted for inflation pursuant to Charter Section 3-306 and Appx. A for ARA 13.

[7] ARA 13.02(J).

[8]  See Charter Section 3-304.

[9] City Code Section 2.16.040 G.; Small Donor Elections Administrative Rule 3(A), (O).

[10] A candidate can, for example, receive a seed money contribution of $500 and an allowable contribution of $350 from the same person before filing a notice of intent to participate in the Small Donor Elections Program. (City Code Section 2.16.040 G.)

[11] In addition, after the filing of a notice of intent, a candidate can receive eligible contributions for future City matching, or "matchable" contributions. After the candidate files an application for certification (to unlock matching funds), the candidate can no longer raise seed money but can continue to raise other forms of funds.

Gonzalez Complaint, Ex. G-05

to Gonzalez during Time Window 2 — whether the contribution was classified as a "matchable" or "allowable" contribution under the program's rules, and regardless of whether the candidate had raised money in the 45-day window before December 23, 2022.[12] Thus, a contribution of up to $350 in Time Window 2 is an amount that the Small Donor Elections program "allows" and is therefore an allowable contribution under the City's Charter. Because it is separately allowable (i.e., it is allowable under Small Donor Elections program rules, and thus a permissible form of contribution under the City Charter's limits), Gonzalez did not run afoul of Charter for the transactions in Exhibit 12.

There is, admittedly, a loophole here that the Gonzalez campaign made use of, but it is a legal one. Because the Small Donor Elections program has a gap in its "election cycle" window — namely, the 45 days after an election — there was a 45-day window after the November 2022 election where Gonzalez could raise money unencumbered by the Small Donor Election's program rules (for the 2020-2022 election cycle or the 2022-2024 election cycle). The Charter's limit ($579) fills this gap, so fundraising is not unlimited, but once the Small Donor Elections program's elections cycle began again (December 23, 2022), the question is whether any amount raised under that program is allowable. If it is, it is considered an allowed contribution under Charter.

For the contributors in Exhibit 12, the Auditor's Office concludes that the contributors' second-in-time contribution was permissible under the City Charter. $350 was an amount that Gonzalez was allowed to take from the contributors in Exhibit 12 under the Small Donor Election program's rules, regardless of the fact they had given in Time Window 1. Thus, the contributions in Time Window 1 and the contributions in Time Window 2 were permissible contributions, individually or in the aggregate.

The complainant's argument appears to be that because the first contribution for all contributors in Exhibit 12 was in Time Window 1, which was in the 45-day period where Small Donor Election's program's rules do not apply to candidates, the amount is not expressly "allowable" under the Small Donor Elections program's rules and thus the amounts in Time Window 1 and Time Window 2 should be aggregated and compared against the Charter limit of $579. We disagree. We think the relevant question is not whether the first contribution was "allowed" under Small Donor Elections program's

---

[12] A candidate can collect $350 in matchable contributions after filing a notice of intent to participate in the Small Donor Elections program. (*See* City Code Section 2.16.040 F., G.) It appears the Time Window 2 contributions are intended to be matchable contributions. In the alternative, because there was no other contribution after the Small Donor Elections program's election cycle began on December 23, 2022, they could also be considered permissible allowable contributions. *See* City Code Section 2.16.040 F.

6

rules, which do not apply to the period in Time Window 1, but whether the latter contribution (in Time Window 2) was allowed. The latter contribution is what tips the contributor over Charter's limits, and thus the one that deserves scrutiny in this situation where it is undisputed that the initial contribution was under $579 and thus permitted by Charter.[13]

To take a starker example, suppose a political committee that qualifies as a "small donor organization" under the Small Donor Elections program rules had given Gonzalez $500 on December 20, 2022. Without more, this would be permissible under Charter's limits. Let's further imagine, however, that this same committee gave Gonzalez an in-kind contribution during June 2024 valued at $10,000. A small donor organization can make in-kind contributions valued at no more than $10,000 per election. The complainant's logic would seem to require the Auditor's Office to conclude that Gonzalez violated City Charter's contribution limits by receiving an excess contribution of $9,921 (the $10,000 plus $500 contributions combined, less the $579 Charter limit). This result is not only contrary to the plain language of City Charter, but it would result in anomalous and unjust consequences.

While the complainant raises important questions about the loophole in the Small Donor Elections program rules that give candidates a 45-day window to fundraise unencumbered by that program's rules — which has the perhaps unintended effect of allowing the candidate to receive more than they would be permitted to raise if they were a nonparticipating candidate in the Small Donor Elections program *and* also get City matching funds — this is a loophole that City Council created for participating candidates. The Auditor's Office must enforce Charter as written, and doing so leads to a finding of no violation for the contributions listed in Exhibit 12.

### b. Two contributors with contributions in Time Windows 1 and 2 are assessed as part of Issue No. 2 transactions.

We note that there are two additional contributors flagged by complainant (contributors Wendy Gerlach and Sean Moreland) who gave in Time Window 1 and Time Window 2. These are unlike the contributors discussed above (*see also* Exs. 5 and 12), however,

---

[13] To be clear, this Determination is not saying that amounts that are permitted by Small Donor Elections program are ignored in the analysis of whether the Charter limits were exceeded. It recognizes, instead, that depending on the timing of certain transactions involving candidates participating in Small Donor Elections program (as well as the identity of the contributor), a candidate may be permitted to take in more than $579 from a contributor over an election cycle. In these instances, that amount becomes the ceiling for assessing a contribution violation, not $579.

7

because they gave more than $350 in Time Window 2. They are discussed below, in connection with Issue No. 2.

**C. Most contributors addressed in Issue No. 2 gave an unlawful contribution, which Gonzalez failed to timely refund.**

**1. Factual background for Issue No. 2.**

This section addresses transactions that allegedly met the following criteria: 1) a contributor either made no contribution in Time Window 1 or made a permissible contribution (under $579) in Time Window 1; 2) the same contributor contributed in excess of $579 in Time Window 2; and 3) some portion of what the contributor contributed in Time Window 2 was refunded by Gonzalez, but weeks or months after the contribution was made. These transactions are excerpted in Exhibit 5. This determination refers to this group of Transactions as Issue No. 2.

Most of the transactions in Issue No. 2 were brought to the Auditor's Office's attention in the highlighting (in green) on the spreadsheet the complainant submitted, but the specific issue does not appear to be addressed in the text of the complaint. However, in looking at the highlighting, a pattern of seemingly unlawful transactions emerged, and the Auditor's Office includes them as part of this complaint (and flagged them for Gonzalez to address) given the spreadsheet calls attention to them. The Auditor's Office verified the entries in the complainant's spreadsheet are as reflected in ORESTAR.

**2. Determinations for Issue No. 2.**

With the exception of contributions attributed to David Angeli, the Auditor's Office finds that Gonzalez violated the City's campaign finance law by accepting, and not refunding in a timely manner, contributions that were not only in excess of what is permitted by Charter, but also in excess of what is permitted by the Small Donor Elections program rules.

With the exception of Angeli, as discussed specifically below, the contributors identified in Issue No. 2 gave Gonzalez *more than* was permitted under Small Donor Elections program rules. Under the rules of that program, a candidate can accept contributions of up to $350 from individuals as either "allowable" or "matchable" contributions. The only other form of contribution that the candidate can accept from individuals is seed money, but that is capped at an aggregate of $5,000.[14] Gonzalez reached his seed money limit

---

[14] City Code Section 2.16.040 C.

8

on or around May 15, 2023. All of the transactions identified in Exhibit 5 and that are in Time Window 2 are ones that were given after this date.

Gonzalez recorded in ORESTAR each of the individual contributors in Exhibit 5 as having given more than once and in excess of $579 in Time Window 2. Gonzalez refunded amounts from each of the individual contributors in Exhibit 5 that exceeded $350 (presumably to ensure he stayed within limits of the Small Donors Elections program). The amounts that the campaign took in from these individual contributors beyond $350 were not allowed under Small Donors Elections program rules. Given this, to the extent the contributions exceeded $579 (or a slightly higher amount for two specific cases where the contributor also gave in Time Window 1), they are not considered allowable amounts under Charter.[15]

Although Gonzalez issued refunds to the contributors in Exhibit 5, he did not do so within the 7-day grace period that Auditor's Office Administrative Rule 13.05(B) extends to candidates and contributors. This period is consistent with the time state law allows for refunding contributions; it also recognizes that when campaigns take in cash, hold on to it, and refund it, that has hallmark aspects of a loan. (Loans are a form of contribution that are regulated under the City's campaign finance law.[16]) And in fact, in the transactions identified in Issue No. 2, Gonzalez held on to the unlawful contribution for weeks, and even months in some instances, giving the campaign an opportunity to make use of the funds (essentially, giving the campaign a no-interest loan).

Below is a list of each of the Issue No. 2 contributors who gave in excess of what was permitted by Small Donor Elections program rules and Charter, and the amount that the contribution exceeds City Charter.

| Contributor Name | Amount in Excess of Charter Limits[17] |
|---|---|
| Scot Abplanalp | $151 |

---

[15] As discussed above, the Charter does not exempt the amount permitted by Small Donors Elections program from consideration in determining if the Charter contribution limits were exceeded. Rather, the amount of an unlawful contribution will be the total contributed less the greater of (i) $579 (Charter limit) or (ii) the amount that a candidate participating in the Small Donor Elections program may lawfully accept from a contributor, which can depend on the timing of the contribution(s) and identity of the contributor (e.g., individual, political committee, etc.).

[16] See City Charter Section 3-308(e); Appx. B for ARA 13(C).

[17] Unless otherwise stated, the amount of the unlawful contribution is determined by totaling the contributions given (whether or not refunded) and subtracting $579.

9

| | |
|---|---|
| William Cornog | $471 |
| Jeffrey Davisson[18] | $21 |
| Wendy Gerlach[19] | $350 |
| Brent Hutchings | $121 |
| Gordon Keane | $21 |
| Belinda Kinyon[20] | $121 |
| Frederick Kinyonb[21] | $121 |
| Sean Moreland[22] | $700 |

---

[18] The Auditor's Office finds Gonzalez was in violation of Charter by accepting contributions in excess of Charter limits from Belinda Kinyon, Frederick Kinyonb, and Jeffrey Davisson, but declines to find a corresponding violation by Belinda Kinyon, Frederick Kinyonb, and Jeffrey Davisson themselves. The reason is that while Gonzalez would have known that he had exceeded the seed money limits at the time he accepted the initial contributions from these contributors, it is not obvious that the contributors themselves would have known this. Unlike the bulk of contributors in Issue No. 2, who gave after Gonzalez filed his notice of intent and was seeking "matchable" contributions of up to $350 from contributors, these contributors made their first contribution to Gonzalez before he announced his candidacy and they may, in good faith, have thought they were giving seed money contributions. Gonzalez is differently situated as he knew how much money he had raised at the time of these contributions.

[19] Gerlach made a permissible contribution of $250 in Time Window 1. However, in Time Window 2, Gerlach contributed an additional $700, of which $350 has been refunded outside of the return window. Gerlach therefore contributed a total of $950. As discussed above (in connection with Issue No. 1), the first $250 was permissible under Charter and not covered by the Small Donor Elections program rules. The next $350 was likewise permissible. Thus, the Auditor's Office considers that Wendy Gerlach's permissible contributions were $600 rather than $579.

[20] See footnote 18, above.

[21] See footnote 18, above.

[22] Moreland made a permissible contribution of $500 in Time Window 1. However, in Time Window 2, Moreland contributed an additional $1050, of which $700 has been refunded outside of the return window. Moreland therefore contributed a total of $1,550. As discussed above, the first $500 was permissible under Charter and not covered by the Small Donor Elections program rules. The next $350 was likewise permissible. Thus, the Auditor's Office considers that Sean Moreland's permissible contributions were $850, rather than $579.

10

Gonzalez Complaint, Ex. G-10

| Sean Ostler | $21 |
|---|---|
| David Pollock | $121 |
| Sergio Zepeda | $841 |
| **TOTAL** | **$3,060** |

In total, the unlawful contributions in Issue No. 2 sum to **$3,060**.

There is one contribution in Issue No. 2 that appears from what Gonzalez filed on ORESTAR to be unlawful, but the contributor clarified it was not. This is the set of transactions attributed to David Angeli. Angeli provided evidence that the first contribution was made by his wife, and the second contribution was made by him. Gonzalez acknowledged Angeli's clarification in its own response and stated that it "mistakenly refunded" Angeli's contribution. (Ex. 3.) The Auditor's Office does not include this in the list of unlawful contributions in Issue No. 2.

### IV. The Auditor's Office assesses a penalty of $9,180, payable by Gonzalez, which will be deposited into the City's general fund.

The Auditor's Office concludes that the amount of unlawful contributions in Issue No. 1 and Issue No. 2 combined total $3,060.

The City Charter provides that each violation of the campaign finance provisions "shall be punishable by imposition of a civil fine which is not less than two nor more than twenty times the amount of the unlawful Contribution … at issue." (Charter Section 3-305.) Thus, the penalty must be between $6,120 and $61,200. Auditor's Office Administrative Rule 13.05(D)(4) contains several mitigating and aggravating factors that are considered in deciding whether to set the penalty at the minimum amount or higher.

Here, the Auditor's Office determines that a fine of **$9,180**, or 3 times the unlawful contribution ($3,060), is appropriate. The following aggravating factors justify the increase in fine from the minimum mandatory fine of two times the unlawful contribution:

- **Budget and resources**: Gonzalez was well resourced, having received full matching funds ($100,000) from the Small Donor Elections program, and having raised more in campaign contributions than most other competing candidates for Portland mayor.
- **Repeated and continuous violation**: Gonzalez issued 17 refunds that were outside the return window and occurred on various dates, indicating there was

opportunity to identify and correct course on the issue of belated refunds. The evidence indicates this was not done.

## V. Payment

A penalty in the amount of $9,180 shall be paid (by Rene for Portland) to the City Auditor's Office. Payment shall be provided to the City Auditor's Office by **Monday, January 13, 2025**. Payment can be sent by mail or delivered to:

City of Portland Auditor's Office
1221 SW 4th Ave. Rm 130
Portland, OR 97204

## VI. Additional Authority and Appeals

This Notice of Determination is issued pursuant to the Auditor's authority under City Charter Section 3-305 (Implementation and Enforcement). That section sets forth the process for implementation and enforcement of the provisions of City Charter Article 3 (Campaign Finance in Candidate Elections), including the recipients' appeal rights. (See also Auditor's Office Administrative Rule 13.03(C) (requiring in part that decisions on complaints be in writing, identify whether a violation occurred, and state the basis for the decision).)

As described by City Charter Section 3-305(i) and Auditor's Office Administrative Rule ("ARA") 13.03(D)(5)-(6), the complainant and the subjects of the complaint may seek judicial review of the decision in Multnomah County Circuit Court. In addition, the Auditor's Office may, on its own discretion or on request of an interested party, withdraw a decision for reconsideration within the earlier of 30 days from issuance of the decision or until the decision is appealed.

As set out in ARA 13.03(D)(6), decisions of the Auditor's Office can be appealed to the Circuit Court within the following timelines:

- For decisions that are not withdrawn for reconsideration, within 60 days from the issuance of a decision; and
- For decisions that are withdrawn for reconsideration, within 60 days from the issuance of the reissued decision.

Sincerely,

Reed Brodersen

12

Reed Brodersen
Chief Deputy Auditor

CC: Seth Wooley, Complainant

13

Gonzalez Complaint, Ex. G-13

# EXHIBIT H

 

October 21, 2024

Rene Gonzalez
c/o Rene Gonzalez for Portland
P.O. Box 42307
Portland, Oregon 97242
**DELIVERED ELECTRONICALLY**
candidate@reneforportland.com
amy@reneforportland.com

## Notice of Redetermination
Complaint No. 2024-01-RG

Dear Rene Gonzalez:

## I.    Introduction and Overview

On August 16, 2024, the Elections Division, a division within the Auditor's Office, received a complaint alleging that Rene Gonzalez had violated Portland's campaign finance law — which is enforced by the Auditor's Office — by receiving an unlawful contribution. (Ex. 21.) Gonzalez is both a current City commissioner and a candidate for mayor in the November 2024 election. The complaint referred to an Oregonian article reporting that Gonzalez had used $6,400 in City of Portland funds to "polish his Wikipedia page."[1] The complaint contended the funds were spent "to edit [Gonzalez's] Wikipedia page for his run for Mayor."  (Ex. 21 at 4.) The Auditor's Office provided this

---

[1] Dixon Kavanaugh, S. (2024, August 7). Portland Commissioner Rene Gonzalez spent thousands in city funds to polish Wikipedia page. *The Oregonian/OregonLive*. https://www.oregonlive.com/politics/2024/08/portland-commissioner-rene-gonzalez-spent-thousands-in-city-funds-to-polish-wikipedia-page.html.

1221 SW Fourth Ave, Room 310
Portland, OR 97204
reed.brodersen@portlandoregon.gov
portland.gov/auditor
503-823-4078

complaint to Gonzalez on August 16, 2024, along with two other emails sent to the general Auditor's Office inbox on this topic.

After receiving the complaint, the Auditor's Office conducted an initial investigation. The Auditor's Office then issued an initial determination on September 16, 2024 (the "Initial Determination"). The Initial Determination found no violation of the City's campaign finance law. However, the Initial Determination also noted that this was an exceedingly close call and that investigators were still waiting for additional relevant documents, but that the Auditor's Office had to issue the Initial Determination on the date it did under City law.

The Auditor's Office subsequently received additional evidence that altered the Auditor's Office's conclusions and on October 2, 2024, withdrew its Initial Determination for reconsideration.

The Auditor's Office now re-issues its determination in this matter and finds that **Gonzalez violated the City's campaign finance law** by accepting an unlawful contribution. The contribution is the resources (money, time, and services) spent and employed by the City to promote Gonzalez's candidacy by developing and posting an edit to Gonzalez's Wikipedia page meant to bolster Gonzalez's status as a "Democrat." Gonzalez's political party affiliation is a key issue for his mayoral campaign that is unrelated to his work as a nonpartisan City Commissioner.

The Auditor's Office assesses a **civil penalty of $2,400** to the Rene for Portland campaign, which, upon payment, will be deposited into the City's general fund. The civil penalty is slightly increased beyond the mandatory minimum due to the presence of aggravating factors, most significantly, Gonzalez's attempt to interfere in the investigation, and the misleading of investigators by Gonzalez's staff.

The Auditor's Office previously referred this matter to the Secretary of State to determine whether any City employees engaged in prohibited political activities pursuant to ORS 260.432 and whether Commissioner Gonzalez violated ORS 260.432 by requesting employees engage in political advocacy during working hours. The Auditor's Office will provide the Secretary of State with this Redetermination and supporting exhibits. In addition, the Auditor's Office refers this matter to the Small Donor Elections program (in which Gonzalez is a participating candidate) to address as it deems appropriate.

## II.     Relevant Procedural Background

The City Auditor is an elected official who oversees the Auditor's Office. In 2018, Portland voters overwhelmingly (87.4%) voted to enact campaign finance regulations in the City's Charter. These provisions, among other things, cap the contributions that can

2

be made and received by candidates for City office. (See Charter, Art. 3.) As part of this package of reforms, voters also voted to make the independent City Auditor responsible for enforcing the Charter's campaign finance provisions. (See Charter Section 3-305.)

Under City Charter, the Auditor is required to take written complaints of campaign finance violations from any person. (Charter Section 3-305(c).) Upon receipt of a complaint the Auditor is required, by law, to do the following: examine the complaint, make any investigation necessary, issue a notification of the complaint to every person who is an object of the complaint, accept written materials supporting or opposing the complaint, and render a decision on the complaint. (Charter Section 3-305(e).) The Auditor's Office has also enacted a comprehensive administrative rule to codify the complaint process. (See Auditor's Office Administrative Rule 13.03.)

The Auditor's Office received one official, and two more informal, complaints about Gonzalez's use of City funds on his Wikipedia page. Under City law, the Auditor's Office is required to investigate and issue determinations on abbreviated timelines, designed to give voters as much information as possible before an election. In this case, investigators made multiple attempts to get critical information from Gonzalez but did not receive all documents before the Auditor's Office had to issue its determination. Because of this, the Auditor's Office noted in its Initial Determination that it reserved the right, consistent with Auditor's Office Administrative Rule 13.03(D)(5), to withdraw the Initial Determination for reconsideration within 30 days in the event that additional evidence was received that altered the Auditor's Office's conclusions in the Initial Determination.

On September 5, 2024, the Auditor's Office made a public records request to the City for documents it had requested, but not received, from Gonzalez in the course of the investigation. The Auditor's Office has subpoena authority but elected not to use it in light of the highly unusual circumstances of this matter. It took the City almost six weeks to fully respond to the records request. The Auditor's Office received an initial set of documents on September 26, 2024, but did not receive the full set of records from the City until October 15, 2024.

### III.     Factual Background Relevant to the Redetermination

#### A.     The initial investigation revealed some, but not all, key facts relevant to this Redetermination.

The Auditor's Office refers to the extensive factual background in the Initial Determination, attached as Exhibit A, for full details about this determination. However,

3

this section summarizes key facts in the Initial Determination that are relevant to this Redetermination:[2]

- The "Rene Gonzalez (politician)" Wikipedia page was created on or around November 9, 2022, the day after the general election in which Gonzalez won a seat on Portland's City Council.

- Gonzalez attempted to edit the Wikipedia page in his candidate capacity in November 2022.

- In November 2022, in the process of attempting to amend the Wikipedia page, Gonzalez shared information about his status as a Democrat with a Wikipedia administrator.

  o At the time, the Wikipedia page stated: "Though both candidates are registered Democrats, during the campaign Hardesty attempted to paint Gonzalez as right wing, with ties to Republican political consultants and conservative school board candidates supported by the political action committee he organized."

  o On November 23, 2022, Gonzalez shared with a Wikipedia administrator that "the [Gonzalez] campaign sent a cease and desist letter to our opponent during the campaign for what we believed were inflammatory/false statements contributing to threat of political violence." Gonzalez went on to cite to a Willamette Week article that labeled his opponent's "mailers as a 'lie.'" Gonzalez also included a quote from the article that: "The implication [from the mailer is] that Rene Gonzalez is a Republican…. [B]ut he's a pro-choice Democrat."

- Gonzalez publicly announced his candidacy for mayor on December 7, 2023. However, it is more likely than not that he became a "candidate," as that term is used in City law, months before that date.

- On November 25, 2023, Shahriyar (Shah) Smith, in his capacity as the Commissioner's Chief of Staff, reached out to WhiteHatWiki (whose legal name is Codename Enterprises, Inc.). WhiteHatWiki is a vendor that provides Wikipedia-related services, including Wikipedia strategy and updates. Smith told WhiteHatWiki his project was: "Prominent elected official looking to refresh Wikipedia Page related to 2022 election."

---

[2] Citations to supporting documents for this section can be found in the Initial Determination (Exhibit A). They are removed from this summary for readability.

4

- On March 12, 2024, a contract securing WhiteHatWiki's services for Gonzalez was fully executed. The parties were identified as "City of Portland – Office of Portland City Commissioner Rene Gonzalez" and "Codename Enterprises, Inc." (doing business as WhiteHatWiki and Buzzr.com). The contract provides that WhiteHatWiki would work on assisting with "Request Edits" and/or "Contentious Matters." Both types of projects involve developing and advocating for edits on the Wikipedia page; what differentiates them is how much controversy or difficulty there is surrounding the edits.

- Ultimately, Gonzalez's Office chose to ask WhiteHatWiki to provide it with "8 Request Edits" under the terms of the contract. For this, WhiteHatWiki charged the City $6,400, which the City paid in two installments (one on March 25, 2024, and one on June 17, 2024).

- Harrison Kass, Commissioner Gonzalez's policy advisor, was assigned to work on the Wikipedia edits with WhiteHatWiki shortly after his arrival at the City (in February 2024) and described his role as a "middleman" between WhiteHatWiki and Gonzalez.

- Kass and WhiteHatWiki exchanged ideas for edits over the course of a few months (March – June, 2024). Kass stated that he did not care for the Wikipedia project, so he "slow-walked" it. As a result, he recalls having several discussions with Gonzalez and others in the office about the status and content of the Wikipedia edits. Kass would relay WhiteHatWiki's suggested edits to Gonzalez, who would give his feedback, and then Kass would relay that back to the vendor.

- Gonzalez was aware, at a minimum, of the substance and focus of all of the eight "Request Edits" submitted on his behalf to Wikipedia. He formed this knowledge through, at a minimum, more than one conversation with his staff prior to the submission of the edits to Wikipedia. He also provided his feedback on the edits, and they were all run by him to give him an opportunity to comment. While staff stated he did not formally "sign off," his review and discussion on multiple occasions, and position as leader of the office, qualifies as his assent to the substance of the edits.

- The eight "Request Edits" that were developed in connection with WhiteHatWiki were submitted to Wikipedia (by Harrison Kass) on June 25, 2024. One of the eight edits (Edit No. 3) was as follows:

  In the **Portland City Council, Council race** section, please change the first clause of the third paragraph.

  From:

5

> Though both candidates were registered Democrats,
>
> *To this*:
>
> Though both candidates were Democrats,
>
> Rationale: Replaces Primary source that is a broadcast debate with a well-regarded secondary source, The Oregonian. Removes "registered" as that is not reflected in the source.

- At the time of the Initial Determination, the Auditor's Office concluded that the evidence pertaining to the origin of Edit No. 3 — removing the word "registered" before "Democrats" — was inconclusive. But Kass said the intention behind Edit No. 3 was:

  > There's a yeah, there's a misunderstanding that [Gonzalez is] a Republican and that kind of related to the, this idea that he was supporting Patriot Prayer or whatever. So I know that's bothered him for a long time. And obviously it's a kind of Portland-specific problem, though [unintelligible] so far to the left. But yeah, I think it was just addressing something that was an inaccuracy, like emphasize that he's a registered Democrat. He's I think he like voted for Biden. So yeah, that was bugging him.

**B.      Information received after the Initial Determination gave more context to Edit No. 3, regarding Gonzalez's political party affiliation.**

This section outlines new information discovered in the records provided to the Auditor's Office in response to its public records request.

- In the Initial Determination, the Auditor's Office explained that Edit No. 3 — the edit about Gonzalez's political party affiliation — could be considered a campaign contribution, but that the evidence the Auditor's Office had received to date was not sufficient to establish that it was more likely than not a contribution.

- It is now clear that the Auditor's Office did not have a complete evidentiary record, despite multiple attempts to get a key document from Gonzalez and his staff, and that the resources spent to secure Edit No. 3 do, in fact, constitute a campaign contribution.

- Specifically, since issuing the Initial Determination, the Auditor's Office has learned that Kass emailed WhiteHatWiki a marked-up version of the Gonzalez Wikipedia page on March 21, 2024 (and that Smith received this on March 22, 2024). (Ex. 23, Ex. 26.) Kass's email—which the Auditor's Office received in the

6

initial investigation as part of a longer chain *without the attachment* (Ex. 39)—says, "Here's an initial scan of proposed changes that can be made to the existing Wikipedia text." (Ex. 26 at 1.)

- o   The Auditor's Office expressly asked Gonzalez in writing for the attachment to this specific email. (Ex. 24 at 2.) Specifically, the Auditor's Office asked: "Please provide all attachments to this email, including the 'scan' referenced."

- o   Gonzalez referred the Auditor's Office to Kass for the information requested. (Ex. 25 at 2.)

- o   Kass responded in writing on September 3, 2024: "The 'scan' I refer to is just a visual scan of Wikipedia page." (Ex 25 at 1.) This was a false statement.

- o   This explanation did not make sense to the Auditor's Office's investigators, so a member of the Auditor's Office staff asked Smith orally, on September 4, 2024, for this scan and any other missing attachments to emails provided in the investigation. Smith a) responded that there were no missing attachments to any emails and b) reiterated the specific statement that Kass had made that Kass's email "here's a scan" did not refer to something attached but to a "visual scan." This was a false statement.

- o   The Auditor's Office received the first of two installments of emails in response to its public records request on September 26, 2024. Among the batch of emails was Kass's March 21, 2024, email to WhiteHatWiki stating: "Here's an initial scan of proposed changes that can be made to the existing text." This email had an attachment (contrary to what both Kass and Smith told investigators). (Ex. 26.)

- •   The document attached to Kass's March 21, 2024, email to WhiteHatWiki reflects the initial edits that Gonzalez's Office asked WhiteHatWiki to assist it in making to Gonzalez's Wikipedia page. This included the following proposed addition: "Gonzalez has been registered as a Democrat for X years."[3] (Ex. 26 at 3.)

---

[3] At the time the Auditor's Office had to issue the Initial Determination, we knew only that Gonzalez's staff had emailed internally about suggesting this edit. (See Exs. 6A-6C.) As mentioned in the Initial Determination, we could not confirm whether or not this requested edit was shared with WhiteHatWiki. (Ex. A at 13, 20.)

- Commissioner is a nonpartisan position in the City of Portland.[4] A commissioner's political party affiliation is irrelevant to their job duties.

- On September 26, 2024, the Auditor's Office also received a key email exchange (Ex. 27) with WhiteHatWiki which had been provided to the Auditor's Office by Smith during the initial investigation in jumbled form, with pages out of order and text apparently missing. The email exchange as initially provided (Ex. 20) had been too difficult to follow to draw definitive conclusions from (as mentioned in the Initial Determination). The contents are now clear. Specifically, from the email exchange, the Auditor's Office is able to conclude that:

  o After Gonzalez's team asked for the Wikipedia edit "Gonzalez has been registered as a Democrat for X years," WhiteHatWiki researched this point in "multiple periodical databases" to try to confirm Gonzalez was identified as a registered Democrat in a source that Wikipedia would credit and approve. (Ex. 27 at 2.) WhiteHatWiki told Smith, "[W]e knew this was important to you so we searched for hours." (Ex. 27 at 3.)

  o However, despite hours of searching, all that WhiteHatWiki could find was a reliable source saying that Gonzalez was a Democrat — i.e., not one saying that he was a *registered* Democrat. (Ex. 27 at 3.)

  o The Wikipedia page at the time (which is ever-evolving) did state that Gonzalez was a "registered Democrat" – though not for how long he had been registered, and WhiteHatWiki thought the point was vulnerable to being changed again because it lacked strong citation support. Thus, WhiteHatWiki recommended removing the term "registered" before "Democrat" on the Wikipedia page. They made this recommendation because they understood that making the broader point that Gonzalez was a "Democrat" was important to Gonzalez, and because they were concerned that keeping "registered" in the edit requests sent to Wikipedia when no Wikipedia-acceptable source supported that Gonzalez was, in fact, registered as a Democrat would cause a loss of credibility with the Wikipedia administrators. (See generally Ex. 27.)

  o WhiteHatWiki made this change — keeping the concept of "Democrat" but removing the word "registered" — in the proposed Wikipedia edits shared with Gonzalez's team. (See Exhibit A at 14.) Gonzalez's team balked at

---

[4] See Charter Section 3-105. (The version in effect presently states that the City's elective offices "are nonpartisan." The version in effect at the time Gonzalez was elected provided that "[n]omination of …. Commissioners … are nonpartisan.")

8

Gonzalez Complaint, Ex. H-08

removing "registered" from the Wikipedia page, however, and pushed back. They asked WhiteHatWiki to drop the edit, and work with them on another edit (as one of the eight edits they contracted for) on the grounds that removing the term "registered" was simply a "grammatical" change. (See Exhibit A at 14-15; see also Ex. 27 at 4.)

- o  WhiteHatWiki disputed the characterization that striking the word "registered" was "grammatical," saying: "You want to leave in the article that [Gonzalez] is a registered Democrat. Whether he is a registered Democrat or [a] Democrat *was a campaign issue* central to the City Council campaign. This is not grammar[.]" (Ex. 27 at 2 (emphasis added).)

- o  WhiteHatWiki also reiterated its recommendation to submit an edit to the Wikipedia page that would strike the term "registered" from the Wikipedia page but that would provide support for the statement Gonzalez is a Democrat saying: "Given the controversy, *getting this statement reliably sourced and more stable on the page seems like a major win for you*…. For a proposal with multiple [request edits] to be effective, you can't leave obvious, major policy mistakes on the page. You have to build good faith with the reviewers that you are improving the page, not just promoting a politician…. So this issue - Democrat vs. registered Democrat; not addressing the policy error vs. addressing it - is absolutely central to this proposal and the page." (Ex. 27 at 3 (emphasis added).)

- o  WhiteHatWiki's assertions that Gonzalez was receiving a benefit from getting the statement "reliably sourced and more stable"— thus making it less likely that his status as a Democrat would be altered in the future—is supported by the fact that Gonzalez's political party affiliation was not consistently stable on Wikipedia. For example, a screenshot of his Wikipedia page from February 16, 2023, shows that his political party was, at least at one point, listed as "Republican." (See Ex. 44)

- o  Smith ultimately agreed with the proposal to change the text from "registered Democrat" to "Democrat." (Ex. 27 at 1.)

- Gonzalez has made his status as a Democrat a key point in the current mayoral campaign. This underscores that his political party affiliation is a critical issue to his campaign.

- o  For example, Gonzalez's campaign's X account has made repeated mentions of his alignment or affiliation with Democrats. (See Ex. 18 (excel capture of content from X account, reflecting at least 6 mentions of Gonzalez's alignment or affiliation with Democrats) at 1, 2, 13.)

9

- o In addition, at least some of Gonzalez's campaign yard signs emphasize that he is a Democrat. Gonzalez's campaign also posts photos of this signage on the campaign's Instagram account. (See Exs. 28-30.)

- The public records response also reveals more on the extent of Gonzalez's involvement in the Wikipedia project, which Kass confirmed in his interview (and which Gonzalez and Smith both downplayed). For example:

  - o Agendas of weekly Gonzalez staff team meetings that were emailed out to all staff in Gonzalez's Office, including Gonzalez, reflect that the Wikipedia edits were reviewed with Gonzalez. (See, e.g., Ex. 31, which states a 4/8/24 agenda item is to "Review Wiki and media requests with Commissioner Gonzalez"; Ex. 32, which states the 4/15/24 agenda would include Wiki/Newsletter update; Ex. 33, which states the 4/26/24 agenda would include a "Wikipedia Update" that included "Review initial draft.")

  - o Kass emailed Gonzalez on April 8, 2024, with "the list of priority topics we sent to Wikipedia editors." (Ex. 34.)

  - o Kass emailed WhiteHatWiki on May 6, 2024: "We received feedback from the Commissioner on the Wikipedia edits." (Ex. 35.)

  - o Smith emailed Gonzalez on May 29, 2024, "GG and I with Harrison finalizing Wiki edits – looking solid sir." (Ex. 36.)

  - o Smith emailed Gonzalez on July 16, 2024, "Wikipedia consultants are conferring on next steps re "Patriot Prayer' … will get back to us soon." (Ex. 37.)

  - o Smith also worked closely with Gonzalez managing the Office's response to press inquiries when the story about the Wikipedia edit project broke. (See, e.g., Ex. 38 (collection of emails).)

- The documents that the Auditor's Office received in response to its public records request also highlight that Gonzalez's staff was focused on other campaign issues as possible Wikipedia edits.

  - o For example, Gonzalez's staff originally wanted to add that Gonzalez's 2022 Council campaign largely focused on "restoring public safety and economic vitality," to the existing text about his 2022 campaign platform. (Ex. 26 at 3.) WhiteHatWiki declined, saying "there are no print sources that note economic vitality (or anything specifically economic), public safety or investing into the revitalization of downtown. Unfortunately, we can't include it here." (Ex. 40 at 1.) But Kass pushed back, asking WhiteHatWiki to research: "Is there anything where he says, something

10

like, homeless and crime are hampering small businesses, or driving businesses from downtown? Anything that criticizes the economic ramifications of crime/homelessness?" (Ex. 40 at 1.) This is a requested edit that WhiteHatWiki appears to have researched, with City funds, to highlight Gonzalez's 2022 campaign platform, not his work as City commissioner.

- Finally, while Gonzalez has suggested that staff "professional development" was a main reason for the Wikipedia project (see Gonzalez Interview at 25:51-26:18), the evidence received in the investigation undercuts this assertion. WhiteHatWiki proposed spending only 30 minutes showing staff how to request edits and their contracted scope of work was only minimally focused on training staff. (Ex. 41 at 4 ("[T]he account creation and submission process takes about 30 minutes, during a carefully monitored screen share."); Ex. 3.) In the records the Auditor's Office received on October 15, 2024, it is also clear that Gonzalez's staff met with another potential contractor who talked with Gonzalez's staff about "undertak[ing] a project to assess the potential to update the existing Rene Gonzalez Wikipedia article," and proposed conducting research, recommendations, and ongoing support, but only providing one webinar where Gonzalez's staff could review the vendor's report and Wikipedia best practices and major guidelines. (Ex. 42 at 6.) In other words, neither contractor under consideration understood training to be a significant part of the services that Gonzalez wanted provided.

## IV.    Determination

The questions before the Auditor's Office are whether, in paying WhiteHatWiki for assisting Gonzalez's Office in making edits to the Rene Gonzalez Wikipedia page, and in providing services of City staff and WhiteHatWiki to make edits to Gonzalez's Wikipedia page, the City (acting through Commissioner Gonzalez's Office) made an unlawful contribution to Gonzalez in his capacity as a candidate and whether Gonzalez (or his candidate committee) accepted an unlawful contribution. The Auditor's Office concludes that, at least for Edit No. 3 (regarding Gonzalez's political party affiliation), the answers to these questions are yes. As to the other seven edits, the Auditor's Office reiterates the factual and legal conclusions in its Initial Determination (Exhibit A), and finds that there is insufficient evidence to conclude that money or services related to the other seven Wikipedia edits constitute an unlawful contribution.

11

## A.    City Charter limits the amounts and sources of candidate contributions.

City Charter provides that a candidate may receive only the following contributions:

- $500 — adjusted by inflation to be $579 for the current election cycle — from any individual or political committee other than a "Small Donor Committee;"

- Any amount from a qualified "Small Donor Committee;" and

- For candidates participating in the Small Donor Elections program (like Gonzalez), any amount permitted by the Small Donor Elections program.[5]

There are several forms a "contribution" can take. For purposes of this determination, it suffices to say a "contribution" includes both the payment of money to or on behalf of a candidate and also the furnishing, without equivalent compensation or consideration, of services or any other thing of value to or on behalf of a candidate.[6]

## B.    City funds spent to provide services to a City official, who is also a candidate, could qualify as a contribution to the official in their capacity as a candidate depending on the particular facts and circumstances.

The Auditor's Office has determined Gonzalez was a "candidate" as of March 2023 — well before the City paid WhiteHatWiki or incurred the liability to do so. (See Exhibit A, Section III.B.1.)

The Auditor's Office also concludes that if the City hires and pays for a vendor to assist an elected official in messaging that is for the purpose of assisting the elected official in their capacity as a candidate, that could be an unlawful "contribution" as that term is defined in City Charter. The City is not a contributor from which a candidate can lawfully receive a donation under City Charter (i.e., the City is not an individual, a political committee, or a small donor committee).[7]

The crucial question to be answered in this case is whether the City paid WhiteHatWiki, and made WhiteHatWiki's services, as well as City staff services, available to Gonzalez

---

[5] City Charter Sections 3-301, 3-304.

[6] Portland City Charter Section 3-308, Intro & (a); Auditor's Office Administrative Rule 13, Appx B(A).

[7] The Small Donor Elections program has provided an advisory opinion to the Auditor's Office that, if the amounts paid to WhiteHatWiki constitute a contribution to Gonzalez, that would not be a permissible contribution under the Small Donor Elections program's rules. (Ex. 19.)

12

in his capacity as a candidate. As stated in the Initial Determination, and as bears repeating here: the Auditor's Office does not view an elected official's communications that are limited to discussion of the elected official's acts in office as a "contribution" to the elected official in their capacity as a candidate. It would unduly chill speech for a communication from an elected official to their constituents about the official's actions and accomplishments in office to be considered campaign activity.

But on the other hand, if an elected official running for office uses the resources and money of the City at the official's disposal to issue communications that are unrelated to City business, and instead are campaign communications, this could constitute an unlawful contribution from the City to the elected official that violates campaign finance law. Imagine, for example, that instead of Gonzalez having knowledge that his staff was requesting an edit to Wikipedia highlighting his mayoral platform that was worked on with a vendor using City money and City resources, Gonzalez knew that his staff, using City money and City resources, was erecting a billboard in downtown Portland stating: "Rene Gonzalez is running for Mayor on the platform of public safety, homelessness, drugs, and revitalizing the economy." The Auditor's Office would have no hesitation concluding that this was a campaign finance violation.

The challenge here is that some of the requested Wikipedia edits that Gonzalez either sought, or his staff developed with his knowledge and consent, fall within the realm of clearly permissible forms of communication, while others, on their face, go beyond mere communication about his in-office work and priorities. The Auditor's Office initially found that the evidence about Gonzalez's motivations and the reasons for the edits that have nothing to do with City business on their face was mixed and insufficient to establish that it was more likely than not that the time and resources spent on the Wikipedia edit project was a contribution. But the Auditor's Office also noted that additional evidence could change this determination.

     **C.**     **Resources spent in connection with developing Edit No. 3, regarding Gonzalez's political party affiliation, constitute an unlawful contribution to Gonzalez in his capacity as a candidate.**

As to Edit No. 3 specifically, regarding Gonzalez's status as a Democrat, the Initial Determination stated: "One interpretation of the record evidence is that Gonzalez and his staff wanted, and spent City resources on trying to get, a beefed-up entry on the Rene Gonzalez Wikipedia page about his political party affiliation, but that WhiteHatWiki could not find evidence to support it. Spending resources to search for evidence to bolster the public record that Gonzalez is a registered Democrat, when he serves in a nonpartisan role, may very well be a contribution to a candidate." (Ex. A at 20.)  Based on the incomplete record available to the Auditor's Office at the time of the Initial Determination, the Auditor's Office could not be certain this was the case.

13

Now that the full set of documents on this edit has been provided to the Auditor's Office, the Auditor's Office concludes that this edit was, in fact, requested by Gonzalez's representatives for the purpose of bolstering the public record stating that Gonzalez is a Democrat. This is a key campaign issue for Gonzalez; in fact, Gonzalez initially raised his party status to Wikipedia administrators back in 2022, in his capacity as a candidate. He also continues to emphasize it in the current race for mayor. (See above at Section III.B.)

Moreover, Commissioner is a nonpartisan position in the City of Portland. Gonzalez's political party affiliation is thus irrelevant to Gonzalez's work as a Commissioner. Notably, Gonzalez has been unable to articulate any reason why his political party had a bearing on his work as a City Commissioner. Instead, when he was asked by investigators at his interview how "editing a party affiliation would relate to city business as a nonpartisan elected official," his answer was, ultimately: "I have no opinion on this one." (Gonzalez Interview at 49:34-50:11.) Kass, for his part, thought the intention behind the edit was that it had "bothered [Gonzalez] for a long time" that there was a "misunderstanding that he's a Republican." (Kass Interview at 55:34-55:48.)

In addition, Gonzalez—who is of course a candidate and a critical figure in his own campaign— had knowledge of the edits before they were submitted, consented to the substance of the edits, and remained involved in the Wikipedia edit project from its inception through the resulting media controversy. (See above at Section III; Exhibit A at 8-9.)

A contribution to a candidate or their campaign committee does not need to be in the form of a payment of cash for it to qualify as a "contribution" that is governed by the City's campaign finance laws. There are many forms a contribution can take, including the payment of money on behalf of a candidate and the furnishing, without equivalent compensation or consideration, of services (other than personal services for which no compensation is asked or given) to or on behalf of a candidate.

Here, the City (acting through Gonzalez and his staff) paid money to WhiteHatWiki to research and develop an edit about Gonzalez's political party affiliation as one of the eight edits it requested WhiteHatWiki to assist with. In addition, the City provided WhiteHatWiki's services to Gonzalez in his capacity as a candidate by providing WhiteHatWiki's research and expertise to Gonzalez to bolster his Wikipedia page regarding a key campaign issue that is of no relevance to his work as a commissioner. The City also provided City staff services (including the time of Smith and Kass as well as others) in helping to develop and finetune, and then with WhiteHatWiki's assistance to post, the edit and citation sources to bolster the point about Gonzalez's political party status. City staffers were paid by the City for this work, thus their services also qualify as a form of contribution.

14

While Gonzalez has suggested that the edit was perhaps not ultimately that satisfying to him (see, e.g., Gonzalez Interview at 49:54-49:57), and the evidence reveals that his team requested a more substantial edit than Gonzalez ended up getting, this does not alter the conclusions in this determination. First, as WhiteHatWiki explained in significant detail, providing a strong citation support for the fact that Gonzalez was a Democrat, and making the point "stable" on the Wikipedia page, was a "major win" especially given the "controversy" around the point and the fact it was a "campaign issue" that was "central" to Gonzalez's campaign in 2022. (See above, Section III.B.) Second, money, time and substantial effort was expended to research, develop and post Edit No. 3, regardless of the fact its content changed over time or that Gonzalez ultimately may have wished it could have been more robust. A contribution does not cease to be a contribution simply because the candidate uses it to develop a message they end up having some buyer's remorse about.

In conclusion, the Auditor's Office concludes that the time, money, and services spent in researching, developing, drafting, reviewing, and posting Edit No. 3 regarding Gonzalez's political party affiliation is a contribution. The Auditor's Office also concludes that it is more likely than not money was spent on behalf of Gonzalez as a candidate and services were provided to Gonzalez as a candidate — not a City commissioner — in connection with this edit. As the City is not an entity that can make a contribution to a candidate, this is an unlawful contribution.[8]

**V.      The Auditor's Office assesses a penalty of $2,400, payable by Gonzalez in his capacity as a candidate, which will be deposited into the City's general fund.**

**A.      The Auditor's Office conservatively values the contribution at $800.**

The Auditor's Office assesses the value of the unlawful contribution at $800. This amount reflects 1/8 of the total cost paid to WhiteHatWiki, recognizing that Edit No. 3 was one of the eight contracted-for edits.

It is also a conservative estimate of the unlawful contribution. The amount could have been significantly higher for a number of reasons, including: a) the fact that WhiteHatWiki provided Gonzalez's Office a discount, reflecting that fair market value for

---

[8] The Auditor's Office typically finds both the contributor and the candidate in violation when an unlawful contribution is made and received. This case is unusual. Gonzalez acted as and for the City in this instance, and is the one who caused the City to make the contribution. The City does not have independent liability and it would serve no rational purpose for the City as a separate entity to be required to pay a civil penalty to itself.

15

the edit may be even higher;[9] b) the edit (at least in its originally intended form) appears to be significantly more valuable to Gonzalez than other edits, as reflected by the fact he first brought his party status up to Wikipedia administrators in 2022 and that his political party affiliation is a point his campaign has invested money in making in other contexts; and c) the $800 figure does not include the value of staff time developing, refining, and posting the Wikipedia edit.

### B.    Aggravating factors, including Gonzalez's interference in the investigation, justify increasing the civil penalty from the minimum amount.

The City Charter provides that each violation of the campaign finance provisions "shall be punishable by imposition of a civil fine which is not less than two nor more than twenty times the amount of the unlawful Contribution … at issue." (Charter Section 3-305.) Thus, the penalty must be between $1,600 and $16,000. Auditor's Office Administrative Rule 13.05(D)(4) contains several mitigating and aggravating factors that are considered in deciding whether to set the penalty at the minimum amount or higher.

Here, the Auditor's Office determines that a **fine of $2,400**, or three times the unlawful contribution ($800), is appropriate given the aggravating factors present. The most significant aggravating factor is Gonzalez's interference and lack of cooperation in this investigation. These actions include:

- Gonzalez emailed the Auditor to request that the Chief Deputy Auditor be "immediately" removed from this investigation, citing a conflict that does not exist, and claiming that the Auditor's Office's investigation into him "has had all the appearance of a politically orchestrated attack." (Ex. 22 at 3.) He also asked the Auditor to "void" the Auditor's Office's referral to the Secretary of State. (Ex. 22 at 3.)[10]

---

[9] See Ex. 4 at 1 (WhiteHatWiki offer of 15% "public servant discount").

[10] Gonzalez has suggested the Chief Deputy Auditor is somehow conflicted in this matter, and that renders the investigation and determination somehow suspect. The Auditor's Office disagrees. The Auditor's Office has detailed conflicts of interest policies. These internal policies carefully balance employees' First Amendment rights against their public duties, and were developed in coordination with the union that represents multiple Auditor's Office employees, including certain staff in the Elections Division.

There is no conflict here. The allegations of conflict appear to be based on the fact that Jackie Yerby, the primary complainant (the Auditor's Office received other complaints about the Wikipedia project as well), is on the board of directors of an organization, Portland for All, that the Chief Deputy Auditor's former partner is also on the board of. The Chief Deputy Auditor

16

- Gonzalez emailed Elections Division staff directly to complain about the investigation and claimed: "you are being manipulated with these election complaints in an attempt to taint the well as Portlanders decide their next mayor." (Ex. 17 at 1.)

- Smith verbally chastised a member of the Elections Division staff about the questions that were asked to him by another staff member who was performing their Charter-mandated duties.

- In addition to the above, Gonzalez's designees misled the Auditor's Office about a key document. During the course of the initial investigation, Gonzalez was asked by Auditor's Office staff, in writing, to provide what appeared to be a missing attachment to a key email. Gonzalez referred the Auditor's Office to Kass for the document (and referred the Auditor's Office to Smith for documents generally). Both told Auditor's Office staff (Smith verbally, Kass in writing) that there was no attachment. These turn out to have been false statements, as revealed when the City produced the full email with attachment in response to a public records request following the initial investigation. As discussed above, this document was critical in changing the determination from a finding of no violation to the finding of a violation. Whether Smith and Kass's misstatements were intentional or not, they had the effect of causing the Auditor's Office to issue an initial determination that was based on an incomplete and misleading record, resulted in a finding that would have been different if complete information had been provided during the initial investigation, and took unnecessary time and resources from the Auditor's Office during a critical election by prolonging the investigation.

The Auditor's Office has been charged with investigating and enforcing City law for almost two decades (starting with when the lobbying code was adopted in 2006). This is the first time this Office has seen an attempt to apply this magnitude of pressure on its staff by a person under investigation. We find this, and the misleading of the Auditor's

---

does not know Yerby and has no relationship with her. Yerby made the complaint in her individual capacity, with no reference to Portland for All in the complaint. While Portland for All has been outspoken in its opposition of Gonzalez's candidacy — as have others in the City — the mere fact that the Chief Deputy Auditor's former partner's current organization is politically opposed to Gonzalez is far too attenuated to establish a conflict of interest. In addition, the complainant and their motivations in making a complaint are wholly irrelevant to the Office's investigation of Gonzalez, and so nothing about Yerby, or any organization she is affiliated with, was under investigation in this matter. Moreover, there is no benefit that the Auditor's Office (let alone the Chief Deputy Auditor personally) stands to gain one way or the other based on the outcome of this investigation.

17

Office about a key document in the investigation, relevant in the context of determining penalties in this matter.

The other main aggravating factor present is that Gonzalez had significant resources at his disposal (both in the form of a well-resourced campaign and access to the City Attorney's Office) to obtain an opinion as to the propriety of spending City funds in this fashion. Given the media and public interest in this matter, it should have been obvious that, at the very least, this conduct could raise questions. Gonzalez is sufficiently well-resourced to have been able to get answers to those questions.

The Auditor's Office believes increasing the penalty from two times to three times the contribution is fair in light of the circumstances. All civil penalties paid to the Auditor's Office for campaign finance violations are deposited into the City's general fund for general City use.

## VI.     Payment

A penalty in the amount of $2,400 shall be paid (by Rene for Portland) to the City Auditor's Office. Payment shall be provided to the City Auditor's Office by **December 20, 2024**. Payment can be sent by mail or delivered to:

City of Portland Auditor's Office
1221 SW 4th Ave. Rm 130
Portland, OR 97204

## VII.     Additional Authority and Appeals

This Notice of Determination is issued pursuant to the Auditor's authority under City Charter Section 3-305 (Implementation and Enforcement). That section sets forth the process for implementation and enforcement of the provisions of City Charter Article 3 (Campaign Finance in Candidate Elections), including the recipient's appeal rights.  (See also Auditor's Office Administrative Rule 13.03(C) (requiring in part that decisions on complaints be in writing, identify whether a violation occurred, and state the basis for the decision).)

As described by City Charter Section 3-305(i) and Auditor's Office Administrative Rule ("ARA") 13.03 (D)(5)-(6), the complainant and the subject of the complaint may seek judicial review of the decision in Multnomah County Circuit Court.

As set out in ARA 13.03(D)(6), decisions of the Auditor's Office that are withdrawn for reconsideration can be appealed to the Circuit Court within 60 days from the issuance of the reissued decision.

Gonzalez Complaint, Ex. H-18

Sincerely,

Reed Brodersen
Chief Deputy Auditor

CC: Jackie Yerby, complainant

19

Gonzalez Complaint, Ex. H-19

# EXHIBIT A

Gonzalez Complaint, Ex. H-20

 

September 16, 2024

Rene Gonzalez
c/o Rene Gonzalez for Portland
P.O. Box 42307
Portland, Oregon 97242
**DELIVERED ELECTRONICALLY**
candidate@reneforportland.com
amy@reneforportland.com

## Notice of Determination
Complaint No. 2024-1-RG

Dear Rene Gonzalez:

### I.   Introduction and Overview

On August 16, 2024, the Elections Office, a Division within the Auditor's Office, received a complaint alleging that Rene Gonzalez had violated Portland's campaign finance law — which is enforced by the Auditor's Office — by receiving an unlawful contribution. (Ex. 21.) Gonzalez is both a current City commissioner and a candidate for mayor in the November 2024 election. The complaint referred to an Oregonian article reporting that Gonzalez had used $6,400 in City of Portland funds to "polish his Wikipedia page."[1] The complaint contended the funds were spent "to edit [Gonzalez's] Wikipedia page for his run for Mayor."  (Ex. 21 at 4.) The Auditor's Office provided this complaint to Gonzalez

---

[1] Dixon Kavanaugh, S. (2024, August 7). Portland Commissioner Rene Gonzalez spent thousands in city funds to polish Wikipedia page. *The Oregonian/OregonLive*. https://www.oregonlive.com/politics/2024/08/portland-commissioner-rene-gonzalez-spent-thousands-in-city-funds-to-polish-wikipedia-page.html.

1221 SW Fourth Ave, Room 310
Portland, OR 97204
reed.brodersen@portlandoregon.gov
portland.gov/auditor
503-823-4078

Gonzalez Complaint, Ex. H-21

on August 16, 2024, along with two other emails sent to the general Auditor's Office inbox on this topic.

After receiving the complaint, the Auditor's Office conducted an investigation, as detailed below. The Auditor's Office has determined that the evidence obtained to date is insufficient to find that a violation of the City's campaign finance law occurred. The Auditor's Office therefore issues a finding of **no violation**.

However, as set forth below, the Auditor's Office finds that this is an exceedingly close call. It is undisputed that Gonzalez's (City) office spent $6,400 of City funds to retain an independent contractor (WhiteHatWiki) to assist it in creating eight edits for the "Rene Gonzalez (politician)" Wikipedia page. The evidence the Auditor's Office has obtained to date suggests that Gonzalez's primary interest in the Wikipedia edit project was that he wanted to remove an entry on the Gonzalez Wikipedia page stating that he had been "criticized" by the Portland Mercury for tagging on Twitter a member of the far-right group, Patriot Prayer. In addition, multiple of the edits requested by Gonzalez's staff on his behalf that were developed in coordination with WhiteHatWiki — including one edit about the key elements of his mayoral platform — have no obvious relation to City business, and instead could be interpreted to relate to Gonzalez's campaign for mayor. Moreover, the evidence gathered to date shows that Gonzalez was aware of and, at least tacitly, approved of the substance of the eight edits. Depending on the particular facts and circumstances, such conduct could constitute a campaign finance violation.

In this particular case, there is mixed evidence about the motivations behind the Wikipedia edit project spearheaded by Gonzalez's office. To find a violation of the City's campaign finance law, the Auditor's Office must determine that it is more likely than not that the City provided funds or services to or on behalf of Gonzalez in his capacity as a candidate. While there are facts that suggest this transpired, based on the current record, the Auditor's Office does not believe they are strong enough to definitively outweigh contrary evidence that suggests that the funds and services were provided to Gonzalez in his capacity as a commissioner.

The Auditor's Office must conduct and complete investigations under short timelines (set out in City Charter). This is a complex investigation that goes well beyond looking at money spent and services received. While Gonzalez and his staff were helpful to the investigation in that they provided certain documents and sat for interviews, the Auditor's Office has not received all the documents it requested from Gonzalez. The Auditor's Office's outside counsel made a public records request to the City for additional materials, which the City is presently working on fulfilling. The Auditor's Office reserves the right, consistent with Auditor's Office Administrative Rule 13.03(D)(5), to withdraw for reconsideration this determination within the next 30 days in the event that

2

additional evidence is received that alters the Auditor's Office's conclusions in this determination.

The Auditor's Office also believes that, in light of facts unearthed in the investigation, a **referral to the Secretary of State's Office** is appropriate for a fuller investigation to determine whether any City employees engaged in prohibited political activities pursuant to ORS 260.432 and whether Commissioner Gonzalez violated ORS 260.432 by requesting employees engage in political advocacy during working hours. The Auditor's Office will forward this determination to the Secretary of State to conduct their own independent assessment.

## II. Investigation to Date

Under Charter, the Auditor's Office must issue a notification to all "objects" of a complaint within two business days of receiving a complaint; must accept written materials supporting or opposing a complaint for a period of 10 business days following such notification; and must render a decision within 10 business days after close of the material submission period. (City Charter 3-305(e).) These periods are reduced by half when the complaint is received within 30 days of the election. (City Charter 3-305(f).) These time periods mean investigations are necessarily compressed and even when all persons are acting in good faith to quickly provide and review materials, the short period to investigate and prepare a determination necessarily limits the scope of investigations in complex matters like this one.

Gonzalez and his (City) staff have cooperated with the Auditor's Office's investigation. Gonzalez sat for an interview with investigators and made his chief of staff and his policy advisor available for interviews as well. In addition, Gonzalez and his (City) staff have provided certain records requested by the Auditor's Office, primarily email communications between Gonzalez's staff and WhiteHatWiki. However, these were provided with gaps and content missing. (There is no reason to believe this is deliberate.) In addition, the Auditor's Office did not receive internal emails within Gonzalez's office pertaining to Wikipedia that the Auditor's Office requested. As a result, the Auditor's Office has made a public records request to the City, which is currently being fulfilled. Given the Charter-required timelines, this determination is being issued without review of these additional documents.

3

Gonzalez Complaint, Ex. H-23

## III. Factual Background

### A. In November 2022, Gonzalez attempted to edit the Rene Gonzalez Wikipedia page in his "campaign" capacity.

The "Rene Gonzalez (politician)" Wikipedia page was created on or around November 9, 2022, the day after the general election in which Gonzalez won a seat on Portland's City Council. (See Ex. 9 (Wikipedia edit trail).) The Wikipedia page came to Gonzalez's attention shortly thereafter. (Gonzalez Interview at 5:30-5:52.)

Before his term for City Council began, Gonzalez personally made requests for edits to the Wikipedia page, under the username "Reneforportland" (which later became the username "Pdxrose24"). (Gonzalez Interview at 5:53-6:55.)[2] Between November 19, 2022, and November 23, 2022, Gonzalez made both explicit requests that the page be edited (including a request that Wikipedia link to the Oregonian's endorsement of him) and provided information for a Wikipedia administrator to consider in connection with additional edits to the page. These edit requests can be found at Exhibit 8, under the header "Campaign Feedback." Gonzalez clarified to investigators that in November 2022 he was "involved in [the editing of Wikipedia] at the campaign level." (Gonzalez Interview at 6:19.)

Among the information that Gonzalez shared with a Wikipedia administrator in November 2022 was content on two topics relevant to the current campaign finance investigation:

- The first piece of information Gonzalez shared with Wikipedia related to his status as a Democrat.

- At the time, the Wikipedia page stated: "Though both candidates are registered Democrats, during the campaign Hardesty attempted to paint Gonzalez as right wing, with ties to Republican political consultants and conservative school board candidates supported by the political action committee he organized." (Ex. 10 (11/19/22 version of Wikipedia page), at 2.)

- On November 23, 2022, Gonzalez shared with a Wikipedia administrator that "the [Gonzalez] campaign sent a cease and desist letter to our opponent during the campaign for what we believed were inflammatory/false statements contributing to threat of political violence." (Ex. 8 at 3.) Gonzalez went on to cite

---

[2] Gonzalez initially went by "Reneforportland" on Wikipedia but he subsequently requested to change the name of his Wikipedia account to "Pdxrose24." (Ex. 11, Pdxrose24 "User talk.") This appears to have been successful.

4

to a Willamette Week article that labeled his opponent's "mailers as a 'lie.'" (Ex. 8 at 3.) Gonzalez also included a quote from the article that: "The implication [from the mailer is] that Rene Gonzalez is a Republican…. [B]ut he's a pro-choice Democrat." (Ex. 8 at 3.)

- Second, Gonzalez took issue with a mention of his social media "tag" to a member of a right-wing group, Patriot Prayer.

- At the time, the Wikipedia page stated: "The Portland Mercury criticized Gonzalez for posting an election thank you to supporters on his Twitter and tagging Quincy Franklin, a member of the far-right-wing group Patriot Prayer. Writer Steven Humphrey questioned if Gonzalez was actually a Democrat and said, 'Gonzalez eventually deleted the tweet without explanation or apology.'" (Ex. 10 (11/19/22 version of Wikipedia page), at 2.)

- On November 23, 2022, Gonzalez explained to a Wikipedia administrator that vandalism of his campaign office "is what led to the thank you to supporters on his [Gonzalez's] Twitter that tagged Quincy Franklin - we did not know who he [Franklin] was, but he had video taped words of encouragement and shared on instagram after office was vandalized and threatened with further vandalism. It was odd Mercury focused on the shared instagram post, without referencing the well documented vandalism and threats it was in response to." (Ex. 8 at 3.)

Gonzalez's attempts to further clarify his political party affiliation and to put in context the Twitter "tag" to the Patriot Prayer member got no traction on Wikipedia in 2022.

### B. In 2024, Gonzalez's Office hired WhiteHatWiki to assist it in drafting and submitting edits on the Rene Gonzalez Wikipedia page.

Gonzalez took office as a City Commissioner on January 1, 2023. In an interview with investigators, Gonzalez explained that he expected "from day one" that Wikipedia would be a part of his communications platform as a City Commissioner. (Gonzalez Interview at 11:57-12:11.) Commissioner Gonzalez's chief of staff, Shahriyar (Shah) Smith, recalls that the office began discussing the prospect of updating the Rene Gonzalez Wikipedia page in mid-2023 and began looking for vendors to assist in the process in October or November of 2023. (Smith Interview at 11:00-11:43.)

### 1. Gonzalez was a "candidate" at the time the Wikipedia editing project began to be discussed in his office.

Gonzalez publicly announced his candidacy for mayor on December 7, 2023. (Ex. 13.) However, it is more likely than not that he became a "candidate," as that term is used in City law, months before that date.[3]

It is not necessary to determine precisely when Gonzalez became a candidate, as that term is defined in City Charter, for purposes of this investigation. This is because it is more likely than not that Gonzalez was a candidate during all times the Wikipedia edit project was in process in his office. Specifically, under City (and state) law, a person can become a "candidate" by receiving and accepting a contribution, whether or not the office for which the individual will seek election is known when the contribution is received and accepted. (Portland City Charter Section 3-308, Intro & (a); Auditor's Office Administrative Rule 13, Appx B(A).)

Gonzalez was receiving and accepting contributions by mid-March 2023, which he did not return. He filed the contributions in ORESTAR (the Secretary of State's online filing system for candidate transactions). (See Ex. 12 (collection of selected cash contributions filed by Rene for Portland in ORESTAR with transaction dates in the first half of 2023); see also ORS 260.057 (the Secretary of State filing system is for "candidates and political committees" for purpose of filing "contributions received and expenditures made by the candidates and political committees").) It is thus more likely than not Gonzalez qualified as a candidate by, if not earlier than, March 2023.

---

[3] "Candidate," under City Charter, has the meaning set forth at ORS 260.005(1) as of January 1, 2018.  (See Portland City Charter Section 3-308, Intro & (a).) This definition is set out at Auditor's Office Administrative Rule 13, Appx B(A). A "candidate" includes an "individual whose name is printed on a ballot, for whom a declaration of candidacy, nominating petition or certificate of nomination to public office has been filed or whose name is expected to be or has been presented, with the individual's consent, for nomination or election to public office" as well as "an individual who has solicited or received and accepted a contribution, made an expenditure, or given consent to an individual, organization, political party or political committee to solicit or receive and accept a contribution or make an expenditure on the individual's behalf to secure nomination or election to any public office at any time, whether or not the office for which the individual will seek nomination or election is known when the solicitation is made, the contribution is received and retained or the expenditure is made, and whether or not the name of the individual is printed on a ballot[.]"

6

### 2. Gonzalez's (City) staff begin to search for a vendor to assist with Wikipedia edits in late 2023.

On November 25, 2023, Smith, in his capacity as the Commissioner's Chief of Staff,[4] reached out to WhiteHatWiki (whose legal name is Codename Enterprises, Inc.). (Ex. 2 at 18.) WhiteHatWiki is a vendor that provides Wikipedia-related services, including Wikipedia strategy and updates. They describe themselves as "perhaps the most experienced Wikipedia agency in the world in dealing with the full spectrum of Wikipedia scenarios, from page updates to dealing with warning flags and hostile editors, to new pages." (Ex. 15 (excerpt from WhiteHatWiki website).)

In his November 25, 2023, submission to WhiteHatWiki, Smith answered the question "How can we help you? Please be as detailed as possible" with the statement: "Prominent elected official looking to refresh Wikipedia Page related to 2022 election." (Ex. 2 at 18.) WhiteHatWiki responded the next day, and the Commissioner's Office followed up on December 12, 2023. In that December 12, 2023, email, the then-communications director for the Commissioner's Office explained that the Rene Gonzalez Wikipedia "page is exclusively focused on [Gonzalez's] initial city hall race and requires updates to his time as a commissioner and broader political trajectory within the city." (Ex. 1 at 8.)

On December 20, 2023, after an initial conversation with staff in the Commissioner's office, WhiteHatWiki emailed Gonzalez's then-communications director as well as Smith a proposal and draft contract. (Ex. 1 at 1-28.) Gonzalez contends the Wikipedia edit project was then "accelerated" after a January 12, 2024, arson event involving the burning of one of his family's vehicles outside his home.[5] (Gonzalez Interview at 13:05-13:11.) The Auditor's Office has been unable to verify the Wikipedia edit project was, in fact, accelerated after January 12, 2024, and notes that the plan to update the Wikipedia page was developed weeks prior to the arson.

On March 12, 2024, a contract securing WhiteHatWiki's services was fully executed. (Ex. 3.) The parties were identified as "City of Portland – Office of Portland City Commissioner Rene Gonzalez" and "Codename Enterprises, Inc." (doing business as WhiteHatWiki and Buzzr.com). (Ex. 3 at 1, 10.) The contract provides that WhiteHatWiki would work on assisting with "Request Edits" and/or "Contentious

---

[4] Smith also volunteers in his personal time for Gonzalez's campaign. (Smith Interview at 2:27-2:31.)

[5] See Zielinski, A. (2024, January 12). Portland police investigating care fire in front of Commissioner Gonzalez's house. *Oregon Public Broadcasting*. https://www.opb.org/article/2024/01/12/portland-eastmoreland-district-oregon-fire-rene-gonzalez-crime-car-arson-police/.

7

Gonzalez Complaint, Ex. H-27

Matters." (Ex. 3, § 1.0.) Both types of projects involve developing and advocating for edits on the Wikipedia page; what differentiates them is how much controversy or difficulty there is surrounding the edits. (See Ex. 3, § 4.0.)

### 3. The City contracted to pay WhiteHatWiki $6,400 to assist it with eight edits to the Gonzalez Wikipedia page.

Ultimately, Gonzalez's office chose to ask WhiteHatWiki to provide it with "8 Request Edits" under the terms of the contract. (See Exs. 4, 5.) For this, WhiteHatWiki charged the City $6,400, which the City paid in two installments (one on March 25, 2024, and one on June 17, 2024). (Ex. 14.)

Under the contract, WhiteHatWiki agreed to a number of deliverables in connection with these eight "Request Edits."  These included: a kick off discussion to review client needs; developing a list of up to eight proposed "Request Edits" in consultation with Commissioner Gonzalez's office; searching for "reliable sources" as defined by Wikipedia; review of similar Wikipedia "Good Articles" to propose as models; preparing the Request Edit language for submission with full "Wiki coding"; preparing a detailed explanation for Wikipedia reviewers describing the rationale and/or policy explaining Request Edits; recommending a strategy for requesting independent review; discussing the recommended proposal with Commissioner Gonzalez's Office; up to two rounds of revisions; and training a designee on the submission process and making appropriate notifications to the independent Wikipedia editors. (See Ex. 3, § 2.0.)

Documents reviewed by the Auditor's Office confirm that work on the Request Edits began shortly after the contract was signed. (See, for example, Exs. 6A-6C.)

### C. Gonzalez was meaningfully involved in the development of the edits to the Gonzalez Wikipedia page, and staff ran the edits past him before they were finalized.

The evidence collected to date establishes that it is more likely than not that Gonzalez was aware, at a minimum, of the substance and focus of all of the eight "Request Edits" submitted on his behalf to Wikipedia. He formed this knowledge through, at a minimum, more than one conversation with his staff prior to the submission of the edits to Wikipedia. He also provided his feedback on the edits, and they were all run by him to give him an opportunity to comment. While staff stated he did not formally "sign off," his review and discussion on multiple occasions, and position as leader of the office, qualifies as his assent to the substance of the edits.

Specifically, Harrison Kass, Commissioner Gonzalez's policy advisor, shared with investigators that when he joined the Commissioner's office in February 2024, the decision to edit the Wikipedia page had already been made. He was assigned to work

on the Wikipedia edits with WhiteHatWiki shortly after his arrival at the City and described his role as a "middleman" between WhiteHatWiki and Gonzalez. (Kass Interview at 8:05-8:08.)

Kass and WhiteHatWiki exchanged ideas for edits over the course of a few months (March – June, 2024.) Kass stated that he did not care for the Wikipedia project, so he "slow-walked" it. (Kass Interview at 8:11-8:17.)  As a result, he recalls having several discussions with Gonzalez and others in the office about the status and content of the Wikipedia edits. (Kass Interview at 8:33-11:07.)

According to Kass, the Wikipedia edits under consideration with WhiteHatWiki were frequently an agenda item during the full office's Monday meetings. (Kass Interview at 8:37-9:00.) Kass estimates the Wikipedia edits were discussed four to five times at these Monday meetings during the course of a few months. (Kass Interview at 8:52-9:00.) He further recalls that Gonzalez was present for the meetings "consistently," although reflected that it is possible Gonzalez was not there every single time. (Kass Interview at 9:19-9:24.) In addition, Kass informed investigators that because he was slow on the project, Gonzalez would check in with him periodically (about once a month) for an update. (Kass Interview at 10:26-10:37.)

When Kass was asked by investigators who gave him directions on the edits, he clarified it was an "ongoing thing" and that Gonzalez "wanted the Patriot prayer thing" addressed. (Kass Interview at 7:35-7:40.) He further said he checked in with Gonzalez every couple of weeks on the progress. (Kass Interview at 7:41-7:50.) Kass would relay WhiteHatWiki's suggested edits to Gonzalez, who would give his feedback, and then Kass would relay that back to the vendor.  (Kass Interview at 7:52-8:05.) Kass also informed investigators that while Gonzalez did not formally sign off on the edits, the substance of the edits all "came across [Gonzalez's] desk," although Kass himself may have made some very "granular" changes that he did not bother "to run up the chain."[6] (Kass Interview at 11:37-12:38.)

### D.  The City submitted eight edit requests to Wikipedia on June 25, 2024.

The eight "Request Edits" that were developed in connection with WhiteHatWiki were submitted to Wikipedia (by Harrison Kass) on June 25, 2024. The eight edits were as follows (see Ex. 8 at 3-6):

---

[6] Kass's recollection is far more detailed than, but not inconsistent with, Gonzalez's. Gonzalez recalled that at some point he saw the requested edits but did not recall when. (Gonzalez Interview at 36:39-37:12.) The Auditor's Office found Kass credible and that he spoke with candor and has no reason to disbelieve his statements on the extent of Gonzalez's involvement in considering and reviewing the Wikipedia edits.

9

1. "In the Infobox, please add his law degree from Willamette University."

2. "I have a few updates for the **Early life and career** section. The first is to change this sentence from this: Gonzalez was raised in Anchorage, Alaska, where his father worked as a trial judge and federal prosecutor.

    *to this*:

    Gonzalez was raised in Anchorage, Alaska, where his father, a Mexican American, worked as a trial judge and federal prosecutor."

3. "In the **Portland City Council, Council race** section, please change the first clause of the third paragraph.

    From:

    Though both candidates were registered Democrats,

    *To this*:

    Though both candidates were Democrats,"

4. "In the **Portland City Council, Council race** section, please remove the last sentence of the third paragraph:

    The Portland Mercury criticized Gonzalez for posting an election thank you to supporters on his Twitter and tagging Quincy Franklin, a member of the far-right-wing group Patriot Prayer."

5. "In the **Portland City Council, Council term** section, please combine the first two sentences, which currently read:

    Gonzalez's term began on January 1, 2023. The transition team is being headed by Tom Miller, a former chief of staff for former city commissioner Sam Adams. Gonzalez will serve a two-year term before needing to run again.

    *To this*:

    Gonzalez's two-year term began on January 1, 2023. The transition team was led by Tom Miller, who had served as chief of staff for former Portland mayor Sam Adams."

6. "In the **Portland City Council, Council term** section, please update the last sentence that reads:

    Gonzalez was assigned management of Portland Fire & Rescue and other emergency services, excluding the police department.

    *To this*:

10

Gonzalez was assigned management of Portland Fire & Rescue, the Bureau of Emergency Communications, and Portland Bureau of Emergency Management."

7. "In the **Portland City Council, Council term** section, please add a new sentence to the end of the paragraph:

In September 2023, a drug criminalization law proposed by Gonzalez and Portland Mayor Ted Wheeler was unanimously passed by Portland City Council."

8. "In the **Portland City Council, Council term** section, please add a new paragraph to the end of the section:

In December 2023, Gonzalez announced his candidacy for mayor of Portland on the platform of public safety, homelessness, drugs, and revitalizing the economy."[7]

### E. Additional Background on Edit Numbers 4, 8, and 3.

As discussed in more detail below, as a general matter, if the City (acting through an elected official or otherwise) funds communications on behalf of an elected official, even one running for office, and those communications focus on the work the elected official has accomplished while in office, the City will typically not be making a contribution to the official in their capacity as a candidate.[8] Here, only two of the eight requested edits relate on their face to Gonzalez's work as a City Commissioner and arguably only one is substantive.[9] However, this determination focuses on the three requested edits that are furthest afield from Gonzalez's City business. These three edits are:

- **Edit No. 4**: This is the request to remove the reference to Gonzalez tagging a Patriot Prayer member in his post-election Twitter thank you, which occurred before he began his term.

---

[7] Citation notations are omitted from all quotes for readability.

[8] This is a general proposition; unique facts and circumstances could be present that would put a specific scenario outside of the general rule.

[9] Edit No. 7 relates to Gonzalez's work on a drug criminalization law while a member of City Council. Edit No. 6 relates to his work as Commissioner but is not particularly substantive—it asks for "other emergency services, excluding the police department" to be replaced with "the Bureau of Emergency Communications, and Portland Bureau of Emergency Management." A Wikipedia administrator rejected the latter edit on the grounds that the source provided "seems to support the current language, and I'm confused why you called out the specific ones you did." (Ex. 8 at 4-5.)

11

- **Edit No. 8**: This request was to add Gonzalez's candidacy for mayor and his mayoral platform, which is unrelated to Gonzalez's role as a City Commissioner.

- **Edit No. 3**: This is the request to modify a detail about Gonzalez's political party affiliation. Commissioner is a nonpartisan position in Portland.

   1. **The attempted removal of the reference to the Patriot Prayer Twitter tag (Edit No. 4) appears to be the motivation for the Wikipedia edit project.**

The evidence the Elections Office has obtained to date suggests that Gonzalez's primary interest in the Wikipedia edits was that he wanted removed the entry on the Wikipedia page stating that he was "criticized" by the Portland Mercury for tagging a member of the far-right group, Patriot Prayer, in his election thank you on Twitter.

Specifically, according to Harrison Kass, his understanding, which he initially heard about second hand, was that Gonzalez was "pissed about" the Patriot Prayer reference on Wikipedia and it was "stuck in his craw." (Kass Interview at 2:49-2:59.) Kass also clarified that he later learned directly "from Rene" that Gonzalez's "emphasis" was on getting rid of the Patriot Prayer mention. (Kass Interview at 18:20-18:40, 40:55.) Kass further described his understanding of the overall purpose of the project of proposing Wikipedia edits as:

> My understanding of the purpose was that there were inaccuracies. Yeah, I know Rene was bothered like by inaccuracies or partial truths with a lack of context that was not flattering… The Patriot Prayer thing, retweet, was what was really bugging him.

(Kass Interview at 4:33-5:06.)

Kass also stated to investigators that there was "never any doubt on my end" that he was supposed to get the Patriot Prayer reference removed and that "it came up plenty... that was clear to me." (Kass Interview at 40:20-40:38.) Gonzalez also agrees that he put an emphasis on the Patriot Prayer issue in the edits and told investigators he did not think his concern about the Patriot Prayer mention was lost on his team, and that the Patriot Prayer edit request could be attributed directly to Gonzalez. (Gonzalez Interview at 39:12-39:58.)

Consistent with Kass's statements to investigators, the removal of the Patriot Prayer tag reference was suggested in the first round of edits prepared by Kass and a colleague in March 2022. (*See* Ex. 6, 6B.)  It likewise appeared in versions of the Wikipedia "request edits" that WhiteHatWiki prepared and shared (via Google document) with Kass on April 24, 2022, May 12, 2024, and June 25, 2024. (Ex. 7 at 4, 8-9, 12.)

Gonzalez Complaint, Ex. H-32

**2. The mayoral platform edit (No. 8) appears to have been suggested by WhiteHatWiki but submitted to Wikipedia with Gonzalez's knowledge and assent.**

It appears from the information the Auditor's Office has been able to obtain that the requested edit to add that Gonzalez was running for Mayor and the key elements of his mayoral platform was initially suggested by WhiteHatWiki.

Specifically, on April 5, 2024, Marisa Bramwell (of WhiteHatWiki) told Kass that "[o]n your redline document" — sent to WhiteHatWiki on March 21, 2024 — there's a list at the bottom of things you want added - are there one or two that are top priority? I'm adding in a line about his run for mayor ... so if there's something else you'd like to add please let me know."  (Ex. 1 at 30.) The Auditor's Office has been unsuccessful in obtaining the attachment to this email. However, Kass told investigators that WhiteHatWiki suggested the mayoral edit. (Kass Interview at 42:55-43:15.)

Kass did not respond to tell WhiteHatWiki not to make Gonzalez's run for mayor one of the eight Request Edits. (See Ex. 1 at 30.) From the documents reviewed by the Auditor's Office, both the fact of Gonzalez's mayoral run and the key elements of his mayoral platform appeared in versions of the Wikipedia "request edits" that WhiteHatWiki prepared and shared (via google document) with Kass on April 24, 2022, May 12, 2024, and June 25, 2024. (Ex. 7 at 7, 10, 13.)  The language of edit No. 8 regarding Gonzalez's mayoral platform points is unchanged from, at the earliest, April 24, 2022, through the date of submission to Wikipedia. (Ex. 7 at 7, 10, 13.) Given the date the language was settled upon, and Kass's description of the edit process, it is more likely than not Gonzalez was aware of, and assented to, the mayoral platform edit before its submission to Wikipedia.[10]

**3. It appears that it was important from the beginning of the project to Gonzalez's staff to emphasize he was a registered Democrat, but WhiteHatWiki could not find adequate publicly available support for the edit and suggested deleting "registered."**

The evidence the Auditor's Office has received to date pertaining to the origin of Edit No. 3 — removing the word "registered" before "Democrats" — is inconclusive. The Auditor's Office does not currently have access to the original edit proposal emailed from Gonzalez's office to WhiteHatWiki. But documents internal to the Gonzalez office from March 2024 reveal staff was contemplating adding that he was a "Democratic"

---

[10] Smith also approved of this and all other edits. Smith wrote to WhiteHatWiki on June 10, 2024: "We accept all edits." (Ex. 20 at 6 (emails provided to the Auditor's Office in the order shown in Ex. 20).)

13

politician. (Ex. 16C.) They further contemplated an addition to the Wikipedia page along the lines of: "Gonzalez has been registered as a Democrat for X years." (Ex. 6C.) The evidence the Auditor's Office has received to date also suggests that WhiteHatWiki could not adequately confirm from publicly available sources that Gonzalez was a registered Democrat, and that they proposed deletion of "registered," which Kass and Smith pushed back on as a mere "grammatical" change.

Investigators asked Kass the intention behind Edit No. 3. His response was:

> There's a yeah, there's a misunderstanding that he's a Republican and that kind of related to the, this idea that he was supporting Patriot Prayer or whatever. So I know that's bothered him for a long time. And obviously it's a kind of Portland-specific problem, though [unintelligible – 55:54] so far to the left. But yeah, I think it was just addressing something that was an inaccuracy, like emphasize that he's a registered Democrat. He's I think he like voted for Biden. So yeah, that was bugging him.

(Kass Interview at 55:24-56:09.)

Prior to the edits being submitted to Wikipedia, Gonzalez's staff had a dispute with WhiteHatWiki about Edit No. 3. The correspondence on this issue was provided to the Auditor's Office in a manner that is hard to track (pages out of order and text missing) but it would appear that the change from "registered Democrats" to "Democrats" appeared in both the April 24, 2024, and May 13, 2024, versions of the edits WhiteHatWiki exchanged with Gonzalez's Office. (Ex. 7 at 8, 12.)

However, it also appears the issue was discussed on May 8, 2024, and that WhiteHatWiki told Gonzalez's Office in a comment on a shared Google document: "You asked that we try to research that he is a registered Democrat. We had to do a lot of research to eliminate the possibility that it appeared somewhere. Once we found it did not, we found a source that came as close as possible."  (Ex. 20 at 1.[11]) It appears that subsequently, in or around early June 2024, Kass rejected the edit striking "registered" and asked WhiteHatWiki to substitute the edit with "a substantive addition that introduced one of our policy principles (AMR staffing model)." (Ex. 20 at 8.)

WhiteHatWiki responded that Edit No. 3 "was on your list for us to work on and was included in a prior round and approved."  (Ex. 20 at 7.) WhiteHatWiki stated that Gonzalez's Office was under no obligation to use a rejected item, but that it would not add another edit at that date. (See Ex. 20 at 7.) After the situation escalated, WhiteHatWiki wrote to Kass that: "We have explained this all, but let's go over it again.

---

[11] Exhibit 20 was provided to the Auditor's Office as an excerpt from a large PDF; the pages were provided in the order shown in Exhibit 20.

14

You want to leave in the article that he is a registered Democrat. Whether he is a registered Democrat was a campaign issue central to the City Council campaign. This is not grammar," — the email provided to the Auditor's Office cuts off here. (Ex. 20 at 5.)

Smith got involved and told WhiteHatWiki this was not a meaningful edit and it was unacceptable. Ultimately, however, the edits proceeded as WhiteHatWiki suggested, and Edit No. 8 was submitted to Wikipedia after Smith concurred. (Ex. 20 at 6.)

## IV. DETERMINATION

The Auditor's Office has determined that the evidence is insufficient to find that a violation of the Portland City Charter's campaign finance regulations occurred.

The questions before the Auditor's Office are whether, in paying WhiteHatWiki for assisting Gonzalez's Office in making edits to the Rene Gonzalez Wikipedia page, and in providing services of City staff to make edits to Gonzalez's Wikipedia page, the City (acting through Commissioner Gonzalez's office) made an unlawful contribution to Gonzalez in his capacity as a candidate and whether Gonzalez (or his candidate committee) accepted an unlawful contribution. The Auditor's Office concludes that this is an exceedingly close call, but that the evidence it has gathered to date does not establish that it is more likely than not that Gonzalez received a "contribution" from the City.

Although the Auditor's Office does not find a violation here, the Auditor's Office believes it is important to clarify that this is not because the conduct that Gonzalez and his staff engaged in could not constitute a campaign finance violation. Instead, this is because of the mixed nature of the evidence about the motivations behind the Wikipedia edit project and the requested edits.

### A. City Charter limits the amounts and sources of candidate contributions.

City Charter provides that a candidate may receive only the following contributions:

- $500 — adjusted by inflation to be $579 for the current election cycle — from any individual or political committee other than a "Small Donor Committee;"

- Any amount from a qualified "Small Donor Committee;" and

- For candidates participating in the Small Donor Elections program (like Gonzalez), any amount permitted by the Small Donor Elections program.[12]

---

[12] City Charter Sections 3-301, 3-304.

Gonzalez Complaint, Ex. H-35

There are several forms a "contribution" can take. For purposes of this determination, it suffices to say a "contribution" includes both the payment of money to or on behalf of a candidate and also the furnishing, without equivalent compensation or consideration, of services or any other thing of value to or on behalf of a candidate.[13]

### B. City funds spent to provide services to a City official, who is also a candidate, could qualify as a contribution to the official in their capacity as a candidate depending on the particular facts and circumstances.

The Auditor's Office has determined Gonzalez was a "candidate" as of March 2023 — well before the City paid WhiteHatWiki or incurred the liability to do so. (See above at Section III.B.1.)

The Auditor's Office also concludes that if the City hires and pays for a vendor to assist an elected official in messaging that is for the purpose of assisting the elected official in their capacity as a candidate, that could be an unlawful "contribution" as that term is defined in City Charter. The City is not a contributor from which a candidate can lawfully receive a donation under City Charter (the City is not an individual, a political committee, or a small donor committee). In addition, the amount paid to WhiteHatWiki was $6,400 — well above the $579 contribution limit. Even if the edits were priced individually, it would be reasonable to value each of the eight edits at $800 (one-eighth of the total cost).[14]

The crucial question to be answered in this case is thus whether the City paid WhiteHatWiki, and made WhiteHatWiki's services, as well as City staff services, available to Gonzalez in his capacity as a candidate. The Auditor's Office does not view an elected official's communications that are limited to discussion of the elected official's acts in office as a "contribution" to the elected official in their capacity as a candidate. It would unduly chill speech for a communication from an elected official to their constituents about the official's actions and accomplishments in office to be considered campaign activity.

But on the other hand, if an elected official running for office uses the resources and money of the City at the official's disposal to issue communications that are unrelated to City business, and instead are campaign communications, this _could_ constitute an unlawful contribution from the City to the elected official that violates campaign finance

---

[13] Portland City Charter Section 3-308, Intro & (a); Auditor's Office Administrative Rule 13, Appx B(A).

[14] The Small Donor Elections program has provided an advisory opinion to the Auditor's Office that, if the amounts paid to WhiteHatWiki constitute a contribution to Gonzalez, that would not be a permissible contribution under the Small Donor Elections Program's rules. (Ex. 19.)

16

law. Imagine, for example, that instead of Gonzalez having knowledge that his staff was requesting an edit to Wikipedia highlighting his mayoral platform that was worked on with a vendor using City money and City resources, Gonzalez knew that his staff, using City money and City resources, was erecting a billboard in downtown Portland stating: "Rene Gonzalez is running for Mayor on the platform of public safety, homelessness, drugs, and revitalizing the economy." The Auditor's Office would have no hesitation concluding that this was a campaign finance violation.

The challenge here is that some of the requested Wikipedia edits that Gonzalez either sought, or his staff developed with his knowledge and consent, fall within the realm of clearly permissible forms of communication, while others, on their face, go beyond mere communication about his in-office work and priorities. In particular, the edits discussed above at Section III.E pertaining to the Patriot Prayer Twitter tag, Gonzalez's key mayoral platform items, and Gonzalez's political party affiliation are, on their face, unrelated to Gonzalez's activities as a City Commissioner and are all issues that are or have been campaign issues for Gonzalez. However, the evidence to date does not clearly establish that at the time WhiteHatWiki was hired, at the time funds were promised or paid to WhiteHatWiki, or at the time WhiteHatWiki and City staff worked on edits for Gonzalez's benefit, these three edits were being sought for Gonzalez in his capacity as a candidate.

> **C. The evidence does not establish that it is more likely than not the City gave money or provided services to or on behalf of Gonzalez in his capacity as a candidate.**

This section discusses the Auditor's Office's conclusions with respect to each of the three edits that the Auditor's Office believes are closest to edits paid for and provided to Gonzalez in his capacity as a candidate, as opposed to a City commissioner: edit numbers 4 (Patriot Prayer), 8 (mayoral platform), and 3 (political party affiliation).

For all three edits, the Auditor's Office finds the following are true:

- The three edits are all ones that Gonzalez has identified as campaign issues presently or in the past. Edit No. 8 (mayor platform) is Gonzalez's mayoral platform — clearly a campaign issue. Edits No. 4 (related to Patriot Prayer) and No. 3 (regarding his political party affiliation) are ones Gonzalez raised in November 2022, in the aftermath of the election, and in his "campaign" capacity. (See above at Section III.A.)

- Gonzalez had knowledge of the three edits before they were submitted. (See above at Section III.C.)

17

- Gonzalez consented to the submission of the three edits before they were submitted. (See above at Section III.C.)

- Aside from Gonzalez himself, there is no evidence of any involvement of Gonzalez's campaign staff in the Wikipedia edit project. While Smith is a volunteer for the campaign, there is no evidence that he has a role in the campaign that would encompass accepting contributions, determining appropriate expenditures, or issuing communications.

### 1. The current evidence in the record does not establish that the Patriot Prayer edit rises to the level of a contribution.

The request to remove the reference to the tag on Twitter of a Patriot Prayer member (edit No. 4) is apparently the driving force behind the Wikipedia edit project. (See above at Section III.E.1.) While an argument could be made that the reason Gonzalez and his staff sought the edit was to benefit him in his capacity as a candidate, the current record is insufficient to establish this is more likely than not the case.

On the one hand, Gonzalez and Smith contend that there is a direct nexus between the requested edit and City business. Gonzalez has explained to investigators that he was motivated to address the Patriot Prayer tag mention on Wikipedia because of safety concerns. Specifically, Gonzalez told investigators that he thought the way he was being "painted online" was creating "security risks to an elected official." (Gonzalez Interview at 51:00.) Gonzalez and Smith do not deny that Gonzalez tagged a Patriot Prayer member in his election thank you post on Twitter. But as Gonzalez described it, he has received threats tied to the perception of being "right wing" and the Patriot Prayer edit "is brought up along, including in … some of the threats." (Gonzalez Interview at 54:35-56:16.) Gonzalez further contends that the security risk he faces undermines his ability to function as elected. (Gonzalez Interview at 51:51-51:55.)

On the other hand, while there is concrete evidence Gonzalez has faced threats, including some as a result of the perception he supports Patriot Prayer, there is also mixed evidence as to whether this was the motivating factor for the Wikipedia edits. Notably, Kass does not mention safety concerns as a reason for the edit. Instead, he thought having the Patriot Prayer mention on Wikipedia "degrad[ed] confidence," and while he stated that he does not believe Gonzalez was motivated to remove the mention of the Patriot Prayer reference to benefit his campaign, Kass acknowledged that "in most of America you can't be associated with radical right wing and be a viable candidate for about anything." (Kass Interview at 1:16:41-1:16:46.) In addition, this was an issue that Gonzalez directly engaged Wikipedia on — with no success — in the days following the November 2022 election, in his capacity as a candidate and before he was a City commissioner. (See above at Section III.A.) And as Kass explained, for

18

Gonzalez, the "Patriot Prayer bit just, you know, stuck in his craw." (Kass Interview at 2:54-2:57.)

In addition, cutting in favor of concluding that the purpose of the edit was to benefit Gonzalez as a candidate is that the "rationale" that Kass submitted to Wikipedia with this edit included that: "This author is a partisan who is very open that he was trying to keep Gonzalez from getting elected and wants to damage him politically in the future." (Ex. 8 at 4.)  On the other hand, Kass distanced himself from the rationales, said that WhiteHatWiki prepared the rationales, and stated that Gonzalez did not review them. (Kass Interview at 1:08:31-1:08:41, 1:09:01-1:09:23.) It remains unclear from the evidence gathered to date if the rationales reflect information that Gonzalez's staff gave to WhiteHatWiki or if WhiteHatWiki simply prepared rationales with what it thought would be most compelling to Wikipedia administrators.

Given that there is some evidence of nexus to safety concerns, in the absence of additional evidence that Gonzalez and his staff were motivated for the purpose of benefiting him as a candidate, the Auditor's Office concludes that there is insufficient evidence to establish the finding of a violation on the basis of the Patriot Prayer edit.

### 2. The current evidence in the record does not establish that the mayoral platform edit rises to the level of a contribution.

Gonzalez's mayoral platform is clearly related to his candidacy. In addition, the evidence is Gonzalez knew about, and assented to, this edit request.

However, the Auditor's Office is unable to conclude that the cost associated with the edit or services provided in connection with the edit were provided to or on behalf of Gonzalez in his capacity as a candidate. The edit appears to have been suggested by WhiteHatWiki and drafted by WhiteHatWiki. There is, at present, no evidence that Gonzalez or his staff expressly asked for any mention of his candidacy when they paid or committed to pay funds to WhiteHatWiki. And while the evidence suggests Gonzalez knew about and, at a minimum, tacitly approved of the edit, Gonzalez and his staff also understood from WhiteHatWiki that they needed to offer noncontroversial "ministerial" edits to get some of the more controversial ones (like the Patriot Prayer one) made. (Gonzalez Interview at 1:01:32-1:01:45; Smith Interview at 17:35-18:35.) The choice of Gonzalez's mayoral platform, as opposed to some other "ministerial" edit, is certainly questionable. In fact, Gonzalez himself stated that "I don't really see the benefit to the city one way or another either, except as it relates to getting other changes that are important to the city." (Gonzalez Interview at 1:02:57-1:03:07.)

However, the intention of the contributor matters to the outcome. The contributor in this case would be the City, acting through Gonzalez's office. The evidence presently in the record does not establish that it is more likely than not that when the obligation to pay

19

WhiteHatWiki was incurred, the City (acting through Gonzalez's office) intended to refer to his mayoral platform. Nor is there evidence that the City (again, acting through Gonzalez's office) provided services to Gonzalez in the form of drafting or providing input on the mayoral edit. Instead, the evidence at present is that WhiteHatWiki suggested the edit, drafted the edit, and drafted the accompanying rationale. While Kass apparently submitted it to Wikipedia, this was with the other edits that Gonzalez and his team did provide meaningful input on, and there is no evidence Kass provided any incremental service to Gonzalez in copying and pasting the edit with the others.

3.  **The current evidence in the record does not establish that the removal of Gonzalez being a "registered" Democrat rises to the level of a contribution.**

Finally, as with the other two edits, the Auditor's Office is unable to conclude on the present record that the edit to remove "registered" from before "Democrat" results from funds spent or services provided to Gonzalez in his capacity as a candidate. There is conflicting evidence in the present record about how and why the edit arose, who asked for it, and whether it provided any benefit to Gonzalez at all.

One interpretation of the record evidence is that Gonzalez and his staff wanted, and spent City resources on trying to get, a beefed-up entry on the Rene Gonzalez Wikipedia page about his political party affiliation, but that WhiteHatWiki could not find evidence to support it. Spending resources to search for evidence to bolster the public record that Gonzalez is a registered Democrat, when he serves in a nonpartisan role, may very well be a contribution to a candidate. But the Auditor's Office lacks all the underlying communications on this issue, and only has partial emails exchanged between the vendor and Gonzalez's staff, some of which suggest that Gonzalez's office did not want this to be one of their edits. The Auditor's Office cannot conclude on the current record that it is more likely than not that the cost and services associated with this edit is a contribution.

D.  **Gonzalez's responses to the Complaint are not persuasive and are not the basis of the Auditor's Office's determination.**

While the Auditor's Office does not find any violation, the Auditor's Office does think it is worth addressing certain points made by Gonzalez in his response to the complaint. The Auditor's Office did not find those contentions persuasive and does not base its finding of no violation on the response.

On August 30, 2024, Gonzalez provided the Auditor's Office with a formal response to the complaint. (Exs. 16A-16C.) In addition, on September 5, 2024, he provided

20

additional comments, which appear to be a supplement to his response. (Ex. 17.) Both are discussed below.

First, Gonzalez argues that "[n]o campaign staff have directed or have been involved in the June 2024 Wikipedia requested changes or engaged with the vendor." (Ex. 16B at 2.) The Auditor's Office finds this irrelevant as Gonzalez is the candidate and was involved in reviewing and approving the edits before submission. He further acknowledges that at least one edit (the Patriot Prayer edit) can be attributed to him.

Second, Gonzalez argues that the complaint does not specify who the donor is, which he contends violates basic principles of due process. The Auditor's Office disagrees. Complainants will not always know the identity of a contributor. Here, the alleged contribution was clearly identified, and the facts of who engaged and paid for the services at issue (the City) were well known to Gonzalez. He has been afforded a meaningful opportunity to understand the basis of the alleged violation.

Third, Gonzalez argues that office communications do not constitute a campaign contribution.[15] The Auditor's Office disagrees this is necessarily true. Instead, as discussed above (see Section IV.B), this is a fact-specific determination. Moreover, the Auditor's Office has reviewed Gonzalez's City X (Twitter) account and his campaign (ReneforPortland) X account. Gonzalez uses the former for communicating about official City business, and the latter for communicating about items like his mayoral platform and his political affiliation. (See Ex. 18 (excel capture of content from X account, reflecting at least 6 mentions of Gonzalez's alignment or affiliation with Democrats) at 1, 2, 13.) This underscores that Gonzalez himself recognizes the difference between communicating about City business and communicating about campaign-related matters.[16]

---

[15] Relatedly, Gonzalez points to the fact that Commissioner Rubio, one of his opponents in the mayoral race, "regularly touts her accomplishments on platforms supported by city staff or use [sic] city resources in the months leading up to the election." (Ex. 16B at 4.) However, the examples Gonzalez provided are communications squarely related to Commissioner Rubio's work as a commissioner, unlike some of the Wikipedia edits discussed in this determination.

[16] Gonzalez also offers examples of federal elected officials editing Wikipedia pages nearly two decades ago as evidence that there is no contribution here, as well as the fact that Representative Salinas is expected to spend taxpayer funds on communicating with constituents. (Ex. 16B at 2-3.) The Auditor's Office does not find this relevant. It is unclear what the nature or content of the edits on federal officials' Wikipedia pages was, whether the edits were confined to discussions of the officials' time in office, or whether anyone contended there was a campaign finance violation. As for Representative Salinas, the U.S. House of Representatives forbids members from using federal funds to issue communications for personal or political reasons or with campaign content and the House has a process in place for determining whether communications are permissible before they are issued. (This is, in

Fourth, Gonzalez contends that the complaint that resulted in the investigation here is based on an "error-filled news article." (Ex. 16B at 5.) The Auditor's Office is required to examine all campaign finance complaints to determine whether a violation occurred, and to make any investigation necessary. The Auditor's Office has done its own investigation, and in this case, has not relied on the complaint or news articles in coming to its determination.

Fifth, Gonzalez claims the complaint is politically motivated, a point reiterated in his supplemental email. (Ex. 16B at 5; Ex. 17 at 1.) The political motivations of complainants are irrelevant to the Auditor's Office. Under City Charter, the Auditor's Office _must_ take all written complaints of campaign finance violations. (See City Charter Section 3-305(c)-(e).) The Auditor's Office is administratively independent of the City and all elected officials aside from the City Auditor and is best positioned to address allegations of campaign finance violations without a public perception of undue interference. The Auditor's Office strives for impartiality in the administration of elections and enforcement of campaign finance regulations and conducts full and complete investigations. This case is no different.

Sixth, in his supplemental email, Gonzalez contends this is a "rehash of 2022," when a complaint was filed and the Small Donors Elections Program's determination that Gonzalez had accepted an impermissible contribution was reversed by an administrative law judge. (Ex. 17 at 1.) Gonzalez further contends "you are being manipulated with these election complaints in an attempt to taint the well as Portlanders decide their next mayor. "(Ex. 17 at 1.) The Auditor's Office disputes this contention. The people of Portland voted to add the campaign finance regulations, including the related enforcement provisions, to Charter; these require the Auditor to accept and investigate complaints. The Auditor's Office believes there are reasons that merit a full investigation here. The Auditor's Office has made a reasoned and impartial determination after conducting as complete an investigation as possible given the circumstances and time restrictions. Moreover, the Auditor's Office elections staff are seasoned professionals and the Auditor's Office finds it is concerning in the current climate to paint them as susceptible to political influence.[17]

---

fact, covered in the article cited in footnote 4 of Ex. 16B.) In addition, City/State law does not entirely parallel federal law on the definition of "contribution."

[17] Gonzalez also stated that the Elections Office chooses to publish investigations that are pending. (Ex. 17 at 1.) This is incorrect; the Elections Office does not do so. This investigation became a matter of public knowledge after a public records request was made. The complainant also went public about the complaint filed with the Elections Office.

22

## V.  Conclusion and Referral to Secretary of State

For the reasons discussed above, the Auditor's Office finds no violation. However, the Auditor's Office is continuing its investigation by obtaining and reviewing additional materials from Gonzalez's (City) office and reserves the right, consistent with its administrative rules, to amend this determination within 30 days if additional evidence obtained alters the Auditor's Office's conclusions.

Moreover, the Auditor's Office refers this matter to the Secretary of State. The Auditor's Office believes that a fuller record may lead to the conclusion that one or more individuals in Commissioner Gonzalez's office violated ORS 260.432, which is in the purview of the Secretary of State to determine.

## VI. Additional Authority and Appeals

This Notice of Determination is issued pursuant to the Auditor's authority under City Charter Section 3-305 (Implementation and Enforcement). That section sets forth the process for implementation and enforcement of the provisions of City Charter Article 3 (Campaign Finance in Candidate Elections), including the recipient's appeal rights.  (See also Auditor's Office Administrative Rule 13.03 (C) (requiring in part that decisions on complaints be in writing, identify whether a violation occurred, and state the basis for the decision).)

As described by City Charter Section 3-305(i) and Auditor's Office Administrative Rule ("ARA") 13.03 (D)(5)-(6), the complainant and the subject of the complaint may seek judicial review of the decision in Multnomah County Circuit Court. In addition, the Auditor's Office may, on its own discretion or on request of an interested party, withdraw a decision for reconsideration within the earlier of 30 days from issuance of the decision or until the decision is appealed.

As set out in ARA 13.03(D)(6), decisions of the Auditor's Office can be appealed to the Circuit Court within the following timelines:

- For decisions that are not withdrawn for reconsideration, within 60 days from the issuance of a decision; and

- For decisions that are withdrawn for reconsideration, within 60 days from the issuance of the reissued decision.

23

Gonzalez Complaint, Ex. H-43

Sincerely,

Reed Brodersen
Chief Deputy Auditor

CC: Jackie Yerby, complainant

24